Daniel M. Abuhoff (dmabuhof@debevoise.com)
Olga Kaplan (okaplan@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6696

*Attorneys for Plaintiff Harbinger F&G, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ x
HARBINGER F&G, LLC,  :  Index No. 12-civ-5315 (RA)
 :
            Plaintiff,  :  ECF Case
v.  :
 :  **COMPLAINT**
OM GROUP (UK Limited),  :
 :
            Defendant.  :
------------------------------------------ x

Plaintiff Harbinger F&G LLC (formerly known as Harbinger OM, LLC) ("Harbinger" or "Buyer"), by and through its undersigned counsel, as its Complaint against Defendant OM Group (UK Limited) ("OM" or "Seller"), alleges as follows:

## NATURE OF THE CASE

1. Harbinger brings this action for OM's breach of its obligation to reduce the purchase price for Harbinger's acquisition of Old Mutual U.S. Life Holdings, Inc. (the "Acquisition").

2. The Acquisition price was premised on Harbinger's ability to complete a specified reinsurance transaction. The reinsurance transaction was subject to approval by the Maryland Insurance Administration (the "MIA") subsequent to the Acquisition's closing. The MIA, however, disapproved the reinsurance transaction, triggering a $50 million reduction in the purchase price pursuant to the parties' First Amended and

Restated Stock Purchase Agreement dated February 17, 2011 (the "Stock Purchase Agreement").  [Exhibit 1]

3. OM has refused to effect the purchase price reduction because, according to OM, Harbinger did not make sufficient efforts to persuade the MIA to reverse its disapproval of the reinsurance transaction.  Under the Stock Purchase Agreement, OM is obligated to reduce the purchase price irrespective of Harbinger's efforts in this regard.  In any event, because the reinsurance transaction was a key component of the Acquisition for Harbinger, Harbinger did strive to persuade the MIA to change course.  This effort was unsuccessful because the MIA disapproved the reinsurance transaction based on fundamental aspects of the reinsurance transaction that are central to the value for which Harbinger negotiated and, according to the parties' Stock Purchase Agreement, are not subject to change, even to satisfy the MIA.

## PARTIES

4. Harbinger is a privately held holding company organized under the laws of Delaware and headquartered at 450 Park Avenue, 30th Floor, New York, NY 10022.

5. OM is a multi-line insurance corporation organized under the laws of England and Wales.  It has offices and its primary place of business in London, England.

## JURISDICTION AND VENUE

6. Personal jurisdiction over the defendant is proper because OM agreed in Section 12.7 of the Stock Purchase Agreement to irrevocably submit itself to the

jurisdiction of this Court.  The relevant portion of Section 12.7(b) of the Stock Purchase Agreement provides:

> Each of Seller and Buyer hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any court of the United States of America or any state court, which in either case is located in the City of New York (each, a "New York Court") for purposes of enforcing this Agreement or determining any claim arising from or related to the transactions contemplated by this Agreement.

7. Personal jurisdiction over the defendant is also proper in this Court because the events giving rise to this action, including the principal closing of the Acquisition, occurred in New York.

8. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the controversy is between a citizen of a state and a citizen of a foreign state and Plaintiff seeks monies in an amount well in excess of $75,000.

9. Venue is proper under 28 U.S.C. § 1391, as OM is a corporation subject to personal jurisdiction in this District, and, therefore, is deemed a resident of this District pursuant to 28 U.S.C. § 1391(c).

10. Venue in this District is proper also because, in Section 12.7(b) of the Stock Purchase Agreement, OM irrevocably and unconditionally waived any objection to the laying of venue in an action such as this one in this Court.  The relevant portion of Section 12.7(b) of the Stock Purchase Agreement provides:

> In any such action, suit or other proceeding, each of Seller and Buyer irrevocably and unconditionally waives and agrees not to assert by way of motion, as a defense or otherwise any claim that it is not subject to the jurisdiction of any such

New York Court, that such action, suit or other proceeding is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper . . . .

## FACTS

11.     On February 17, 2011, OM and Harbinger entered into the Stock Purchase Agreement pursuant to which Harbinger was to acquire all of the capital stock of Old Mutual U.S. Life Holdings, Inc., OM's entire US-based insurance business, for approximately $350 million.  The primary holding Harbinger acquired was a company then named OM Financial Life Insurance Company ("OMFLIC"), a Maryland-domiciled life, accident and health insurance company subsequently renamed Fidelity & Guaranty Life Insurance Company ("FG Life").  FG Life is regulated primarily by the MIA.

