UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARBINGER F&G, LLC,<br><br>Plaintiff,<br><br>v.<br><br>OM GROUP (UK) Limited,<br><br>Defendant. | No. 12-civ-5315 (RA)<br><br>ECF Case |

**DECLARATION OF KONSTANTINOS (GUS) CHELIOTIS**

I, Konstantinos (Gus) Cheliotis, hereby declare as follows:

1. I serve as Vice President and Investment Counsel at Harbinger Group, Inc. ("HGI"), the parent company of Harbinger F&G, LLC ("Harbinger"). I advised Harbinger as its in-house counsel on the transaction at issue in this litigation. I submit this declaration based on personal knowledge in support of Harbinger F&G LLC's ("Harbinger") motion for summary judgment against OM Group (UK) Limited ("OM").

**Background**

2. I received my J.D., *summa cum laude*, from New York Law School and have over ten years of experience practicing law. From 2002 to 2010, I was an associate at Milbank, Tweed, Hadley & McCloy LLP, in the firm's Merger & Acquisitions group. While at Milbank, I represented public and private companies in connection with mergers and acquisitions in a variety of industries, including insurance. I joined Harbinger Capital Partners, the majority owner of Harbinger's parent company, HGI, in May 2010 and moved to HGI in June 2012.

## Negotiations

3. On August 5, 2010, Harbinger and OM entered into the Stock Purchase Agreement (the "Original SPA") for the acquisition by Harbinger of the company now known as Fidelity and Guaranty Life Insurance Company ("FG Life") (the "Acquisition"). As internal counsel for Harbinger, I assisted with negotiations and reviewed drafts of the Original SPA. *See* Original SPA.[1]

4. A significant portion of the economic benefits that Harbinger expected to derive from the Acquisition would come from the reinsurance transaction (the "Reinsurance Transaction") contemplated between FG Life and Harbinger's subsidiary, Front Street Re Ltd. ("Front Street"). Harbinger specializes in managing below-investment-grade assets. Through the Reinsurance Transaction, Harbinger intended to utilize its competency to manage $1 billion of below-investment-grade assets.

5. The Original SPA protected Harbinger's economic interests in the Reinsurance Transaction by, among other things, making regulatory approval of the Reinsurance Transaction a condition to the closing of the Acquisition. ***Id.*** at Section 7.2(a).

6. Harbinger submitted a draft Form D application for the Reinsurance Transaction on September 17, 2010 under the Original SPA. *See* **Ex. 10** at HARB-E0120206 (Potter Feb. 18, 2011 Ltr.).[2]

---

1 The Original SPA is attached as Exhibit 3 to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013 ("Kaplan Declaration").

2 "Ex. __" refers to the exhibits attached to the Kaplan Declaration.

7. Beginning in January 2011, Harbinger and OM negotiated an Amended and Restated Stock Purchase Agreement (the "SPA"). I assisted with negotiations and reviewed drafts of the SPA.

8. During these negotiations, OM sought to remove regulatory approval of the Reinsurance Transaction between FG Life and Front Street as a closing condition to the SPA. **Ex. 8**, Plaintiff's Exhibit ("PX") 32, at OM-HARB-0002940. Specifically, OM requested that "the condition as to approval of the 'Reinsurance Transaction' (i.e. the Front Street transaction) [be] deleted" from the original Stock Purchase Agreement dated August 5, 2010 (the "Original SPA") and that Harbinger wait to seek regulatory approval of the Reinsurance Transaction until after the Acquisition closed. ***Id.***

9. As it had previously advised OM, Harbinger responded that its ability to manage $1 billion in below-investment-grade assets as part of the Reinsurance Transaction was central to the deal and constituted a significant portion of the economic benefits that Harbinger sought to derive from the Acquisition. *See* **Ex. 9**, PX 33, at OM-HARB-0002944. Harbinger specializes in managing distressed assets and intended to manage the $1 billion of below-investment-grade assets in accordance with its investment approach.

10. Harbinger agreed to eliminate regulatory approval for the Reinsurance Transaction as a closing condition in exchange for OM's promise to reduce the Acquisition purchase price by $50 million if regulatory approval was not forthcoming. ***Id.*** at OM-HARB-0002945.

11. The terms of this post-closing purchase price adjustment were set forth in Section 5.21 of the SPA, dated February 17, 2011. *See* SPA at Section 5.21.[3]

12. By letter to the Maryland Insurance Administration (the "MIA") dated February 18, 2011, Harbinger withdrew the draft Form D submitted on September 17, 2010, and described the changes in the SPA with respect to the Reinsurance Transaction. **Ex. 10** at HARB-E0120205-09 (Potter Feb. 18, 2011 Ltr.).

