UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
: 
HARBINGER F&G, LLC,                   :   No. 12-civ-5315 (RA)
                                      :
              Plaintiff,              :   ECF Case
v.                                    :
                                      :
OM GROUP (UK) Limited,                :
                                      :
              Defendant.              :
------------------------------------- x

## DECLARATION OF MICHAEL D. DEVINS

I, Michael D. Devins, hereby declare as follows:

1. I am a counsel at Debevoise & Plimpton LLP ("Debevoise"), which advised Harbinger F&G, LLC ("Harbinger") on its acquisition of Fidelity & Guaranty Life Holdings, Inc. ("FGLH") and its subsidiary, Fidelity and Guaranty Life Insurance Company ("FG Life"),[1] from defendant OM Group (UK) Limited ("OM"). I submit this declaration based on personal knowledge in support of Harbinger's motion for summary judgment against OM.

## Background

2. I received my J.D. *cum laude* from Georgetown University Law Center and have approximately 15 years of experience practicing corporate law. I am a member of Debevoise's Mergers & Acquisitions, Securities and Insurance Industry Groups. My practice focuses primarily on mergers and acquisitions in the insurance industry.

---

[1] Prior to the close of the acquisition on April 6, 2011, FGLH was known as Old Mutual US Life Holdings, Inc. and FG Life was known as Old Mutual Financial Life Insurance Company.

3. As a part of my practice, I routinely advise clients on their applications to insurance regulators. These applications include the "Form A," which seeks regulatory approval to acquire control of an insurer, and the "Form D," which seeks regulatory approval for transactions between an insurance company and an affiliated entity.

### Negotiations

4. Debevoise began representing Harbinger in its acquisition of FGLH from OM in approximately November 2010, after the signing of the original Stock Purchase Agreement (the "Original SPA") but before the closing of the transaction.

5. Partly to remove closing uncertainty, given doubts expressed by FG Life's primary regulator, the Maryland Insurance Administration (the "MIA"), Harbinger and OM renegotiated the terms of their purchase agreement and memorialized the restructured transaction in an Amended and Restated Stock Purchase Agreement (the "SPA") dated as of February 17, 2011. *See* **Ex. 8**, Plaintiff's Deposition Exhibit ("PX") 32, at OM-HARB-0002939-40; **Ex. 9**, PX 33, at OM-HARB-002944-45).[2] As outside counsel for Harbinger, I assisted with negotiating and drafting the SPA.

6. During the negotiations of the SPA, OM sought to remove regulatory approval of a reinsurance transaction (the "Reinsurance Transaction") between FG Life and Harbinger's subsidiary, Front Street Re Ltd. ("Front Street") as a closing condition. Specifically, OM requested that "the condition as to approval of the 'Reinsurance Transaction' (i.e. the Front Street transaction) [] be deleted" from the Original SPA and that Harbinger wait to seek

---

[2] "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013 ("Kaplan Declaration").

2

regulatory approval of the Reinsurance Transaction until after the acquisition closed. **Ex. 8**, PX 32, at OM-HARB-0002940.

7.  I helped draft Harbinger's response, which explained that Harbinger intended to take advantage of its expertise in distressed investing to manage $1 billion of below-investment-grade assets in the Reinsurance Transaction. The Reinsurance Transaction was a fundamental aspect of the economics that Harbinger expected to derive from the acquisition. *See* **Ex. 9**, PX 33, at OM-HARB-0002944.

8.  The parties ultimately agreed that if Harbinger could not obtain regulatory approval of the Reinsurance Transaction after the closing, OM would reduce the acquisition purchase price by $50 million. This agreement was memorialized in Section 5.21(f)(ii) of the SPA. *See* **SPA** at 56-61.[3]

### The Reinsurance Transaction

9.  The terms of the Reinsurance Transaction are set out in Exhibit K of the SPA ("Term Sheet"). As part of the Reinsurance Transaction, FG Life would transfer to Front Street approximately $3 billion of assets (or statutory reserves) that supported FG Life's annuity policies. *See* **Term Sheet**.[4]

10. Approximately $1 billion of the assets would be transferred to a New York-based "Trust Account" that would be managed in accordance with an agreed set of investment guidelines ("Trust Account Investment Guidelines"). In accordance with the Trust Account Investment Guidelines, the Harbinger affiliate appointed to manage the Trust Account would sell assets that were investment-grade assets and replace them with below-investment-grade assets.

