UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
HARBINGER F&G, LLC,                                         :
                                                            :   No. 12-civ-5315 (RA)
                                                            :
                        Plaintiff,                          :   ECF Case
v.                                                          :
                                                            :
OM GROUP (UK) Limited,                                      :
                                                            :
                        Defendant.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF PHILLIP J. GASS

I, Phillip J. Gass, hereby declare as follows:

1.      I serve as Managing Director of Investments at Harbinger Group, Inc. ("HGI"), the parent company of Harbinger F&G, LLC ("Harbinger"). I led Harbinger's efforts in negotiating the transaction at issue in this litigation. I submit this declaration based on personal knowledge in support of Harbinger's motion for summary judgment against OM Group (UK) Limited ("OM").

### Professional Background

2.      I received my B.S. in finance from New York University and have over 13 years of experience in specialty finance and asset management. I am responsible for HGI's investments in financial institutions, including insurance, reinsurance, specialty finance and asset management. I joined Harbinger Capital Partners ("HCP"), the majority owner of HGI in 2008 as a senior analyst and moved to HGI in October 2011. At HCP, I was responsible for sourcing, analyzing and managing investments. Prior to joining HCP, I served as Vice President with GE Capital.

**The Acquisition**

3. Harbinger and OM entered into the Stock Purchase Agreement, dated August 5, 2010 (the "Original SPA") for the acquisition by Harbinger of the company now known as Fidelity and Guaranty Life Insurance Company ("FG Life") (the "Acquisition").[1]

4. A significant portion of the economic benefits Harbinger expected to derive from the Acquisition stemmed from the reinsurance transaction (the "Reinsurance Transaction") contemplated between FG Life and Harbinger's subsidiary, Front Street Re Ltd. ("Front Street"). *See* **Ex. 9**, Plaintiff's Deposition Exhibit ("PX") 33, at OM-HARB-0002944.[2]  This is because Harbinger specializes in managing below-investment-grade assets. Through the Reinsurance Transaction, Harbinger expected to utilize its competency in the distressed marketplace by accessing and managing $1 billion of below-investment-grade assets.

5. The Original SPA had several terms that protected Harbinger's economic interests in the Reinsurance Transaction. First and foremost, regulatory approval of the Reinsurance Transaction was a condition to closing the Acquisition. If the Reinsurance Transaction was not approved, Harbinger retained the ability to walk away from the Acquisition entirely. Second, if the regulatory approval for the Reinsurance Transaction was for below $1 billion of below-investment-grade assets, then Harbinger would receive a sliding scale reduction in the purchase

---

[1] Prior to the close of the Acquisition on April 6, 2011, FG Life was known as Old Mutual Financial Life Insurance Company ("OMFLIC").

[2] "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013 ("Kaplan Declaration").

price up to $50 million if only $750 million, the absolute lowest amount, of assets was approved. *See* Original SPA, Section 1.1 (definition of Reduced Asset Amount).[3]

6. Beginning in January 2011, Harbinger and OM began negotiating changes to the Original SPA. I led the negotiations for Harbinger. My counterpart at OM was Alex Duncan.

7. During these negotiations, OM sought to remove regulatory approval of the Reinsurance Transaction as a closing condition to the Acquisition. **Ex. 8**, PX 32, at OM-HARB-0002940. Specifically, OM requested that "the condition as to approval of the 'Reinsurance Transaction' (i.e. the Front Street transaction) [be] deleted" from the Original SPA and that Harbinger wait to seek regulatory approval of the Reinsurance Transaction until after the Acquisition closed. *Id.*

8. In response to OM's request to remove the closing condition, I reiterated to OM—as Harbinger had done since the start of negotiations—that our ability to manage $1 billion in below-investment-grade assets as part of the Reinsurance Transaction was a fundamental element of the Acquisition for Harbinger. *See* **Ex. 9**, PX 33, at OM-HARB-0002944.

9. Accordingly, to protect our economic value in the Acquisition, our willingness to remove regulatory approval for the Reinsurance Transaction as a closing condition was subject to several terms. *Id.* at OM-HARB-0002945. In our counter, we proposed that if Harbinger could not obtain regulatory approval of the Reinsurance Transaction after the closing, OM would reduce the acquisition purchase price by $50 million, subject to certain limitations. This preserved the sliding scale purchase price reduction from the Original SPA and ensured that OM shared the risk of regulatory disapproval with Harbinger like in the Original SPA.

---

[3] The Original SPA is attached as Exhibit 3 of the Kaplan Declaration.

