UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

HARBINGER F&G, LLC,                         :   No. 12-civ-5315 (RA)
                                              :
                  Plaintiff,        :   ECF Case
v.                                          :
                                              :

OM GROUP (UK) Limited,                      :
                                              :
                  Defendant.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JEAN-FRANCOIS LEMAY

        I, Jean-Francois Lemay, hereby declare as follows:

        1.       I am the Chief Investment Officer of Front Street Re Ltd. ("Front Street"), a subsidiary of Harbinger Group Inc. ("Harbinger"). I worked closely with Harbinger on a reinsurance transaction (the "Reinsurance Transaction") between Front Street and Fidelity & Guaranty Life Insurance Company ("FG Life") at issue in this litigation. I submit this declaration based on personal knowledge in support of Harbinger's motion for summary judgment against OM Group (UK) Limited ("OM").

### Professional Background

        2.       I hold a B.S. in actuarial science from Laval University, Quebec Canada. I have over 21 years of experience as a life insurance actuary, with a specific focus in modeling and analyzing both the asset and liability side of the balance sheet and designing and pricing reinsurance deals. I have worked at Front Street since its inception in 2010, initially joining as the Chief Risk Officer.

## Efforts to Obtain Regulatory Approval

3.     On or around July 26, 2011, FG Life submitted its Form D application to its primary regulator, the Maryland Insurance Administration (the "MIA").

4.     After submitting the Form D, FG Life and Harbinger diligently sought MIA approval of the Reinsurance Transaction.  Multiple times during the review process, the MIA requested additional information concerning the Reinsurance Transaction.  For each of these requests, FG Life, Harbinger and Front Street expended a substantial amount of time and resources to compile answers in response to the MIA's requests and to address the MIA's concerns.

5.     I received a phone call from John Tweedie, Front Street's Chief Executive Officer, on or about December 22, 2011 informing me that the MIA disapproved the Reinsurance Transaction.  My immediate reaction was that we need to convince the MIA to reverse course, and, if that did not work, develop an alternative proposal that would be consistent with the Amended and Restated Stock Purchase Agreement ("SPA"), dated February 17, 2011, and approved by the MIA.

## The MIA's Disapproval of the Reinsurance Transaction

6.     On or about January 10, 2012, Harbinger forwarded the MIA's denial letter to me.  From the MIA's denial letter, I understood the MIA to have two objections to the Reinsurance Transaction, which concerned:  (1) the quality and quantity of below-investment grade assets in the Trust Account and the Trust Account Investment Guidelines; and (2) the amount of unrealized gains.  *See* **Ex. 37**, Defendant's Deposition Exhibit ("DX") 7, at HARB-

E0140248-51.[1]  On or about January 20, 2012, the MIA provided Harbinger with a report on the

Reinsurance Transaction prepared by Lewis & Ellis, Inc. (the "L&E Report"), the MIA's outside

actuarial consultants, which informed the MIA's decision.  The L&E Report evaluated the

Reinsurance Transaction and laid out the same objections found in the MIA's denial letter.  *See*

**Ex. 40**, DX 8, at HARB-E0136254-65.  With respect to the investment guidelines, the L&E

Report concluded as follows:

> Lewis & Ellis does not claim to be asset experts, however, we did review the Trust Account Investment Guidelines as part of this transaction.  These guidelines did not appear clear.  In the quality section, the agreement seems to indicate that trust assets can be invested in NAIC 2-6 assets in the percentage range of 0% to 45%.  This table seemed confusing, but this line seemed to imply they can invest up to 45% of the portfolio in below-investment-grade assets.  This would be a major default concern if these types of assets were purchased up to the percentage limits.  I understand the MIA has an investment specialist reviewing this transaction as well, however, I want to voice my concern of this transaction as it relates to the investment guidelines and investments to be utilized in the Trust account.  Given these assets will be marked to market, sudden shifts in the market value could materially impact F&G's balance sheet.

