UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HARBINGER F&G, LLC,

                        Plaintiff,

v.

OM GROUP (UK) Limited,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12-civ-5315 (RA)

ECF Case

## DECLARATION OF ERIC L. MARHOUN

I, Eric L. Marhoun, hereby declare as follows:

1.    I serve as Senior Vice President and General Counsel for Fidelity and Guaranty Life Insurance Company ("FG Life"). From 2011 to 2012, I advised FG Life as its in-house counsel on its efforts to gain approval from the Maryland Insurance Administration ("MIA") of the proposed reinsurance transaction between FG Life and Front Street Re Ltd. ("Front Street") at issue in this litigation. I submit this declaration based on personal knowledge in support of Harbinger F&G LLC's ("Harbinger") motion for summary judgment against OM Group (UK) Limited ("OM").

## Background

2.    I received my J.D. *cum laude* from DePaul University College of Law. I have over 25 years of legal experience advising clients on insurance matters. My experiences include working as an associate and of counsel with the law firm of Lord Bissell & Brook LLP in their corporate insurance group and as an associate at the law firm of Meagher & Geer PLLP in their insurance practice. I also previously served as Lead Group Counsel of American Express

Financial Advisors, Inc., where I oversaw the legal operations of the insurance division of American Express.

3.      In 2007, I joined OM Financial Life Insurance Company ("OMFLIC") as General Counsel.  In that capacity, I assisted with numerous submissions to the MIA, our primary regulator.

### The Acquisition

4.      On February 17, 2011, Harbinger and OM entered into an Amended and Restated Stock Purchase Agreement (the "SPA"), pursuant to which Harbinger was to acquire OMFLIC and other subsidiaries of Old Mutual Financial Life Holdings, Inc.  OMFLIC was subsequently renamed FG Life.  The SPA contemplated that, after closing, FG Life would enter into a reinsurance transaction (the "Reinsurance Transaction") with Harbinger's subsidiary, Front Street.

5.      In order to move forward with the Reinsurance Transaction, Harbinger needed the approval of the MIA because this was a transaction between two affiliated companies, FG Life and Front Street.  Accordingly, Maryland insurance law required a "Form D" application be submitted and approved by the MIA before the Reinsurance Transaction could be culminated.

6.      FG Life's Chief Financial Officer, Barry G. Ward, and I led the efforts to obtain MIA approval of the Reinsurance Transaction because of our extensive experience with the MIA specifically and with insurance regulators generally.  Mr. Ward was also the former head of financial regulation at the Ohio Department of Insurance.  We began working on gaining approval of the Form D prior to the close of the acquisition, while FG Life was still part of OM, and we continued these efforts after the close of the acquisition, when FG Life became part of Harbinger.

7. From the start, the MIA expressed serious concerns with the Reinsurance Transaction. Below-investment-grade assets are assets that are rated numerically by the National Association of Insurance Commissioners ("NAIC") from three to six, with a rating of six signifying the most distressed assets. During its initial review in October 2010, the MIA raised a number of objections about the trust account investment guidelines:

> We also noted some concerns with several of the limitations expressed in the Trust Account Investment Guidelines, and we respectfully request that the company re-examine the propriety of these limits. First, the outer boundaries of limits on exposure to obligations with NAIC Designations of 5 and/or 6 are slightly higher than the limits for these securities that qualify as reserve investments expressed in §5-511(d)(3)(iii) and (iv) (up to 5% for NAIC 5 and 6 and up to 3% for NAIC 6, compared to 3% and 1%, respectively, in §5-511). **Ex. 5** at HARB-E0125381-82 (Hart Oct. 6, 2010 Ltr.).[1]

8. On March 2, 2011, prior to the close of the Acquisition, I attended a meeting with the MIA, along with others from OM, FG Life and Harbinger. We discuss the Reinsurance Transaction's investment objectives, deal structure and asset composition.

**Form D Submission**

9. Following the close of the acquisition on April 6, 2011, I and others at FG Life, Harbinger, and Front Street worked diligently to put together the Form D application. In addition to preparing the Form D submission, the application had to contain near-final versions of the operating agreements for the Reinsurance Transaction, including the Coinsurance Agreement. Additionally, the application required that technical investment and actuarial staff at

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment ("Kaplan Declaration").