12.     Harbinger is a wholly owned subsidiary of Harbinger Group, Inc., a company that is majority owned by funds managed by Harbinger Capital Partners LLC. Harbinger Capital Partners LLC is an investment firm that specializes in managing below-investment-grade assets.  A core competency of Harbinger Capital Partners LLC is in capitalizing opportunities within the distressed marketplace, and its success has resulted from its ability to identify value in this marketplace.  A significant component of the economic benefits the parties expected Harbinger to derive from the acquisition was by virtue of a reinsurance transaction with FG Life to be entered into after the closing by an offshore reinsurance company wholly owned by Harbinger (the "Reinsurance Transaction").  By virtue of the Reinsurance Transaction, a Harbinger affiliate was to act as an asset manager for approximately $1 billion of below-investment-grade assets,

providing it the opportunity to use its specialization in the distressed marketplace to seek high investment returns.

**The Reinsurance Transaction**

13. The terms of the Reinsurance Transaction were set out in Exhibit K to the Stock Purchase Agreement (the "Reinsurance Term Sheet"). [Exhibit 2]  In the Reinsurance Transaction, FG Life was to enter into a reinsurance agreement with Front Street Re Ltd. ("Front Street"), an affiliate of Harbinger.  FG Life would transfer to Front Street approximately $3 billion of assets (or statutory reserves) that supported FG Life's annuity policies.  Front Street would place approximately $1 billion of these assets in a New York-based trust account ("Trust Account") where the assets would not be subject to restrictions under Maryland laws concerning the management of reserve assets.  This would allow the Trust Account to be comprised of below-investment-grade assets and managed in accordance with liberal investment guidelines known as the "Trust Account Investment Guidelines." [Exhibit A of the Reinsurance Term Sheet]  An affiliate of Harbinger would be appointed asset manager of the Trust Account, and would utilize its expertise in distressed debt to first convert the entire Trust Account into below-investment grade assets and then actively manage the Trust Account.

14. The remaining reserves, approximately $2 billion, were to be in the possession of FG Life on a funds withheld basis (the "Funds Withheld").  Unlike the Trust Account, the Funds Withheld account would be subject to Maryland law concerning management of reserve assets and would be managed by third party managers such as

5

Goldman Sachs Asset Management in accordance with conservative investment guidelines known as the "Funds Withheld Investment Guidelines." [Exhibit B of the Reinsurance Term Sheet]. The assets would all be investment-grade.

15. Harbinger looked to the Reinsurance Transaction—in particular, the opportunity to manage $1 billion of assets in the Trust Account in accordance with the Trust Account Investment Guidelines—as a significant component of the economic value it expected to achieve from the Acquisition.

16. The Reinsurance Transaction was subject to approval by the MIA. Because the parties understood that the inability to complete the Reinsurance Transaction would fundamentally compromise the value of the Acquisition for Harbinger, the parties agreed in the original Stock Purchase Agreement, dated August 5, 2010 (the "Original Stock Purchase Agreement"), that the MIA's approval of the Reinsurance Transaction was a closing condition -- that is, that the Acquisition could not be closed unless and until the Reinsurance Transaction was approved by the MIA. [Exhibit 3, Section 7.2(a)] A number of reasons prevented OM and Harbinger from closing on the Original Stock Purchase Agreement, including doubts about the MIA's willingness to approve the Reinsurance Transaction.

**The Reinsurance Transaction Provisions of the Stock Purchase Agreement**

17. To allow the acquisition contemplated under the Original Stock Purchase Agreement to proceed, Harbinger and OM restructured the terms of their purchase agreement so that the MIA's approval of the Reinsurance Transaction would no longer be

6

a condition to closing. Instead, the parties protected Harbinger's value in the Acquisition by providing that if the MIA did not approve the Reinsurance Transaction after the closing, OM would reduce the Acquisition purchase price by $50 million. This is referred to in the Stock Purchase Agreement as the "Post-Closing PP Reduction." [Section 5.21(f)(ii)]

18. The parties further agreed that, if the MIA conditioned approval of the Reinsurance Transaction on changes or alterations, then Harbinger and OM would undertake "Remedial Efforts" to attempt to gain the MIA's approval. [Section 5.21(d)] In those situations in which Remedial Efforts were required, each of OM and Harbinger would "use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that would be acceptable" to the MIA and that provided to Harbinger "benefits substantially similar to the benefits provided under the existing terms." [Section 5.21(d)]

19. There were limitations on the obligation to undertake Remedial Efforts. As noted above, the parties were under no obligation to engage in Remedial Efforts unless the MIA conditioned approval on changes or alterations to the Reinsurance Transaction. Even in these circumstances, Remedial Efforts were not required beyond 150 days following the MIA's disapproval. Furthermore, Harbinger was not required to make fundamental changes to the Reinsurance Transaction to satisfy the MIA. In particular, Harbinger was not required to agree to any "Adverse Reinsurance Transaction Condition or Restriction," including any condition or restriction (i) "not customarily imposed in