13. FG Life is domiciled in Maryland, and is regulated primarily by the MIA. Because the Reinsurance Transaction was between two affiliated companies, FG Life and Front Street, approval of the MIA pursuant to a "Form D" application was required.

14. FG Life's then-Chief Financial Officer Barry G. Ward and FG Life's General Counsel Eric Marhoun led the efforts to obtain MIA approval of the Reinsurance Transaction because of their extensive experience with the MIA. They began working on gaining approval of the Form D prior to the close of the Acquisition, while FG Life was still part of OM, and they continued these efforts after the close of the Acquisition, when FG Life became part of Harbinger.

15. I reviewed drafts of the Form D application, which was submitted to the MIA on July 26, 2011. Following the Form D submission, the MIA sent Harbinger and FG Life numerous questions about the Reinsurance Transaction. I assisted with responding to these requests. During the five-month pendency of the Form D review, Harbinger did everything it reasonably could to get the Reinsurance Transaction approved because this transaction would have provided substantial economic benefits to Harbinger and its subsidiaries.

---

3 The SPA is attached as Exhibit 1 to the Kaplan Declaration.

**Reinsurance Transaction Denial**

16. On December 22, 2011, I was informed by HGI's Managing Director of Investments Phil Gass, Mr. Ward and/or Mr. Marhoun, that the MIA had disapproved the Reinsurance Transaction, first, because the MIA was concerned about the risks associated with supporting FG Life's obligations with the size of below-investment-grade assets permitted by the investment guidelines and, second, because it appeared to the MIA that the sale of certain assets would generate an unreasonable amount of unrealized gains for Front Street that would be unfair to FG Life.

17. Between the December 22nd call from the MIA and the January 10, 2012 denial letter, OM expressed concerns about obtaining a final denial letter from the MIA because OM believed the letter would make it more difficult to change the MIA's decision. This is not something I agreed with because I felt a final denial letter would provide a clear understanding for the basis of the MIA's denial, which Harbinger and OM could utilize in trying to agree on an alternative transaction. Nevertheless, Harbinger was willing to explore with OM and the MIA alternatives to obtaining a final denial letter, so long as this would not undermine the timing with respect to dealings with the MIA and the possible purchase price adjustment.

18. I spoke to Michael Devins, Harbinger's outside counsel at Debevoise & Plimpton LLP about potential solutions that would address OM's concerns about obtaining a final order, including requesting the MIA delay the final order for 150 days while the parties revised the transaction. I understand that Mr. Devins presented these proposals to OM and stated that Harbinger was open to any suggestion from OM. OM rejected our proposals and declined to present any alternative.

19. On January 10, 2011 the MIA sent a formal disapproval letter stating that it had disapproved the Transaction because of two concerns, first, that the amount of below-investment-grade assets in the Trust Account could have an adverse effect on FG Life's policyholders and, second, that the amount of unrealized gains to be ceded from FG Life to Front Street was unfair to FG Life. **Ex. 37**, Defendant's Deposition Exhibit ("DX") 7, at HARB-E0140247-51.

20. On the first point, the MIA stated:

> [W]e believe that the structure of the proposed transaction potentially adversely affects the interests of F&G Life's policyholders. This is a result of the significant increase in the amount of below-investment-grade assets ultimately supporting F&G Life's policyholder obligations under the proposed transaction. . . . The proposed transaction provides that the investment-grade assets would be sold, and the proceeds reinvested in below-investment-grade assets. While the Company believes the investment manager would employ an appropriate investment strategy to mitigate the risk from below-investment-grade assets, there is no assurance that the investment manager will successfully mitigate the risks. Furthermore, it is unclear that [Front Street] could safely generate sufficient investment returns from the assets in the trust account in order to meet its obligations under the treaty, given its plans to invest in below-investment-grade assets. ***Id.*** at HARB-E0140250.

21. FG Life (and Harbinger) hired Ralph Tyler, a MIA Commissioner, to assist in attempting to persuade the MIA to reverse its decision not to approve the Reinsurance Transaction. Although we were not obligated to seek a revised transaction under the SPA, we wanted to get a deal done because it would provide substantial benefits to us and our subsidiaries.

22. Less than a week after receiving the written denial, we contacted the MIA and scheduled a meeting for January 23, 2012. Before the meeting occurred, however, we learned

that the MIA was under the mistaken impression that we had been provided, and reviewed, the report from Lewis & Ellis, Inc., their outside actuarial firm. With OM's consent, we postponed this meeting with the MIA to review the Lewis & Ellis report, which was now provided.