---

[3] The SPA is attached as Exhibit 1 to the Kaplan Declaration.
[4] The Term Sheet is attached as Exhibit 2 to the Kaplan Declaration.

The Trust Account Investment Guidelines permitted a substantial portion of the assets in the Trust Account to be invested in assets rated by the National Association of Insurance Commissioners' ("NAIC") Securities Valuations Office as "5" or "6," which are the lowest rated below-investment-grade assets. *See id.* at Exhibit A; **Ex. 42** at HARB-E0164808 (Marhoun Jan. 27, 2012 Email).

11. The remaining $2 billion was to be held by FG Life on a funds withheld basis ("Funds Withheld Account"). These funds would be managed in accordance with a more restrictive set of investment guidelines than the Trust Account. *See* **Term Sheet** at Exhibit B.

### Form D Submission

12. The Reinsurance Transaction required the approval of the MIA because this was a transaction between two affiliated companies, FG Life and Front Street. Maryland insurance law required a "Form D" application be submitted and approved by the MIA before the Reinsurance Transaction could be consummated.

13. After closing, FG Life and Front Street diligently negotiated the block of assets that FG Life would transfer to Front Street as part of the Reinsurance Transaction, and my colleagues at Debevoise and I carefully documented the terms in the Form D and its supporting documents. We also provided drafts of the Form D and supporting documents to OM's outside counsel, Dewey & Lebouef LLP ("Dewey"), for its comments and approval and negotiated the language in these documents with Dewey. *See, e.g.*, **Ex. 13**, PX 64, at HARB-E0016500-01 (Bannigan May 31, 2011 Email). These endeavors necessarily required significant time and resources.

14. The Form D was submitted to the MIA on July 26, 2011. **Ex. 14**, Defendant's Deposition Exhibit ("DX") 17, at HARB-E0098095-201.

15. FG Life's Chief Financial Officer, Barry G. Ward, and General Counsel, Eric Marhoun, led FG Life's (and Harbinger's) efforts to secure approval of the Form D application. Both Messrs. Ward and Marhoun had extensive experience working with the MIA.

16. During the pendency of the MIA review, I helped draft responses to the MIA's written requests for additional information and ensured that Dewey was informed of FG Life's communications with the MIA concerning the Reinsurance Transaction. My practice was to notify—or to direct my team at Debevoise to notify—Dewey about written requests by the MIA to FG Life as soon as I was informed about these requests. This provided Dewey an opportunity to comment on FG Life's proposed response to the MIA. *See, e.g.*, **Ex. 15**, PX 36, at OM-HARB-0019268; **Ex. 16** at HARB-E0000132-42 (Bannigan Oct. 3, 2011 Email); **Ex 25** at HARB-E0154395 (Devins Dec. 6, 2011 Email). I also informed Dewey of Harbinger's and FG Life's November 16, 2011 in-person meeting with the MIA, asking them for comments on the draft presentation to the MIA and providing them with an opportunity to attend the meeting. **Ex. 21**, PX 39, at OM-HARB-0013768-69. I further ensured that Dewey was informed of phone calls with the MIA discussing the Reinsurance Transaction. *See, e.g.*, **Ex. 18** at HARB-E0154361 (Devins Oct. 26, 2011 Email); **Ex. 23**, DX 23, at OM-HARB-0018687; **Ex. 29**, DX 52, at HARB-E0154382; **Ex. 31** at HARB-E0154347 (Devins Dec. 20, 2011 Email).

17. I believe Harbinger used reasonable best efforts to get the Reinsurance Transaction approved by the MIA. I believe Harbinger wanted to proceed with this transaction because it provided substantial economic benefits to Harbinger.

<u>Reinsurance Transaction Disapproval</u>

18. On December 22, 2011, as I was preparing to board an airplane, I received an email from Harbinger's in-house counsel, Gus Cheliotis, informing me that the MIA had

disapproved the Reinsurance Transaction. The next day, on December 23, I learned that the MIA had called Messrs. Ward and Marhoun and notified them that the Commissioner had disapproved the transaction because of concerns about the investment guidelines, including the amount of below-investment-grade assets permitted in the Trust Account, and the amount of unrealized gains that would be transferred to Front Street. **Ex. 33**, DX 56, at HARB-P0000629. Consistent with my practice, I promptly informed OM's outside counsel of FG Life's call with the MIA about the Reinsurance Transaction. **Ex. 34**, DX 26, at HARB-E0161442.