10.     The parties' negotiations culminated with the execution of the First Amended and Restated Stock Purchase Agreement ("SPA") dated February 17, 2011.  Section 5.21 of the SPA set out the terms dealing with the Reinsurance Transaction.  It removed regulatory approval of the Reinsurance Transaction as a closing condition and added the post-closing purchase price adjustment of $50 million in the event the Reinsurance Transaction was disapproved, subject to certain limitations.

### The Reinsurance Transaction

11.     The terms of the Reinsurance Transaction are set out in the Amended SPA.  *See* Reinsurance Transaction Term Sheet ("Term Sheet").[4]  As part of the Reinsurance Transaction, FG Life would transfer to Front Street approximately $3 billion of assets (or statutory reserves) that supported FG Life's annuity policies.  Front Street would place approximately $1 billion of these assets in a New York-based trust account ("Trust Account").  The Trust Account would be comprised of below-investment-grade assets and managed in accordance with liberal investment guidelines known as the "Trust Account Investment Guidelines."  An affiliate of Harbinger would be appointed asset manager of the Trust Account, and would utilize its expertise in distressed debt to first convert the entire Trust Account into below-investment-grade assets and then actively manage the Trust Account.

12.     The remaining reserves, approximately $2 billion, were to be in the possession of FG Life on a funds withheld basis ("Funds Withheld").  Unlike the Trust Account, the Funds Withheld account would be subject to Maryland law concerning management of reserve assets and would be managed by third party managers in accordance with conservative investment guidelines.  *See* Exhibit B of Term Sheet.  The assets would all be investment grade.

---

[4]     The Term Sheet is attached as Exhibit 2 of the Kaplan Declaration.

4

13. Harbinger looked to the opportunity to manage $1 billion of below-investment-grade assets in the Trust Account in accordance with the Trust Account Investment Guidelines as a significant component of the economic value it expected to achieve from the Acquisition. The Reinsurance Transaction provided Harbinger investment flexibility in managing the assets in the Trust Account, by allowing a high percentage of investments in the riskiest categories of below-investment-grade assets. Specifically, pursuant to the Trust Account Investment Guidelines, the a substantial portion of the assets in the Trust Account could be comprised of NAIC 5 and 6 grade assets, which are the riskiest below-investment-grade assets.

14. Harbinger intended to utilize this additional flexibility by managing the Trust Account in accordance with a similar strategy employed by Harbinger's credit distressed fund known as the "Blue Line Fund," which targeted a net annual rate of return exceeding 20%. *See* **Ex. 17**, Defendant's Deposition Exhibit ("DX") 108, at OM-HARB-0012190-91. Alternative investment managers and hedge funds, like Harbinger, typically target and achieve rates in excess of 20% by focusing on deeply distressed debt, which provide higher risks and rewards. In this industry, 10% returns are conservative estimates for distressed debt investing.

15. Harbinger's anticipated 20% rate of return on the below-investment-grade assets in the Trust Account would amount to approximately $200 million in net investment income annually. In order to be conservative, Harbinger's submissions to the MIA projected a return of 10% on below-investment-grade assets. **Ex. 17**, DX 108, at OM-HARB-0012135-48. Even assuming a conservative rate of return of only 10%, Harbinger anticipated generating approximately $100 million annually from the assets in the Trust Account.

16. Another anticipated economic benefit from the Reinsurance Transaction was the creation of new business with Front Street. Front Street needed a reinsurance treaty in force to

attract third-party reinsurance deals because, in contemplating a reinsurance treaty, a ceding company would look to a reinsurer that is established with capital and in force business. The Reinsurance Transaction would have provided Front Street with its inaugural transaction and helped it acquire new business.

17.     Additionally, the Reinsurance Transaction provided certain economic benefits to FG Life, previously known as OMFLIC. By moving all of the below-investment-grade assets from FG Life's balance sheets onto Front Street's balance sheets, the Reinsurance Transaction improved FG Life's capital, de-risked its balance sheet and increased its risk-based capital ratio, which, in turn, would allow FG Life to write new business.

### Reinsurance Transaction Denial

18.     Because the Reinsurance Transaction would be between affiliated companies, Front Street and Front Street, it was subject to approval by the Maryland Insurance Administration ("MIA") pursuant to a "Form D" application.

19.     By mid-December 2011, I was optimistic that the MIA would approve the Form D based on updates that FG Life had received from the MIA. **Ex. 30** at HARB-E0000986 (Launer Dec. 16, 2011 Email); **Ex. 32** at HARB-E0140252 (Ward Dec. 21, 2011 Email).