*Id.* at HARB-E0136258.  With respect to the unrealized gain issue, the L&E

Report concluded that as follows:

> It is our understanding it is the intent of the Company to transfer assets at book value equal to the amount of statutory reserves with no adjustment for a ceding commission, as they have indicated this is $0 for this transaction.  It is also our understanding the market value associated with the assets to be transferred have an unrealized gain of approximately $230 million.  The reinsurer has

---

[1]  "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013 ("Kaplan Declaration").

the ability to take these assets and sale [sic] them for the unrealized gain which implies there is a negative ceding commission of approximately $230 million.  Based on the independent analysis of the embedded profits of this block of business, the value of this block of ranged from $5 million to negative $22 million.  Based on this analysis, we believe transferring assets with an unrealized gain of approximately $230 million violates the fair and reasonable Insurance Article as the Company is transferring assets with market values in excess of the value of this block of business according to the Company's own analysis.

*Id.* at HARB-E0136260.

7.      On the unrealized gain issue, Lewis & Ellis and the MIA flat out got it wrong.  It was clear that the MIA heavily relied on the L&E Report to reach its conclusion that $230 million in unrealized gains was not reasonable or fair to FG Life's policyholders in light of Milliman Inc.'s actuarial appraisal that valued the block of assets to be ceded in the range of $5 to $(22).  The L&E Report analysis was wholly unsound.  The L&E Report confused and conflated the book yield method, which Milliman used in its actuarial appraisal, with the market yield method used in Lewis & Ellis's analysis to conclude there were $230 million in unrealized gains—*i.e.*, compared apples with oranges.  In other words, Lewis & Ellis was taking the value of the business based on book yields and then comparing it to a value determined on a market yield basis.  Lewis & Ellis should have analyzed the Reinsurance Transaction under either the book yield method or market yield method, but not under a quasi-analysis containing elements of both approaches.  Because this was a basic mistake, I believe this was not an issue and that the transaction was priced fairly and reasonably.

9.      To help the MIA understand the unrealized gains, Harbinger asked Mr. Laird Zacheis of Milliman to draft a memorandum addressing the errors in the L&E Report (the "Milliman Memo").  *See* **Ex. 47**, DX 12, at HARB-E0001215-16.  I reviewed and provided

comments on drafts of the Milliman Memo.  I believe the Milliman Memo fully addressed the inaccuracies of the L&E Report.

10.      With respect to Lewis & Ellis's concerns regarding the Trust Account Investment Guidelines, Harbinger, together with Front Street and FG Life, wrote a letter to the MIA that attached the Milliman Memo.  *See* **Ex. 47**, DX 12, at HARB-E0001210-16.  I reviewed the letter and provided revisions.  The letter sought to clarify how the investment guidelines worked.  We explained that the below-investment grade assets are limited to 10% of the FG Life's total assets, not 45%.  Lewis & Ellis was correct that pursuant to the investment guidelines, the Trust Account would be comprised entirely of below-investment grades assets.

11.       On the issue raised by the MIA concerning the quality and quantity of below-investment grade assets in the Trust Account and the Trust Investment Guidelines, Harbinger and FG Life wanted to engage the MIA to gauge their precise concerns.  Representatives of Harbinger, FG Life and Front Street met with the MIA in mid-February 2012 and mid-March 2012.  I did not attend these meetings.  At these meetings, as conveyed to me, the MIA continued to express concerns with the amount of below-investment grade assets and the risk inherent with those assets, and would not approve the Reinsurance Transaction, as structured, without a change to the Trust Investment Guidelines.

## Alternative Reinsurance Transactions

12.      As soon I received notice that the MIA denied the Reinsurance Transaction, I immediately started to think of different possible reinsurance transaction structures that the MIA would likely approve, including every permutation of the existing structure.  From my perspective, Front Street – a new company with no reinsurance treaties in force – was an empty company until the Reinsurance Transaction was approved.   Until then I had no day-to-day work

responsibilities, nor job security.  Furthermore, without an initial treaty from our sister company, FG Life, it would be virtually impossible to attract third-party deals to get Front Street off the ground.  It was of the utmost importance to Harbinger and Front Street, if at all possible, to craft a reinsurance transaction consistent with the SPA that would be approved by the MIA.

13.     I considered various reinsurance transaction structures, but could not think of an alternative proposal that would satisfy the MIA and comply with the parameters of the SPA.  For instance, I could not devise a deal that contained less than $750 million in below-investment-grade assets because the entire purchase price adjustment would be due under the SPA.  Likewise, a substantive change in the investment guidelines to the Trust Account, which was necessary to address the MIA's concerns, was in contravention of the SPA.