FG Life and Front Street choose the appropriate assets and liability blocks to cede to Front Street.

10.     On July 26, 2011, within four months of the closing, FG Life submitted its Form D application. Harbinger communicated with the MIA about the Reinsurance Transaction through FG Life because it was the regulated entity. **Ex. 14**, Defendant's Deposition Exhibit ("DX") 17, at HARB-E0098095-201.

11.     There is no basis for OM's contention that four months was a "considerable delay" in submitting the Form D. **OM's Answer and Counterclaims**, Dkt. No. 13, ¶ 59. *First,* after the close of acquisition, Harbinger and FG Life dedicated time and resources to managing the transition. *Second,* FG Life was required to effectuate another reinsurance transaction not at issue in this litigation immediately after closing the acquisition. That reinsurance transaction also required a Form D submission. *Third,* as I described above, the Form D submissions required a significant amount of work by Harbinger, FG Life and Front Street. *Finally*, OM was given an opportunity to review and comment on drafts of the Form D and relevant operating agreements. Counsel for both sides spent time negotiating the language in the Form D and its accompanying documents. All of these efforts required FG Life to expend tremendous amount of resources.

12.     In sum, FG Life submitted the Form D to the MIA on July 26, 2011 as soon as possible after the acquisition closed.

## Communications with the MIA

13.     Harbinger and FG Life wanted the MIA to approve the Form D. During the five-month pendency of the Form D, I advocated for approval of the Form D application by participating in two in-person meetings with the MIA and exchanging numerous letters, emails,

and telephone calls advocating for approval of the Form D with MIA staff members. I believe that we, Harbinger and FG Life, did everything possible to get the Form D approved.

14. Within a month of submitting the Form D, Mr. Ward and I attended a meeting with the MIA on August 23, 2011 to discuss several pending applications before the MIA, including the Reinsurance Transaction. During this meeting, the MIA staff informed us that they would be sending us a number of high-level questions about the Reinsurance Transaction, including about the rationale for the transaction and its impact on FG Life's policyholders, which would require written responses before they could continue with their review. The MIA also stated that they intended to hire an outside actuarial firm, Lewis & Ellis, Inc., to assist with their review of the Reinsurance Transaction. To aid the MIA's review, we suggested that we meet with the MIA staff and Lewis and Ellis after we received and responded to their questions.

15. Following this meeting, on August 26, 2011, the MIA sent me a list of 15 substantive questions about the Reinsurance Transaction. *See* **Ex. 17**, DX 108, at OM-HARB-0012137-38. Members of Harbinger, FG Life, Front Street and outside counsel immediately began preparing responses to the MIA. We expended substantial resources gathering the data required by the MIA, including information about the volatility of the assets to be transferred and analysis of the anticipated impact of the transaction on FG Life's rating, balance sheet and income statement. I reviewed and commented on drafts of the response letter. The final response, submitted on October 4, 2011, totaled 52 pages. *Id.* at OM-HARB-0012139-91. In the letter, which I signed, I reiterated our request to meet with the MIA to discuss the Reinsurance Transaction because, based on my experience, in-person meetings with the MIA assisted their reviews. *Id.* at OM-HARB-0012145. Before submitting the response, we provided OM with

5

opportunities to comment on the drafts. **Ex. 16** at HARB-E0000132 (Bannigan Oct. 3, 2011 Email).

16.     After we submitted our response to the MIA's August 26 list of questions, the MIA continued to send us numerous requests for additional information. These included requests from the MIA's investment specialist, Alex Hart, about the planned conversion to below-investment-grade assets and the unrealized gain on the securities to be transferred to Front Street. *See* **Ex. 26**, DX 20, at HARB-E0132020-23. The MIA also requested information concerning (*i*) a list of assets to be transferred from FG Life to Front Street along with book and market values (**Ex. 20** at HARB-E0143429-30 (Marhoun Nov. 15, 2011 Email)); (*ii*) ceding commission (**Ex. 24** at HARB-E0049353 (Ward Dec. 2, 2011 Email)); and (*iii*) changes to Coinsurance Agreement between FG Life and Front Street that was appended to the Form D (**Ex. 27** at HARB-E0001095 (Marhoun Dec. 7, 2011 Email); **Ex. 19** at HARB-E0119302, 306-07 (Beckner Nov. 10, 2011 Email). For each of these requests, FG Life and Harbinger spent a tremendous amount of time and resources to compile answers in response to the MIA's requests and to address the MIA's concerns, including revising the operating agreements attached to the Form D.