7

transactions of the type contemplated by the terms of the Reinsurance Transaction," (ii) that require[d] the taking of any action . . . in substance inconsistent with the substantive terms set forth in the Reinsurance Transaction Term Sheet, that would adversely affect in any material respect the economic benefits reasonably expected to be derived by" Harbinger, or (iii) "that require any substantive change in the investment guidelines applicable to the assets in the Trust Account." [Section 5.21(d)]

**Harbinger Seeks Approval of the Reinsurance Transaction**

20. Harbinger strived to have the Reinsurance Transaction approved. Harbinger filed an application with the MIA for the Reinsurance Transaction's approval on July 26, 2011. The application documents submitted to the MIA were substantially on the terms set forth in the Reinsurance Term Sheet and had been reviewed and agreed to by OM.

21. Over the course of the next six months, Harbinger (and FG Life) advocated for the Reinsurance Transaction's approval through numerous letters, telephone calls, and an in-person meeting with the MIA on November 16, 2011. Harbinger explained the terms of the Reinsurance Transaction, addressed the MIA's specific questions and points, and provided additional documentation. Harbinger even amended agreements related to the Reinsurance Transaction in response to the MIA.

22. Throughout the application process, Harbinger closely cooperated with OM. Harbinger kept OM apprised of correspondence with the MIA, gave OM the

opportunity to review and edit written submissions to the MIA, and invited OM to participate in all telephone calls and meetings with the MIA.

23. Despite Harbinger's efforts, the MIA called FG Life on December 22, 2011 to inform the company that the Reinsurance Transaction was not being approved. The MIA sent an official disapproval by letter dated January 10, 2012.

24. The MIA disapproved the Reinsurance Transaction for two principal reasons. First, the MIA was concerned about the risks associated with supporting FG Life's obligations with below-investment-grade assets per the Trust Account Investment Guidelines. Second, the MIA was concerned that the proposed sale of certain investment-grade assets after their transfer to the Trust Account would generate an unreasonable profit or gain for Front Street that would be unfair to FG Life.

25. Harbinger immediately notified OM of both the MIA's telephone call and the written disapproval of the Reinsurance Transaction and discussed with OM the appropriate next steps.

26. Because the MIA flatly disapproved the Reinsurance Transaction, and did not condition its approval on changes or alterations, the Stock Purchase Agreement did not impose upon either party the obligation to take Remedial Efforts. But Harbinger was intent on completing the Reinsurance Transaction, and persisted in its efforts to persuade the MIA. Within a week of the MIA's written disapproval, representatives of Harbinger had a teleconference with representatives of the MIA and requested a meeting with the

MIA Commissioner to explore the MIA's thinking and to correct what Harbinger suspected were errors in the MIA's analysis. Harbinger succeeded in arranging a meeting with the MIA Commissioner for January 23, 2012 to be attended by Harbinger, FG Life and OM's counsel at Dewey & LeBoeuf LLP. OM declined to attend.

27. Before the meeting could take place, Harbinger discovered that the MIA's negative decision rested in part on a report prepared by the MIA's actuarial consultant, Lewis & Ellis, Inc. (the "Actuarial Report"). The MIA had scheduled the meeting on the mistaken assumption that Harbinger had already had the opportunity to review and analyze the Actuarial Report. When it became clear that Harbinger had not been provided the Actuarial Report, and therefore would not be prepared to engage with the MIA, the meeting was postponed (with OM's full knowledge and approval).

28. Harbinger reviewed the Actuarial Report and discovered that it contained errors that may have led to the MIA's second concern with the Reinsurance Transaction, namely, the amount of unrealized gains in the transferred assets. Harbinger sought a meeting with Lewis & Ellis, but the MIA would not allow it. Instead, Harbinger had prepared and submitted, on February 9, 2012, a written analysis by an outside actuarial firm, Milliman, Inc., that identified incorrect assumptions and flawed analysis in the Actuarial Report related to the second concern noted above.

29. Harbinger and its counsel met with the MIA on February 14, 2012 and on March 15, 2012. Despite the importance of these meetings, OM failed to attend and did

not call in.  Its counsel at Dewey & LeBoeuf dialed in, but did not attend in person.

30. From these meetings and Harbinger's other interactions with the MIA, it became clear that whatever progress might be made on the unrealized gains issue, the MIA would not be swayed on its first principal objection to the Reinsurance Transaction, namely, the composition of the Trust Account pursuant to the Trust Account Investment Guidelines.  That the Trust Account would be composed of below-investment grade assets was a central component of the Reinsurance Term Sheet and critical to Harbinger's realization of its economic value expected from the Acquisition.