23. On or about January 20, 2012, the MIA provided Harbinger with the Lewis & Ellis report, which informed the MIA's decision. The Lewis & Ellis report evaluated the Reinsurance Transaction and laid out the same objections found in the MIA's denial letter. *See* **Ex. 40**, DX 8, at HARB-E0136254-65.

24. Our actuaries identified a number of errors in the Lewis & Ellis report that appeared related to the MIA's second stated concern about the amount of unrealized gains being transferred to Front Street. We asked to meet with Lewis & Ellis, but were denied that opportunity. We had our outside actuarial firm, Milliman, Inc., submit a written report to the MIA on February 9, 2012 identifying and correcting the errors in the Lewis & Ellis report. **Ex. 47**, DX 12, at HARB-E0001215-16. We then scheduled an in-person meeting with the MIA Commissioner and her staff for February 14, 2012.

25. I participated in the February 14, 2012 meeting with the MIA. The participants from Harbinger, Front Street and FG Life included Messrs. Gass, Ward, Marhoun, Tyler and Devins and Laird Zacheis, Harbinger's actuarial consultant, and John Tweedie, Front Street's Chief Executive Officer. OM's outside counsel also participated in the meeting. Present for the MIA were Commissioner Therese Goldsmith and Assistant Attorney General Van Dorsey. The Commissioner stated that the two reasons provided in the denial letter, concerning the amount of below-investment-grade assets and the unrealized gains, were the only two reasons for the denial. She also informed us that these two reasons each served as an independent basis for the denial and that the MIA did not have any concerns about Harbinger as asset manager. The

Commissioner declined to discuss the Reinsurance Transaction in further detail until FG Life waived its right to an appeal.

26. I understood that OM agreed with Harbinger that waiving the right to appeal was the best course of action. Therefore, FG Life waived its right to an appeal.

27. Harbinger then scheduled another meeting with the MIA on March 15, 2012. At that meeting, the MIA staff objected to the investment guidelines, specifically concerning the size of, and quality of assets in, the trust account because, in their view, the existing guidelines created significant risks to FG Life they would not tolerate.

28. After the March 15 meeting, on that same day, we held an internal meeting. Everyone agreed that the MIA had made clear that the transaction would not be approved with the existing investment guidelines and that any deal revised to attempt to satisfy the MIA would not preserve the benefits we had bargained for with respect to the Reinsurance Transaction. The investment guidelines and the amount in the Trust Account could not be altered without reducing the economics of the deal and constituting an Adverse Reinsurance Transaction Condition or Restriction. We also agreed that the unrealized gain issue could be remedied through further discussions but did not matter, given the MIA's position on the investment guidelines.

29. We reached out to OM to see if they had any viable proposals. I assisted Mr. Gass in connection with these efforts.

30. In response to our request for alternatives to the Reinsurance Transaction, OM sent us, on May 2, 2012, one written proposal. **Ex. 61**, DX 82, at OM-HARB-0005487-501. This proposal capped the amount of below-investment-grade assets at $500 million. ***Id.*** at OM-HARB-0005489. It stated that an additional $500 million in below-investment-grade assets may

be transferred "following the satisfaction of investment performance criteria to be agreed by the [MIA]," with no details about what the criteria would be. ***Id.*** at OM-HARB-0005489-90.

31. Harbinger did not view the investment performance criteria as a practical solution. We would receive substantially lower returns prior to the satisfaction of these criteria, and we had no protection if the criteria were never satisfied. OM's proposal significantly reduced Harbinger's economic benefit from the transaction and essentially transferred the risk of the disapproval of the Reinsurance Transaction to Harbinger, which was not what Harbinger had bargained for as part of the Acquisition.

32. We reviewed and considered OM's proposal, including its implications under the SPA. Messrs. Devins, Gass and I had a phone conference with OM and asked OM a series of questions, including about the investment performance criteria. OM had no specifics to share with us.

33. We concluded and informed OM that their proposal would constitute an Adverse Reinsurance Transaction or Condition and was consistent with our conclusion that no revised transaction that met the terms contemplated by the SPA could satisfy the MIA. We told OM that we were open to additional proposals from them, but they did not send us any other proposal. **Ex. 62**, PX 76, at HARB-E0112014.

34. Prior to initiating this litigation, Omar Asali, the President of Harbinger, and Philip Broadley, the Group Finance Director of OM's parent company, spoke by telephone and corresponded by email in an attempt to resolve the parties' dispute. I participated in those efforts.