19. Following the disapproval, Harbinger cooperated and negotiated with OM about proposed responses to the MIA.

20. After December 22 and prior to receiving the written disapproval dated January 10, 2012, I had several discussions with OM's outside counsel at Dewey, Kirk Lipsey, about whether or not it was preferable to receive the formal disapproval. In those discussions, Mr. Lipsey expressed the view that a formal disapproval may make it more difficult to negotiate a revised transaction. Mr. Lipsey suggested that, in lieu of formal disapproval, FG Life seek from the MIA a draft opinion. I informed him that the MIA had already denied Mr. Ward's request on December 22 for a draft opinion. **Ex. 35** at HARB-E0027381 (Devins Jan. 9, 2012 Email). Mr. Lipsey next suggested that FG Life withdraw the Form D application. I informed Mr. Lipsey that Harbinger could consider seeking withdrawal, if the parties could reach an agreement on the precise application of the provisions of Section 5.21 of the SPA under those circumstances. The SPA contemplated the possibility of the MIA's written disapproval—and was clear about the timing and nature of the parties' rights and obligations in that event—but did not contemplate a withdrawal of the application.

6

21. I proposed to Mr. Lipsey several alternatives that would both accommodate OM's preference to have the Form D withdrawn and clarify the implications under the SPA. *See id.* at HARB-E0027380-86; **Ex. 36** at HARB-E0098694-99 (Devins Jan. 9, 2012 Email). I also informed Mr. Lipsey that Harbinger was willing to explore any proposals that OM had. OM, however, declined to engage in these discussions.

22. The MIA sent its written disapproval letter on January 10, 2012. **Ex. 37**, DX 7, at HARB-E0140247-51. Harbinger was committed to the Reinsurance Transaction and sought to persuade the MIA to reverse its decision. To assist us with our efforts, FG Life (and Harbinger) hired Ralph Tyler, the former MIA Commissioner. I worked with Messrs. Tyler, Cheliotis, and Marhoun on engaging the MIA on the disapproval of the Reinsurance Transaction.

23. Less than a week after receiving the written disapproval, Mr. Tyler contacted the MIA on behalf of FG Life and scheduled a meeting for January 23, 2012. Before the meeting occurred, we learned that the MIA had mistakenly believed that FG Life had received the report on the Reinsurance Transaction prepared by Lewis & Ellis, Inc. (the "Lewis & Ellis Report"), the MIA's outside actuarial firm. Messrs. Tyler, Cheliotis, Marhoun and I agreed that the most productive path forward with the MIA would be to postpone meeting with them until we had reviewed the Lewis & Ellis Report. Dewey agreed on behalf of OM. Mr. Tyler contacted the MIA to postpone the January 23 meeting. *See* **Ex. 41** at HARB-E0162197 (Cheliotis Jan. 21, 2012 Email).

24. On or about January 20, 2012, the MIA provided Harbinger with the Lewis & Ellis Report, which informed the MIA's decision. The Lewis & Ellis Report evaluated the Reinsurance Transaction and laid out the same objections found in the MIA's denial letter. *See* **Ex. 40**, DX 8, at HARB-E0136254-65.

25. Harbinger and OM identified errors in the Lewis & Ellis Report that may have led to the MIA's concerns about the Reinsurance Transaction. The MIA denied FG Life's request to meet with Lewis & Ellis. **Ex. 44**, DX 127, at HARB-E0027012-15. FG Life then submitted a written report from its outside actuarial firm, Milliman, Inc., on February 9, 2012 identifying and correcting the errors in the Lewis & Ellis Report. **Ex. 47**, DX 12, at HARB-E0001210-16. I drafted a cover memorandum to the Milliman report that explained Milliman's conclusions. I coordinated with Dewey on this written report. *See* **Ex. 46** at HARB-E0033391, 93-94 (Devins Feb. 9, 2012 Email).