20.     On December 22, 2011, I was informed by Mr. Barry Ward or Mr. Eric Marhoun, FG Life's Chief Financial Officer and General Counsel, respectively, that the MIA had disapproved the Reinsurance Transaction in a phone call to Messrs. Ward and Marhoun. I also learned that the MIA provided two reasons for the denial. First, the MIA was concerned that the risks associated with the nature and amount of below-investment-grade assets contemplated by the investment guidelines would not support the interests of FG Life's policyholders. Second, the MIA was concerned that the sale of certain assets would generate an unreasonable amount of

profits for Front Street that would be unfair to FG Life.  These two reasons were confirmed in the written denial letter from the MIA dated January 10, 2012.  **Ex. 37**, DX 7, at HARB-E0140248-51.

21. Although the MIA had flatly denied the Reinsurance Transaction, we remained committed to the Reinsurance Transaction and hoped to persuade the MIA to reverse its decision.  We wanted to get the Reinsurance Transaction approved because of the financial benefits expected.  FG Life (and Harbinger) hired Ralph Tyler, a former MIA Commissioner to help us persuade the MIA.  Harbinger's in-house counsel, Gus Cheliotis, worked with Harbinger's outside counsel at Debevoise & Plimpton LLP, Michael Devins, and Messrs. Tyler and Marhoun on engaging the MIA on the denial of the Reinsurance Transaction to better understand the reasons for the MIA's disapproval and to get the Reinsurance Transaction approved.

22. After being notified of the disapproval, I directed representatives of Front Street, specifically Jean-Francois Lemay, to consider and analyze the implications of potential alternative reinsurance transaction structures.  Because most of the economic benefits expected under the SPA derived from the Reinsurance Transaction, I wanted to consider alternative structures that might address the MIA's concerns.

23. I participated in two meetings with the MIA along with other representatives of Harbinger.  The first meeting was on or about February 14, 2012, which I attended by phone.  Present for the MIA were Commissioner Therese Goldsmith and Assistant Attorney General Van Dorsey.  The MIA stated that the two reasons provided in the denial letter, concerning the nature and amount of below-investment-grade assets and the unrealized gains, were the only two reasons for the denial.  The MIA also informed us that these two reasons were independent and

the MIA did not have any concerns about Harbinger as asset manager. The MIA declined to discuss the Reinsurance Transaction in further details until FG Life had waived its right to an appeal. **Ex. 51**, DX 65, at HARB-E0162663-65.

24.     I understand that FG Life, with the consent of OM, waived its hearing rights following this February 14 meeting. I subsequently participated in a second meeting with staff from the MIA on March 15, 2012 by telephone. The MIA made clear that they had a problem with the size and nature of below-investment-grade assets permitted by the Trust Account Investment Guidelines.

25.     Following the March 15 meeting, I discussed next steps internally with members of our team, including Mr. Cheliotis. We agreed that the MIA would not approve the Reinsurance Transaction, given the Trust Account Investment Guidelines, because of the MIA's concerns that the quality and quantity of the below-investment-grade assets contemplated would not adequately support FG Life's policyholders.

26.     We agreed that to satisfy the MIA, Harbinger would have to significantly change the Reinsurance Transaction in material ways including changing the investment guidelines and significantly reducing the amount of below-investment-grade assets that would be placed in the Trust Account. As a result, we could not formulate a revised reinsurance deal that would satisfy the requirements of the SPA and not trigger the purchase price adjustment under the SPA.

27.     We consulted OM to see if they had any viable proposals. I participated in discussions with OM on this topic.

### Communications with OM about Potential Alternative

28.     On March 22, 2012, I emailed Mr. Duncan to see if he and I could discuss the Reinsurance Transaction "to see how we can move that forward." **Ex. 58** at HARB-E0111361-

62 (Gass March 23, 2012 Email). I spoke with Mr. Duncan shortly after this email. I informed him that, based on our meetings with the MIA, Harbinger was struggling to formulate a proposal that addressed the MIA's concerns without triggering the $50 million purchase price reduction. I asked Mr. Duncan if OM had any suggestions for an alternative transaction.

29. In late April, I exchanged correspondence with Mr. Duncan where I reiterated that Harbinger was open to any proposal from OM. **Ex. 60**, DX 105, at OM-HARB-0005483-85. I encouraged Mr. Duncan to meet with me and my team to discuss OM's alternative proposals. *Id.* On April 25, 2012, I met with Mr. Duncan. During this meeting, he stated that he had two-to-three potential alternative transactions that he was developing and described them at a very high-level using handwritten notes, which appeared to be scribbled in his notepad. I informed Mr. Duncan that, since these proposals were high-level and appeared to be impromptu, he should send me the full proposals in writing once he had the opportunity to think them through. *See* **Ex. 60**, DX 105, at OM-HARB-0005483-85.