### OM's Proposal

14.     In early May 2012, OM sent Harbinger a proposed term sheet for an alternative reinsurance transaction.   The term sheet proposed a Trust Account in the amount of $500 million and a Funds Withheld account in the amount of $2.5 billion.  *See* **Ex. 61**, DX 82, at OM-HARB-0005488-501.  The term sheet contemplated that there would be a subsequent increase in the Trust Account depending on certain investment performance "gates" to be agreed upon with the MIA.  I evaluated this proposal.

15.     As structured, OM's Proposal was clearly not in keeping with the terms of the SPA and would have required payment of the entire purchase price adjustment.  Harbinger was only permitted to manage $500 million in below-investment grade assets in the Trust Account.  *Id*. at OM-HARB-0005489.  This violated Harbinger's right to manage at least $750 million of below-investment-grade assets.

6

16.      The "gates" that would open to increase the amount of below-investment grade assets Harbinger could manage in the Trust Account to $1 billion, which had to be agreed upon with the MIA, were not viewed by us as a practical solution.  The MIA had already rejected the application of the agreed-upon investment guidelines to $1 billion of Trust assets.  OM's Proposal was for the Trust initially to be half that amount – $500 million.  Even if the MIA could ultimately be persuaded to raise that figure – by use of "gates" – in order to bring the average amount in line with the SPA, the Trust would have had to balloon to an amount significantly in excess of $1 billion.  This was unrealistic.   Harbinger would have been put at risk by any proposal that began with Trust assets below $1 billion.  A proposal beginning at $500 million may have been necessary to satisfy the MIA (as OM clearly believed), but was a non-starter for Harbinger.

### The Revised Reinsurance Transaction

17.      On September 28, 2012, FG Life submitted a new Form D to the MIA for a revised reinsurance agreement with Front Street (the "Revised Reinsurance Transaction").  **Ex. 65, DX 115, at HARB-E0137021-139**.  This transaction was approved by the MIA on December 13, 2012.  I participated in discussions about the terms for this transaction and reviewed drafts of the Form D prior to submission.

18.      The terms of the Revised Reinsurance Transaction differed significantly from the Reinsurance Transaction disapproved by the MIA.  It contemplated a $1.5 billion transaction, capped the amount of below-investment-grade assets at $500 million, and altered the investment guidelines to allow less risky assets.  *Id.* at HARB-E0137021-22.  In contrast, the size of the

original Reinsurance Transaction was $3 billion, and it capped the amount of below-investment

grade assets at $1 billion and permitted a higher percentage of NAIC 5 and 6.  *See* **Term Sheet**.[2]

19.     This Revised Reinsurance Transaction was significantly less valuable to

Harbinger than the Reinsurance Transaction.  This is because the quantity and quality of the

below-investment grade assets drives the economics.  In the Revised Reinsurance Transaction,

Harbinger had to change both.

20.     For instance, as my analysis showed around June 2012, the present value

difference between $1 billion invested in below-investment grade assets earning 20%, compared

to $750 million in below-investment grade assets earning 20% is $160 million.  Even more

drastic, of course, is if only $500 million is invested in below-investment grades assets like in the

Revised Reinsurance Transaction.  The present value difference would be approximately $311

million (even if offsetting investment income earned from placing the remaining $500 million in

investment grade assets).  *See* **Ex. 63**, DX 154, at HARB-E0165283-85.

21.     Furthermore, these calculations that I did in June 2012 assumed that the assets in

the Trust Account earned 20% income.  However, because the investment guidelines applicable

to Revised Reinsurance Transaction changed the quality of the assets permitted in the Revised

Reinsurance Transaction, the rate of return on these assets would be lower, and the earnings

would plummet even further.

22.     In sum, the difference in value to Harbinger between the original Reinsurance

Transaction and the Revised Reinsurance Transaction was vastly more than $50 million.

---

[2]     The Term Sheet is attached as Exhibit 2 to the Kaplan Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Toronto, Canada on this 30 day of September, 2013.

Jean-Francois Lemay