17.     To assist the MIA with its review, we arranged a call between actuaries representing the MIA, FG Life and Front Street. The purpose of the call was to provide the MIA's actuarial consultants, Lewis & Ellis, with an overview of the Reinsurance Transaction and to help Lewis & Ellis understand the actuarial analysis underlying it. The call occurred in early November 2011.

18.     We also arranged an in-person meeting with the MIA staff on November 16, 2011. In advance of the meeting, I worked with others at FG Life, Harbinger and Front Street to

assemble a presentation deck that explained the structure of the transaction and addressed the MIA's outstanding inquiries. *See* **Ex. 22** at HARB-E0043021-36 (Nov. 16, 2011 MIA Presentation). Prior to the November 16 in-person meeting, Harbinger provided OM's counsel the opportunity to comment on a presentation deck. OM did not provide any comments on the presentation deck and did not attend the meeting.

19. At the meeting, we explained the structure of the transaction, discussed the anticipated benefits to Front Street and FG Life and answered the MIA's questions about the deal. The MIA reacted positively to our presentation and responses to their questions. Coming out of the meeting, I believed we had improved our chances for approval. The MIA informed FG Life that this meeting reassured it about the Reinsurance Transaction. **Ex. 23**, DX 23, at OM-HARB-0018688-89; **Ex. 28**, DX 24, at HARB-E0167382-83.

20. Mr. Ward and I exchanged phone calls once every few weeks with the MIA's Associate Commissioner for Examination and Auditing, Neil Miller, and the MIA's Chief Financial Analyst, Lynn Beckner, to check in on the application and to offer to answer any remaining questions. On these calls, we asked if the MIA required additional information and requested an update on the status of the review. In December 2011, the MIA informed us that we had done a good job presenting our case and they had a difficult decision to make. *See, e.g.*, **Ex. 28**, DX 24, at HARB-E0167382-83.

21. We, Harbinger and FG Life, were very focused on getting this application approved and had done everything we could to get a positive outcome.

### December 22, 2011 MIA Call

22. On December 22, 2011, however, Mr. Miller called Mr. Ward's cell phone while Mr. Ward and I were walking back from a meeting to inform Mr. Ward that the Form D had

7

been disapproved. Mr. Ward asked Mr. Miller if we could call him back when we returned to our offices. Approximately 20 minutes later, after returning to our offices, we returned Mr. Miller's phone call. On the phone for the MIA were Mr. Miller, Assistant Attorney General Van Dorsey, and possibly Ms. Beckner.

23. Mr. Miller and Mr. Dorsey explained the reason for the denial. They were concerned about the amount of below-investment-grade assets permitted in the trust account under the investment guidelines and were concerned about the asset characteristics being transferred from FG Life to Front Street.

24. Mr. Dorsey provided us with the opportunity to withdraw the Form D on this call. Mr. Ward asked the MIA to provide additional information about the disapproval, and the MIA declined. Mr. Ward then declined the offer to withdraw the Form D, explaining that a written opinion from the MIA would help us better understand the reasons that the MIA disapproved the Form D. I agreed with Mr. Ward's decision. I believed a written decision would provide the fullest explanation for the MIA's disapproval.

25. In a letter dated January 10, 2012, the MIA flatly disapproved the Reinsurance Transaction. Like the December 22 phone call, the letter expressed concerns about the amount of below-investment-grade assets permitted in the trust account. The letter also stated that the MIA was concerned that the sale of certain assets would generate an unreasonable amount of profits for Front Street that would be unfair to FG Life. *See* **Ex. 37**, DX 7, at HARB-E0140247-51.