31. Harbinger and OM continued to consider alternate reinsurance transactions.  On May 2, 2012, OM submitted to Harbinger proposed terms that it thought necessary to satisfy the MIA.  Under OM's proposal, Front Street would initially transfer to the Trust Account, and Harbinger would manage, only approximately $500 million of assets – in contrast to the $1 billion asset transfer contemplated by the Reinsurance Term Sheet.  This proposal, which would have significantly reduced the economic value the parties expected Harbinger to achieve from the investment of the assets in the Trust Account in accordance with the Trust Account Investment Guidelines, constituted an Adverse Reinsurance Transaction Condition or Restriction under the Stock Purchase Agreement.  Harbinger studied and discussed with OM its proposal, but ultimately rejected it by letter dated May 15, 2012.

32. Harbinger continued to exchange communications with OM through the

end of June 2012.  Throughout this time, Harbinger cooperated with OM and remained ready and willing to work with OM towards a proposal to the MIA that would not constitute an Adverse Reinsurance Transaction or Condition.  Despite Harbinger's efforts to engage in meaningful discussion with OM, the parties' have not been able to formulate a revised Reinsurance Transaction in accordance with the Stock Purchase Agreement and Reinsurance Term Sheet.

## CAUSE OF ACTION – BREACH OF CONTRACT
### (Section 5.21(f)(ii) & 5.21(f)(iii))

33. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

34. OM has an unambiguous and binding obligation under the Stock Purchase Agreement to reduce the purchase price of the Transaction by $50 million in the event of the MIA's disapproval of the Reinsurance Transaction.

35. Harbinger used reasonable best efforts—including letters, meetings and telephone calls with the MIA and the incurrence of significant legal and actuarial expenses—to obtain the MIA's approval for the Reinsurance Transaction.

36. Nevertheless, on January 10, 2012, the MIA disapproved the Reinsurance Transaction in writing.

37. Because the MIA flatly disapproved the Reinsurance Transaction, and did not require that the terms of the Reinsurance Transaction be changed or altered, Harbinger

was not obligated to take Remedial Efforts pursuant to the Stock Purchase Agreement.

38. Nevertheless, when the MIA disapproved the Reinsurance Transaction, Harbinger made substantial efforts to coordinate with OM and persuade the MIA to change its position. These efforts were not successful because the MIA's objection to the Reinsurance Transaction is to the Trust Account Investment Guidelines, a central component of the Reinsurance Transaction. Changes in these guidelines would constitute an Adverse Reinsurance Transaction or Restriction to which Harbinger was not obligated to agree.

39. On April 6, 2012, Harbinger sent OM a notice of the Post-Closing PP Reduction of $50 million containing the basis for the reduction along with copies of the MIA's disapproval and all correspondence between Harbinger and the MIA. [Section 5.21(f)(iii)]

40. Notwithstanding the fact that the MIA flatly disapproved the Reinsurance Transaction, Harbinger undertook Remedial Efforts for a period of more than 150 days. Following that period, on July 6, 2012, Harbinger sent OM a renewed notice of Post-Closing PP Reduction of $50 million. [Section 5.21(f)(iii)]

41. OM has refused to comply with the terms of the Stock Purchase Agreement and has disclaimed any responsibility to reimburse Harbinger $50 million.

42. OM rejected Harbinger's request for the Post-Closing PP Reduction. Prior to the commencement of this litigation, Omar Asali, a senior officer of Harbinger, and

Philip Broadly, a senior officer of OM, discussed the issues herein and attempted to resolve the dispute without success.

43. OM's failure to pay Harbinger the Post-Closing PP Reduction of $50 million is a breach of Section 5.21(f)(ii) and Section 5.21(f)(iii) of the Stock Purchase Agreement.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment awarding Harbinger:

(1) The Post-Closing PP Reduction of $50 million, plus pre-judgment interest as permitted by law;

(2) Plaintiff's attorneys' fees, costs, and other expenses; and

(3) Such other and further relief as is just and proper.

Dated:   New York, New York
         July 9, 2012

                              DEBEVOISE & PLIMPTON LLP


                              By: /s/   Daniel M. Abuhoff
                                  Daniel M. Abuhoff (dmabuhof@debevoise.com)
                                  Olga Kaplan (okaplan@debevoise.com)

                              919 Third Avenue
                              New York, New York 10022
                              (212) 909-6000

                              *Attorneys for Harbinger F&G, LLC*

14