35. OM did not reimburse Harbinger the Post-Closing PP Reduction.

**The Revised Reinsurance Transaction**

36. On September 28, 2012, FG Life submitted a new Form D to the MIA for a revised reinsurance agreement with Front Street (the "Revised Reinsurance Transaction"). **Ex. 65**, DX 115, at HARB-E0137021-139. This transaction was approved by the MIA on December 13, 2012. I participated in discussions about the terms for this transaction and reviewed drafts of the Form D prior to submission.

37. The terms of the Revised Reinsurance Transaction differ significantly from the original Reinsurance Transaction. The Revised Reinsurance Transaction is for $1.5 billion transaction, with below-investment-grade assets at $500 million. ***Id.*** at HARB-E0137021-22. The original Reinsurance Transaction was for $3 billion, with below-investment-grade assets capped at $1 billion. In addition the investment guidelines in the Revised Reinsurance Transaction were markedly different from those in the Reinsurance Transaction, which permitted a higher percentage of the riskiest below-investment-grade assets. *See* Term Sheet.[4]

38. Before ultimately accepting the Revised Reinsurance Transaction, the MIA asked us to consider capping the amount of below-investment-grade assets under management at $100 million. **Ex. 66** at HARB-E0158408 (Marhoun Nov. 15, 2012 Ltr.).

**Government Investigations**

39. I understand that OM contends that Harbinger has breached its representations and warranties under Section 4.5 of the SPA by failing to disclose litigation by the U.S. Securities and Exchange Commission ("SEC") and U.S. Department of Justice ("DOJ"). OM's Answer & Counterclaims, Dkt. No. 13, ¶¶ 111-17. OM claims that it relied on Harbinger's

---

[4] The Term Sheet is attached as Exhibit 2 to the Kaplan Declaration.

representation in entering the SPA and was damaged because the government investigations "hindered [Harbinger's] ability to obtain regulatory approval for the Reinsurance Transaction . . ." *Id.* ¶ 116.

40. Specifically, OM asserts that "Harbinger's failure to pursue an alternative transaction with the MIA was partially motivated by Harbinger's desire to avoid full disclosure of investigations by the [SEC] targeting Harbinger and Philip A. Falcone for various violations of federal securities law." *Id.* ¶ 80. These contentions are a meritless attempt to distract the Court from the simple facts surrounding the MIA's disapproval of the Reinsurance Transaction on two independent grounds.

41. Section 4.5 of the SPA states that, as of August 5, 2010 (the date of the Original SPA), "there are no Actions pending or, to the knowledge of the Buyer, threatened in writing against any of Buyer or its Affiliates . . ." SPA at Section 4.5. "Actions" is defined as "any claim, action, suit, litigation, arbitration or other proceeding by or before any Governmental Entity or arbitral body." *Id.* at Section 1.1.

42. As of August 5, 2010, Harbinger was voluntarily participating in three informal investigations with the SEC that were not the subject of any subpoena or written request. Harbinger had also produced documents in response to a January 2010 subpoena from the U.S. Attorney's Office ("USAO"), but had not heard anything from the USAO since March 2010. These were not pending litigations, nor litigations threatened in writing.

43. The SEC did not make such a threat of litigation until the issuance of Wells Notices in December 2011, a year and a half after the representation (and ten months after the date of the amended SPA), and the USAO never initiated any action as a result of its subpoena.

44. Furthermore, OM was aware of the SEC investigations by November 15, 2010—nearly four months before it entered into the amended SPA. In November and December 2010, OM received briefings from Harbinger and its regulatory legal counsel concerning the investigations.

45. On December 17, 2010, over seven months before Harbinger sought approval of the Reinsurance Transaction under the amended SPA, Harbinger provided the MIA with a full briefing of the SEC investigation. I attended this meeting along with internal and external counsel for Harbinger, and we answered all of the MIA's questions. During this meeting, the MIA never stated nor implied that the SEC investigation would negatively impact their review of the Reinsurance Transaction. Counsel for OM attended this meeting.

46. On March 31, 2011, several months after receiving the December 2010 briefing on the SEC investigation, the MIA approved Harbinger and Philip Falcone as the controlling persons of FG Life. **Ex. 12** at HARB-E0142898-901 (Mar. 31, 2011 MIA Approval Ltr.).

47. The MIA Commissioner expressly stated at the February 14, 2012 meeting that the identity of the parties was not a basis for the MIA's denial of the Reinsurance Transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, New York on this 3 day of October, 2013.

Konstantinos (Gus) Cheliotis