26. On February 14, 2012, I attended an in-person meeting with the MIA along with Messrs. Tyler, Ward and Marhoun. OM's counsel, Elizabeth Bannigan of Dewey, and others attended by telephone. No one from OM attended. Present at the meeting for the MIA were Commissioner Therese Goldsmith and the MIA's counsel, Van Dorsey. Commissioner Goldsmith stated that the two reasons listed in the January 10, 2012 disapproval letter were independent reasons and that each reason was a sufficient concern for the MIA to disapprove the transaction. She further stated that there were no other reasons for the disapproval and the identity of the parties to the transaction was not a basis for the disapproval. Commissioner Goldsmith also said that the MIA did not rely solely on the Lewis & Ellis Report in reaching its conclusion about the unrealized gains issue and that the MIA had conducted its own independent analysis. Commissioner Goldsmith declined to provide additional details about the reasons for the disapproval until FG Life had decided whether or not it would waive its right to appeal the January 10 disapproval letter. She stated that FG Life could either request a hearing to dispute the MIA's determination or waive its right to a hearing and discuss the MIA's concerns in greater detail. *See* **Ex. 51**, DX 65, at HARB-E0162664-65.

27.     Commissioner Goldsmith's statement at the February 14 meeting reaffirmed to Harbinger that certain investigations by the U.S. Securities & Exchange Commission ("SEC") targeting Harbinger for various violations of federal securities law did not impact the MIA's decision regarding the Reinsurance Transaction. In advocating for the Reinsurance Transaction, the SEC investigation did not impact Harbinger's efforts to obtain MIA approval for the deal.

28.     Following the February 14 MIA meeting, I spoke to Ms. Bannigan about whether or not FG Life should waive its right to a hearing. We both agreed that waiving the hearing was the best path forward since a hearing was subject to an arbitrary and capricious standard of review that would make it difficult to overturn the MIA's disapproval. **Ex. 51**, DX 65, at HARB-E0162663. Shortly after we spoke, Ms. Bannigan informed me that OM had consented to waiving the hearing.

29.     After FG Life waived its right to a hearing, we scheduled another in-person meeting with the MIA for March 15, 2012. Prior to this meeting, I discussed our proposed discussion points with Dewey. **Ex. 56**, DX 138, at HARB-E0165134.

30.     On March 15, 2012, I attended an in-person meeting with the MIA, along with Messrs. Ward, Marhoun and Tyler. Laird Zacheis from Milliman and Mr. Cheliotis and possibly Phil Gass, Managing Director of Investments of Harbinger's parent company, participated by phone. Mr. Lipsey, OM's counsel, participated by phone. No one from OM participated in this meeting. The MIA representatives present at the meeting included its investment specialist, Alex Hart, Associate Commissioner for Examination and Auditing, Neil Miller, and Mr. Dorsey.

31.     This March 15 meeting was an opportunity for frank discussion about the MIA's action. The MIA engaged in a substantive discussion about the two reasons for their disapproval. First, they stated that the investment guidelines gave FG Life discretion to increase

9

significantly the amount of its below-investment-grade assets, which, in turn, increased risk with respect to FG Life's portfolio.  I asked whether changes to the investment guidelines would be required in order to obtain approval.  An MIA staff member responded that both the absolute amount of below-investment-grade assets and the proportion of below-investment-grade assets relative to the rest of the proposed investment portfolio were not acceptable.   With respect to unrealized gains, the MIA stated that, while Milliman's methodology may have been valid, the amount of unrealized gain was still sizeable and appeared to be unfair to FG Life.  *See* **Ex. 33**, DX 56, at HARB-P0000631-32.

32. Later on March 15, I participated in an internal call with Messrs. Cheliotis, Gass, Tyler, Ward, Marhoun (and possibly others) to discuss the MIA meeting.  The consensus within this group was that the MIA required a substantial change to the investment guidelines and that, to satisfy the MIA, the Reinsurance Transaction would have to be changed in a manner that would trigger the SPA's $50 million purchase price adjustment.  Given the MIA's concerns about the investment guidelines, we did not believe that addressing the MIA's independent, second reason for disapproval—the $230 million unrealized gain issue— mattered.