30. In response, OM sent us one proposal, on May 2, 2012. **Ex. 61,** DX 82, at OM-HARB-0005487-501. This proposal, sent to me, contained significant changes to the reinsurance transaction.

31. OM's proposal capped the amount of below-investment-grade assets in the Trust Account at $500 million instead of the $1 billion contemplated in the Reinsurance Transaction. *Id.* at OM-HARB-0005489; Term Sheet. Changing this fundamental term would have reduced by 50% the amount of below-investment-grade assets under Harbinger's management. This would have constituted an adverse reinsurance condition under the SPA because, among other things, it left Harbinger managing less than $750 million of assets and was inconsistent with the substantive terms of the Term Sheet.

9

32. The proposal also contemplated that an additional $500 million in below-investment-grade assets may be transferred to the Trust Account "following the satisfaction of investment performance criteria to be agreed by the [MIA]." **Ex. 61**, DX 82, at OM-HARB-0005489-90. OM's proposal, however, provided no details whatsoever about what these investment performance gates would require and what criteria Harbinger would have to accomplish to gain additional assets under management. OM's proposal essentially sought to transfer all of the risk of disapproval to Harbinger, which was not what we had bargained for as part of the Acquisition.

33. I, along with Messrs. Devins and Cheliotis, had a phone conference with representatives of OM, including Mr. Duncan, on or around May 4, 2012. We asked OM to explain their proposal to us and requested additional information about the investment performance gates. OM, however, had no specifics to share with us about the criteria to be used and failed to address our concerns about their proposal. Following this call, I and others at Harbinger remained concerned that OM's proposal would significantly reduce the economic benefits from the transaction. OM was asking Harbinger to accept a proposal that would not pass muster under the terms of the SPA.

34. I met with Mr. Duncan again on or around May 11, 2012. In that meeting, I informed Mr. Duncan that OM's proposal was not viable because it would trigger the purchase price adjustment under the SPA. We subsequently informed OM formally that their proposal was not acceptable. **Ex 62**, PX 76, at HARB-E0112014. We also told OM that their proposal only confirmed our view that no transaction could both satisfy the MIA's concerns and the SPA. *Id.*

10

35. Nevertheless, over the next several months, I remained open to and was willing to consider any other proposal OM could put forward that would satisfy the SPA. Although I and others at Harbinger relayed our willingness to consider alternative proposals to OM, OM did not make any other proposals.

### The Revised Reinsurance Transaction

36. On September 28, 2012, FG Life submitted a new Form D to the MIA for a revised reinsurance agreement with Front Street (the "Revised Reinsurance Transaction"). **Ex. 65**, DX 115, at HARB-E0137021-139. This transaction was approved by the MIA on December 13, 2012. I participated in discussions about the terms for this transaction and reviewed drafts of the Form D prior to submission.

37. The Revised Reinsurance Transaction differed markedly from the Reinsurance Transaction contemplated by the SPA and economically was far less favorable. The Revised Reinsurance Transaction contemplated the transfer of $1.5 billion to be invested entirely in the more conservative Funds Withheld account, and it capped the amount of below-investment-grade assets at $500 million. **Ex. 65**, DX 115, at HARB-E0137021-22. In contrast, the original Reinsurance Transaction contemplated the transfer of $3 billion and capped the amount of below-investment-grade assets at $1 billion. Furthermore, the investment guidelines in the Revised Reinsurance Transaction were more restrictive than in the initial Reinsurance Transaction, which permitted a higher percentage in the riskiest below-investment-grade assets in accordance with the Trust Account Investment Guidelines. *See* Term Sheet.

38. The Revised Reinsurance Transaction provided for half of the below-investment-grade assets to be managed by Harbinger and the change in the investment guidelines vastly decreased the discretion Harbinger had to invest those assets. Under the SPA, such dramatic

11

changes to the terms of the Reinsurance Transaction would have constituted an Adverse Reinsurance Transaction Condition or Restriction.