**Reinsurance Transaction Disapproval**

26. Harbinger and FG Life were still determined to see the Reinsurance Transaction approved. In that connection, we had hired Ralph Tyler, the former MIA commissioner, to assist

us.  His first task was to help us engage the MIA in our efforts to reverse their denial of the Reinsurance Transaction.  I worked with him, Harbinger's in-house counsel, Gus Cheliotis, and Harbinger's outside counsel, Michael Devins, on these efforts.

27. Less than a week after receiving the written denial, Mr. Tyler contacted the MIA on behalf of Harbinger and FG Life and scheduled a meeting for January 23, 2012.  Before the meeting occurred, however, we learned that the MIA had mistakenly believed that we had reviewed the report from Lewis & Ellis (the "Lewis & Ellis Report") upon which the MIA relied.  Messrs. Tyler, Cheliotis, Devins and I agreed that the most productive path forward with the MIA would be to postpone a meeting with them until Harbinger, FG Life and OM had reviewed the Lewis & Ellis Report.  After obtaining OM's consent, we postponed this meeting with the MIA.

28. On or about January 20, 2012, the MIA provided Harbinger with the Lewis & Ellis Report, which informed the MIA's decision.  The Lewis & Ellis Report evaluated the Reinsurance Transaction and laid out the same objections found in the MIA's denial letter.  *See* **Ex. 40**, DX 8, at HARB-E0136254-65.

29. Working with OM, Harbinger, FG Life and Front Street found a number of errors in the Lewis & Ellis Report that may have led to the MIA's disapproval.  When the MIA denied our request to meet with Lewis & Ellis, we submitted to the MIA a written report authored by our outside actuarial firm, Milliman, Inc., identifying and correcting the errors in the Lewis & Ellis Report.  **Ex. 47**, DX 12, at HARB-E0001215-16.  We then scheduled an in-person meeting with the MIA Commissioner and her staff for February 14, 2012.

30. On February 14, 2012, I attended an in-person meeting with the MIA along with Messrs. Tyler, Ward and Devins.  OM's counsel and others attended by telephone.  Present at the

meeting for the MIA were Commissioner Therese Goldsmith and Mr. Dorsey. Commissioner Goldsmith stated that the two reasons listed in the January 10, 2012 denial letter were independent reasons and that each reason was a sufficient concern for the MIA to disapprove the transaction. Commissioner Goldsmith, however, declined to provide additional details about the reasons for denial until FG Life had decided whether or not we would waive our right to appeal. She stated that we could either request a hearing to dispute the MIA's determination or waive our right to a hearing and work with her staff on the two areas of concerns identified in the January 10, 2012 denial letter.

31.     After the February 14 meeting, I participated in internal discussion with Messrs. Tyler, Devins and others about next steps. We agreed that waiving our hearing rights and meeting with the MIA made the most sense. Mr. Devins was our primary contact with Dewey & LeBouef LLP, OM's outside counsel. I understand that he sought and obtained their consent about our proposed next steps. On February 27, 2012, I sent a letter to Commissioner Goldsmith stating that FG Life was waiving its hearing rights in order to "engag[e] in substantive discussions with the MIA" so that we could "understand in greater detail the basis for the disapproval" of the Reinsurance Transaction. **Ex. 52**, DX 132, at HARB-E0031949-52.

32.     After FG Life waived its right to a hearing, I attended the in-person meeting with the MIA on March 15, 2012, along with Messrs. Ward, Devins, Tyler and other representatives of Harbinger. OM's counsel, Kirk Lipsey, participated by phone. The MIA representatives present at the meeting included Messrs. Hart, Dorsey and Miller. Mr. Hart stated that the MIA disapproved the transaction because the percentages of highly distressed assets allowed in the investment guidelines to the trust account were not consistent with the standards that the MIA applied to affiliated transactions. Mr. Hart stated that the percentages of NAIC 5 and NAIC 6

assets permitted by the investment guidelines were too high and were detrimental to the interest of FG Life's policyholders. Mr. Hart was clear that the MIA would not approve any transaction without a substantial change to the investment guidelines.