33. I spoke with Mr. Lipsey after the March 15 MIA meeting.  Mr. Lipsey concurred that the MIA required a change to the investment guidelines, but that OM wanted to continue developing potential revised transactions.  I responded that I would inform Harbinger of OM's position.  Either in this conversation or in follow-up one, I informed Mr. Lipsey that Harbinger had concluded that it could not develop a deal that could both satisfy the MIA and avoid triggering the purchase price adjustment under the SPA, but Harbinger was open to any proposal in this connection from OM.

10

34.     In response, OM provided Harbinger with one written proposal for an alternative transaction. This proposal capped the amount of below-investment-grade assets at $500 million. It stated that an additional $500 million in below-investment-grade assets may be transferred "following the satisfaction of investment performance criteria to be agreed by the [MIA]." OM's proposal, however, provided no details about these investment performance criteria. **Ex. 61**, DX 82, at OM-HARB-0005487-501.

35.     I reviewed OM's proposal and discussed it both internally with Harbinger and externally in a telephone conference on May 4, 2012, between Harbinger, OM and Dewey. Present on the phone for OM were Mr. Lipsey, Alex Duncan, OM's Director of Finance, and Jim Ritchie, a director for various OM affiliates. They walked us through the proposal but were unable to provide additional details about the investment performance criteria.

36.     After considering OM's proposal, I helped draft a letter informing OM that its proposal would constitute an Adverse Reinsurance Transaction Condition or Restriction, as defined in the SPA, because it restricted Harbinger to managing less than $750 million of assets, additionally it was inconsistent with the Term Sheet and Trust Account Investment Guidelines and would adversely affect Harbinger's expected economic benefits. **Ex. 62**, PX 76, at HARB-E0112013-16.

### Notices of Purchase Price Reduction

37.     Harbinger sent OM two notices requesting payment of the post-closing purchase price reduction. I helped draft both notices. The first notice was sent on April 6, 2012 on the basis that the MIA had flatly denied the Reinsurance Transaction and therefore the parties' obligations to undertake Remedial Efforts was not triggered. **Ex. 59**, DX 60, at HARB-E0029395-97 (Apr. 6, 2012 Notice).

11

38. Notwithstanding the nature of the MIA's disapproval of the Reinsurance Transaction, Harbinger cooperated and negotiated in good faith for alternative terms that would be acceptable to the MIA and would provide benefits substantially similar to the benefits provided under the terms of the SPA that would not constitute an Adverse Reinsurance Transaction Condition or Restriction, as defined in the SPA. Following the 150-day period stipulated in the SPA, Harbinger renewed its notice of post-closing purchase price reduction on July 6, 2012, on the alternative grounds that, if Remedial Efforts were required, Harbinger had performed its obligations. **Ex. 64**, DX 85, at OM-HARB-0002967-68 (July 6, 2012 Notice).

### The Revised Reinsurance Transaction

39. On September 28, 2012, FG Life submitted a new Form D to the MIA for a revised reinsurance agreement with Front Street (the "Revised Reinsurance Transaction"). **Ex. 65**, DX 115, at HARB-E0137021-139. This transaction was approved by the MIA on December 13, 2012 (**Ex. 67** at HARB-E0157568-69 (Miller Dec. 13, 2012 Ltr.)) and closed on December 31, 2012. I participated in discussions about the terms for this transaction and, along with Debevoise lawyers working under my supervision, prepared the Form D that was submitted to the MIA.

40. The terms of the Revised Reinsurance Transaction differed significantly from the Reinsurance Transaction disapproved by the MIA. It contemplated a $1.5 billion transaction, capped the amount of below-investment-grade assets at $500 million, and altered the investment guidelines to reduce the percentages that could be invested in the lowest rated classes of below-investment-grade assets. **Ex. 65**, DX 115, at HARB-E0137021-22. In contrast, the size of the original Reinsurance Transaction was $3 billion; it capped the amount of below-investment-

grade assets at $1 billion, and permitted a higher percentage in the lowest rated below-investment-grade assets in the investment guidelines.  *See* **Term Sheet**.

41.     Harbinger had difficulty gaining approval of even this transaction.  On November 13, 2012, the MIA asked Harbinger and FG Life to consider reducing the amount of below-investment-grade assets to below $500 million and suggested a cap of $100 million.  **Ex. 66** at HARB-E0158408 (Marhoun Nov. 15, 2012 Ltr.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, New York on this 2nd day of October, 2013.

_____
Michael D. Devins