39. As described above in Paragraphs 13-15, Harbinger targeted annual returns exceeding 20% from the below-investment-grade assets in the Trust Account in the Reinsurance Transaction. Reducing the amount of below-investment-grade assets from $1 billion to $500 million like in the Revised Reinsurance Transaction would result in an annual loss of $100 million. Harbinger projected that it could earn a rate of return of approximately 5% on above grade assets. Even if an additional $500 million is invested in investment grade assets, it would produce an annual return of approximately $25 million. Thus, Harbinger's annual loss under the Revised Reinsurance Transaction would be approximately $75 million, $50 million, or $25 million assuming a rate of return of 20%, 15% or 10% respectively. The present value of that loss is far greater than a single $50 million purchase price adjustment which Harbinger seeks in this lawsuit.

40. The Revised Reinsurance Transaction not only was restrictive with respect to the amount of below-investment-grade assets, but also as to the character of the below-investment-grade assets allowed. By contrast with the original Reinsurance Transaction, the Revised Reinsurance Transaction changed the investment guidelines so as not to allow a substantial amount of assets in the riskiest class. This further diminished Harbinger's projected return.

41. Had the Revised Reinsurance Transaction been proposed as an alternative transaction under the SPA, a full $50 million purchase price adjustment would have been triggered.

42. Harbinger would have far preferred the original Reinsurance Transaction to the Revised Reinsurance Transaction, even with the $50 million purchase price adjustment.

12

43. As conservative as the Revised Reinsurance Transaction is, compared to the original Reinsurance Transaction, Harbinger had a difficult time gaining the MIA's approval. The MIA expressed discomfort with below-investment-grade assets in the amount of $500 million and suggested $100 million as an appropriate cap on below-investment-grade assets, before the $500 million cap was ultimately approved. **Ex. 66** at HARB-E0158405-08 (Marhoun Nov. 16, 2012 Email).

## CARVM

44. I understand that, in an unrelated counterclaim, OM has alleged that Harbinger has failed to pay required fees to OM related to the financing of reserves reinsured under the agreement referred to as the "CARVM Treaty." OM's Answer and Counterclaims, Dkt. No. 13, ¶¶ 118-24. OM's claim misrepresents the agreement reached by the parties.

45. I led Harbinger's negotiations of the Original SPA dated August 5, 2010, including about the financing of FG Life's excess reserves. As part of these negotiations, I learned that, in 2008, prior to negotiations of the SPA, FG Life entered into the CARVM Treaty with Old Mutual Reassurance (Ireland) Limited ("OM Re"), a subsidiary of OM, pursuant to which OM Re agreed to reinsure FG Life's liability for waiver of surrender charges benefits under certain annuity contracts issued by FG Life ("CARVM Treaty"). Under the terms of the CARVM Treaty, FG Life agreed to pay 150 basis points per year for this financing.

46. In May 2010, OM's investment banker at J.P. Morgan sent me a bid instruction stating that OM was prepared to provide financing support through December 2015 for 250 basis points per year. In other words, OM would continue to put in place reserve financing on behalf of FG Life in exchange for 250 basis point fee. It was my understanding, based on the language in this bid instruction and based on conversations with OM and its advisor, that the 250 basis

13

points fee would be the total fee that Harbinger and FG Life would pay to OM and OM Re for the same obligation. OM chose to continue to provide the financing by keeping in place the CARVM Treaty between OMFLIC and OM Re and financing a letter of credit as it had done when OMFLIC was its affiliate.

47. At no point during our negotiations did anyone at OM represent to me or anyone on my team, that OM contemplated that there would be two separate charges, one for "financing" and the other for "risk." To the contrary, my understanding, as reflected in Harbinger's May 27, 2010 bid proposal to OM was that there would be a single charge for OM's continuing to maintain the CARVM treaty. In that letter, which I reviewed, Harbinger wrote, "As the *entire consideration* for OM Re maintaining this [CARVM] reinsurance in place through December 31, 2015, the ceding company shall pay an annual premium of 250 basis points." *See* **Ex. 4**, PX 79, at HARB-E0008778 (emphasis added). At no point prior to the signing of the Original SPA did OM indicate that they had a different interpretation of the fee to be paid for the continued financing of reserved reinsurance under the CARVM Treaty.

48. On or about June 28, 2011, after the Acquisition closed, OM took the position, for the first time, that it was entitled to two separate fees for the financing of excess reserves: (1) a quarterly "risk" fee payable from FG Life to OM Re equal to 150 basis points under the CARVM Treaty, and (2) a quarterly facility "financing" fee payable from Harbinger to OM equal to 250 basis points under the SPA.

49. We promptly informed OM that we disagreed with their interpretation of the SPA, which misrepresented the agreement reached by the parties. Harbinger and FG Life have paid OM Group and OM Re the 250 basis points fee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, New York on this 3rd day of October, 2013.

Phillip J. Gass