33. Following this March 15 meeting, we concluded that any revised deal that would satisfy the MIA would trigger the purchase price adjustment under the SPA. As a result, we did not believe that addressing the MIA's independent, second reason for denial—the $230 million unrealized gain issue— would have mattered given the MIA's concerns about the investment guidelines.

34. After reaching this conclusion, I understand that Harbinger and its outside counsel reached out to OM to see if they had any viable proposals. I did not participate in these discussions.

## The Revised Reinsurance Transaction

35. On September 28, 2012, FG Life submitted a new Form D to the MIA for a revised reinsurance agreement with Front Street (the "Revised Reinsurance Transaction"). **Ex. 65**, DX 115, at HARB-E0137021-139. This transaction was approved by the MIA on December 13, 2012. I participated in discussions about the terms for this transaction and reviewed drafts of the Form D prior to submission.

36. The terms of the Revised Reinsurance Transaction differed significantly from the Reinsurance Transaction. It contemplated a $1.5 billion transaction, capped the amount of below-investment-grade assets at $500 million, and altered the investment guidelines to reduce the percentages that could be invested in the riskiest below-investment-grade assets. *Id.* at HARB-E0137021-22. In contrast, the size of the Reinsurance Transaction was $3 billion, and it capped the amount of below-investment grade assets at $1 billion and permitted a higher

11

percentage in the riskiest below-investment-grade assets in the investment guidelines. *See* **Term Sheet** at Exhibit A.[2]

37. Before ultimately accepting the Revised Reinsurance Transaction, the MIA suggested that the below-investment-grade assets under management be capped at $100 million. **Ex. 66** at HARB-E0158405-08 (Marhoun Nov. 16, 2012 Email).

### OM's Third Counterclaim for CARVM Fees

38. I understand that, in an unrelated counterclaim, OM has alleged that Harbinger has failed to pay required fees to OM related to the financing of reserves known as CARVM under the SPA. **OM's Answer and Counterclaims**, Dkt. No. 13, ¶¶ 118-24. OM's claim misrepresents the agreement reached by the parties.

39. In 2008, prior to negotiations of the SPA, FG Life entered into the "CARVM Treaty" with Old Mutual Reassurance (Ireland) Limited ("OM Re"), a subsidiary of OM, pursuant to which OM Re agreed to reinsure FG Life's required excess reserves through its own bank facility. Under the terms of the CARVM Treaty, FG Life agreed to pay 150 basis points per year for this reserve financing. *Id.* ¶¶ 119-20.

40. In Section 5.14(c) of the SPA, Harbinger and OM agreed that OM would continue to provide this reserve financing in exchange for an increased fee of 250 basis points. OM contends that it is owed 400 basis points total for this reserve financing—250 basis points under the SPA and an additional 150 basis points under the CARVM Treaty. OM's contention has no merit.

---

[2] The Term Sheet is attached as Exhibit 2 to the Kaplan Declaration.

41. As discussed above in Paragraphs 3-4, I worked at FG Life when it was owned by OM.

42. Prior to the close of the acquisition on April 6, 2011, I had a conversation with Christopher Read, who was a colleague of mine at OM, about the CARVM fees. Mr. Read was a member of OM's deal team and was involved in drafting Section 5.14(c) of the SPA. During our conversation, Mr. Read stated that the total amount of fees owed by Harbinger and FG Life for CARVM was 250 basis points total and that this was an additional 100 basis points on top of the 150 basis points due under the CARVM Treaty between FG Life and OM Re.

43. In an email to me dated December 20, 2010, Mr. Read again confirmed that the total fee owed for the reserve financing was 250 bps, not 400 bps points as OM contends. In this email, Mr. Read wrote, "Having considered at [OM] plc our preference is not to amend the [2008 CARVM Treaty] and instead to have a separate quarterly payment of the *additional financing costs (ie 100bps)* directly to OMGUK in line with the sale contract." **Ex. 7**, Plaintiff's Deposition Exhibit 20, at HARB-E0112682 (emphasis added).

13

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Baltimore, Maryland on this 26th day of September, 2013.

_____
Eric L. Marhoun