UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HARBINGER F&G, LLC,

                Plaintiff,

v.

OM GROUP (UK) Limited,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12-civ-5315 (RA)

ECF Case

## **DECLARATION OF RALPH S. TYLER**

I, Ralph S. Tyler, hereby declare as follows:

1. I am a partner at the law firm Venable LLP in Baltimore, Maryland where I practice in the Litigation and Government Divisions, specializing in regulatory work. In 2012, I advised Fidelity & Guaranty Life Insurance Company ("FG Life" or the "Company") and Harbinger F&G, LLC ("Harbinger") with respect to their application for approval of a certain reinsurance transaction that was before the Maryland Insurance Administration (the "MIA"). I submit this declaration, on personal knowledge, in support of Harbinger's motion for summary judgment against OM Group (UK) Limited ("OM").

## **Background**

2. I have over 40 years of experience as an attorney practicing in both the private and government sector. With respect to the government sector, I have extensive experience in Maryland state government.

3. In 1982, I joined the Maryland Attorney General's Office where I served in various capacities for fourteen years, including as Deputy Attorney General and as Chief of Litigation. In June 2004, I was appointed the Baltimore City Solicitor in which capacity I

headed Baltimore's law department.  In January 2007, I was appointed Chief Legal Counsel to Maryland Governor Martin O'Malley.

4.      As discussed in more detail below, in September of 2007, I was appointed MIA Commissioner.  I served in that capacity for over two years.  In January 2010, I left the MIA to become Chief Counsel of the United States Food and Drug Administration .

5.      I also have experience in the private sector representing clients before regulators. In October 2011, I joined Venable as a partner in the firm's Litigation and Government Divisions.  Between 1996 to 2004, I was a partner in the law firm then-known as Hogan & Hartson, LLP.

### The Maryland Insurance Administration

6.      In September of 2007, I was appointed Commissioner of the MIA ("Commissioner").  The MIA is an independent Maryland state agency that regulates Maryland's insurance industry and protects consumers by enforcing Maryland insurance laws.  Among other responsibilities, the MIA licenses insurance companies and producers operating in Maryland, conducts financial examinations of insurance companies to ensure their solvency, and generally regulates and oversees Maryland insurers.

7.      As Commissioner, I oversaw all aspects of the work performed by the MIA, including review of "Form A" applications seeking MIA approval for an insurance company's change of control, typically when the domestic insurance company is being acquired by another company.  I also oversaw review of "Form D" applications, which seek MIA approval for a contemplated transaction between a domestic insurance company and an affiliated company. Under Maryland insurance law, transactions resulting in a change of control and transactions between affiliated companies require MIA approval.

8.      During my tenure at the MIA, I became well acquainted with many individuals on the MIA staff, some of whom I recruited to the MIA and who I knew from other experience in Maryland government.

### FG Life

9.      During my time as Commissioner, FG Life was known as Old Mutual Financial Life Insurance Company ("OMFLIC") and was a subsidiary of OM Group (UK) Limited. Because OMFLIC is a Maryland domiciled life insurance and annuity company, the MIA was, and still is, its primary regulator.  As Commissioner, I had dealings with OMFLIC and its General Counsel, Eric Marhoun.  At that time, the MIA paid particular attention to OMFLIC because there were some regulatory concerns with OMFLIC.  Specifically, OMFLIC was in poor financial condition and the MIA had concerns about its solvency.  As a result, I had, on several occasions, met with Mr. Marhoun and other executives of OMFLIC to discuss these regulatory concerns.

### FG Life Engaged My Services

10.     Several months after I joined Venable, Mr. Marhoun reached out to me.  He explained that FG Life was having difficulties communicating effectively with the MIA and inquired whether I would meet with them to discuss how this might be improved.  We met at Venable's offices on December 22, 2011.  Along with Mr. Marhoun, the meeting was attended by Messrs. Lee Launer and Barry Ward, FG Life's Chief Executive Officer and Chief Financial Officer, respectively.  Another colleague of mine, Marta Harding, from Venable attended the meeting.  We discussed FG Life's desire to improve communications with the MIA and the agency's response time to FG Life's requests and concerns.

3

11. As former Commissioner of the MIA, I was in a good position to help FG Life. I had known the then-current Commissioner of the MIA, Therese Goldsmith, having worked together at Hogan and Hartson. I encouraged Ms. Goldsmith to pursue her interest in public service in Maryland. I supported her appointment to the Maryland State Public Service Commission. I also knew other regulators at the MIA, some of whom I worked with and consider friends. During that meeting, I advised FG Life on possible strategies.

12. Shortly after the conclusion of the December 22, 2011 meeting, later that afternoon, Mr. Marhoun called me and reported that he had just been informed by the MIA that a transaction pending before the MIA would not be approved.

13. The transaction at issue, I learned, was the reinsurance transaction between FG Life and its sister company, Front Street Re Ltd. ("Front Street"), an off-shore reinsurance company (the "Reinsurance Transaction"). Because of the transaction's importance to them, FG Life, Harbinger, and Front Street sought a clear understanding of the reasons for the MIA's denial and wanted the MIA to approve the transaction.

14. FG Life retained me to assist the Company in gaining the MIA's approval. I advised on how to best communicate with, and reviewed submissions to, the MIA. I also communicated directly and met (on two occasions) with the MIA.

**Efforts to Engage with the MIA**

15. Shortly after I was engaged, I reviewed the MIA's denial letter dated January 10, 2012 which disapproved the Reinsurance Transaction. **Ex. 37**, Defendant's Deposition Exhibit

4

("DX") 7, at HARB-E0140248-51.[1] The letter denied the Reinsurance Transaction because: (1) the amount of below-investment-grade assets permitted under the investment guidelines and (2) the amount of profits that Front Street would receive from the proposed sale of investment-grade assets (the "unrealized gains"), which would be replaced with below-investment-grade assets.

16.     On January 18, 2012, I followed up on Mr. Ward's earlier request that the MIA meet with FG Life as soon as possible. I sent an email to the MIA Deputy Commissioner, Karen Hornig, to request a meeting. **Ex. 38**, DX 121, at HARB-E0129243-46. Ms. Hornig responded immediately by scheduling a meeting with Commissioner Goldsmith and others at the MIA for January 23, 2012. **Ex. 39**, DX 123, at OM-HARB-0013104-05.

17.     On January 20, the Friday before the scheduled meeting, I learned that the Commissioner and Ms. Hornig mistakenly believed that FG Life had received a report from the MIA's outside actuarial consultants, Lewis & Ellis, Inc. *Id.* at OM-HARB-0013104; **Ex. 44**, DX 127, at HARB-E0027012. I requested the Lewis & Ellis report and received it later that afternoon. **Ex. 40**, DX 8, at HARB-E0136252-65. The Lewis & Ellis report, which informed the MIA's decision, evaluated the Reinsurance Transaction and laid out the same objections found in the MIA's denial letter. *See id.*

18.     Actuaries at FG Life and Front Street found errors in the Lewis & Ellis report that they believed led to the MIA's denial of the Reinsurance Transaction. I spoke with Mr. Marhoun, Michael Devins, Harbinger's outside counsel at Debevoise & Plimpton LLP, and Gus

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013.

Cheliotis, Harbinger's in-house counsel, about next steps. We agreed that the best approach would be to delay the January 23 MIA meeting until after we had met with Lewis & Ellis to discuss the errors in their report. **Ex. 44**, DX 127, at HARB-E0027012. Dewey & LeBouef LLP ("Dewey"), OM's outside counsel, agreed to this approach. **Ex. 41** at HARB-E0162197 (Devins Jan. 21, 2012 Email). I proposed this to Ms. Hornig on the morning of Monday, January 23, and she indicated agreement. **Ex. 44**, DX 127, at HARB-E0027012.

19. Several days later, Mr. Van Dorsey, Assistant General Counsel to the MIA, called me and expressed concern that Harbinger and FG Life would obtain "free discovery" if they were permitted to meet with Lewis & Ellis while FG Life held the right to a hearing contesting the January 10 decision. *Id.* at HARB-E0027013. I discussed the issue with Messrs. Devins, Marhoun and Cheliotis, and we agreed that the best path forward was to waive the hearing in order to obtain the actuarial meeting. Dewey agreed with this approach, but requested a change to my draft email that they believed would more explicitly state that the waiver was conditioned on meeting with Lewis & Ellis. **Ex. 43**, DX 126, at HARB-E0162006.

20. Based on my experience as a regulator, including as former MIA Commissioner, I believed that Dewey's suggested approach was unnecessary because my draft email recounted my prior conversation with Mr. Dorsey and made clear that FG Life's waiver of hearing was predicated on its ability to meet with Lewis & Ellis. **Ex. 43**, DX 126, at HARB-E0162005-06. After Dewey acquiesced to our approach, I sent Mr. Dorsey an email waiving FG Life's hearing rights on January 31. *See* **Ex. 44**, DX 127, at HARB-E0027013, 15.

21. Mr. Dorsey called me on February 2, 2012 and said that FG Life could not meet with Lewis & Ellis but could meet with the MIA staff. I was very surprised by this call. I explained FG Life's rationale for wanting to meet with Lewis & Ellis, including that reasons

6

provided in the MIA's January 10 letter appeared to be based on errors in the Lewis & Ellis report.  *Id.* at HARB-E0027013.

22.     I spoke again with Mr. Dorsey on the morning of February 3 and reiterated FG Life's desire to meet with Lewis and Ellis.  I also stated that the MIA engaged in a sort of "bait-and-switch," having asked FG Life to waive its right to a hearing in order to obtain a meeting with Lewis & Ellis, and after FG Life complied with the request and waived its hearing right, the MIA reversed its position notwithstanding FG Life's waiver.  *Id.*

23.     Mr. Dorsey called me back on the afternoon of February 3.  He stated that the MIA's position remained unchanged that FG Life could not meet with Lewis & Ellis but that FG Life could submit in writing its objections to the Lewis & Ellis report.  Mr. Dorsey also said that the MIA would agree, if FG Life requested, to withdraw FG Life's waiver and to toll the running of the time within which FG Life could request a hearing.  *Id.*

24.     On February 7, 2012, I sent Commissioner Goldsmith a formal letter requesting that the time for requesting a hearing be tolled for 30 days beyond the deadline for requesting a hearing and withdrawing FG Life's waiver of hearing because the MIA had chosen not to honor the understanding that FG Life could meet with Lewis & Ellis if it waived its hearing rights.  I also renewed our request to meet with Commissioner Goldsmith.  *Id.*

25.     The following day, in a letter dated February 8, 2012, Commissioner Goldsmith granted our requests to toll the hearing for 30 days, meet with the Commissioner and to submit a letter in advance of that meeting detailing the errors in the Lewis & Ellis report.  **Ex. 45**, DX 128, at HARB-E0027000-01.  The meeting with the Commissioner and her staff was subsequently held on February 14, 2012.

### February 14, 2012 MIA Meeting

26. In advance of the February 14 meeting, I sent Commissioner Goldsmith the Company's submission addressing the Lewis & Ellis report, which included a memorandum from the Company's outside actuarial firm, Milliman, Inc.  **Ex. 47**, DX 12, at HARB-E0001210-16.  The submission explained that Lewis & Ellis had made a fundamental error, which the MIA relied upon in objecting to the profits that Front Street would receive from the asset transfer.

27. Messrs. Devins, Marhoun and I also prepared talking points for the meeting.  **Ex. 50**, DX 129, at HARB-E0162983-84; **Ex. 48** at HARB-E0162667 (Marhoun Feb. 12, 2012 Email).  I suggested that, with respect to the unrealized gains issue, we ask if the issue was resolved rather than debate the points raised in the letter.  **Ex. 49**, DX 131, at HARB-E0162744.  I provided additional comments meant to help facilitate the discussion with the MIA, so the MIA would provide additional insights into their rationale for denying the Reinsurance Transaction.

28. On February 14, 2012, I attended an in-person meeting with the MIA along with Messrs. Devins, Ward and Marhoun.  OM's counsel, Elizabeth Bannigan at Dewey, and others attended by telephone.  No one from OM attended.  Present at the meeting for the MIA were Commissioner Goldsmith and Mr. Dorsey.  Mr. Ward mentioned the topics we wished to discuss.  The Commissioner replied that FG Life had a choice to make first: the Company could either exercise its right to a hearing or waive its right and engage in discussions about the MIA's rationales for denying the Reinsurance Transaction.

29. The Commissioner also stated that the denial was predicated on two independent grounds that were identified in the January 10 letter, namely the amount of unrealized gains between transferred to Front Street and the amount of below-investment-grade assets.  Each reason for disapproval would therefore need to be addressed.  She further stated that there were

8

no other reasons for denying the Reinsurance Transaction. The Commissioner, however, refused to engage in additional discussions until FG Life had waived its right to a hearing.

30.     The next day, on February 15, 2012, Mr. Devins prepared a summary of the February 14 meeting. I reviewed the summary shortly after it was prepared and believed it accurately reflected our discussions with the MIA. **Ex. 51**, DX 65, at HARB-E0162664-65.

31.     After the meeting, I discussed with representatives of Harbinger, FG Life and Front Street the appropriate next steps. We agreed that FG Life should waive its hearing rights and engage in discussions with the MIA about their rationale for disapproving the Reinsurance Transaction because (*i*) the hearing would be before an appointee of the Commissioner and (*ii*) the hearing decision could be appealed to a court but the standard of reversal—whether the MIA's decision was "arbitrary and capricious"—would be very high. There would be very little chance of successfully appealing the MIA's decision.

32.     Consistent with our practice, I understood that Mr. Devins discussed our proposed next steps with Dewey and obtained their consent. **Ex. 51**, DX 65, at HARB-E0162663-65. On February 27, 2012, Mr. Marhoun sent Commissioner Goldsmith a letter waiving its hearing rights in order for FG Life to have substantive discussions with the MIA staff about their rationale for disapproving the Reinsurance Transaction and to meet with Lewis & Ellis. **Ex. 52**, DX 132, at HARB-E0031951-52.

### March 15, 2012 MIA Meeting

33.     To ensure that the tentatively scheduled meeting with the MIA on March 15 would be productive, I had a frank telephone conversation with Mr. Dorsey prior to that meeting. I informed him that Alex Hart, the MIA's investment specialist, and Neil Miller, Associate Commissioner for the Examination and Auditing Section, should engage in substantive

discussions about the rationale for disapproval, so FG Life and Harbinger could understand the framework for a potentially approvable transaction. Mr. Dorsey said that he understood my concerns and that he would encourage Messrs. Hart and Miller to be responsive to the Company's questions and he would attend the meeting to ensure their compliance. He also noted that the MIA was willing to retain Lewis & Ellis again and acknowledged that the MIA was aware of errors in the Lewis & Ellis report. **Ex. 53**, DX 66, at HARB-E0165259.

34. In advance of the March 15 meeting, I provided input on draft talking points. **Ex. 55**, DX 136 at HARB-E0165275-77; **Ex. 56**, DX 138, at HARB-E0165134-35. These talking points were shared with Dewey. **Ex. 56**, DX 138, at HARB-E0165134. I sought to ensure that the conversation focused on the rationale for denying the transaction and that the tone of the meeting and questions and responses we provided would encourage the MIA to be forthcoming about its reasoning. I believed such a discussion would facilitate a better discussion and permit FG Life and Harbinger to address the MIA's concerns.

35. On March 15, I attended the MIA meeting in-person, along with Messrs. Ward, Marhoun and Devins. Mr. Cheliotis, Phil Gass, the Managing Director of Investments at Harbinger's parent company, and Laird Zacheis, FG Life's and Harbinger's outside actuary, attended the meeting by phone. I believe that Kirk Lipsey, OM's outside counsel from Dewey, also attended by phone. No one attended from OM. Present for the MIA were Messrs. Dorsey, Hart and Miller, and possibly Lynn Beckner, the MIA's Chief Financial Analyst. *See* **Ex. 54**, DX 134, at HARB-E0065290; **Ex. 56**, DX 138, at HARB-E0165134.

36. At the meeting, Mr. Hart spoke in detail about the reasons for the MIA's denial. From Mr. Hart, I understood that he was concerned that the investment guidelines permitted the Trust Account too much discretion, up to $1 billion could to be invested in below-investment-

10

grade assets. Mr. Hart was concerned with both the amount of below-investment-grade assets and the quality of the below-investment grade assets. Mr. Hart clearly communicated that any proposed transaction would have to address, in a significant way, both of these concerns about the investment guidelines.

37. Prior to this meeting, in the January 2012 timeframe, Ms. Hornig had informed me that Mr. Hart had called the Reinsurance Transaction "scary." Having worked with Mr. Hart, I was skeptical that his views about the Reinsurance Transaction would change.

38. During this March 15 meeting, the MIA acknowledged that there were legitimate disagreements between Milliman and Lewis & Ellis about the actuarial analysis underlying the unrealized gains issue.

39. The day after the March 15 meeting, I drafted a letter to the MIA that summarized the meeting, including Mr. Hart's position that the "MIA would not approve a revised transaction absent a change of the [investment] guidelines." **Ex. 57** at HARB-E0165267-68 (Tyler Mar. 16, 2012 Email). This letter was not sent to the MIA because Messrs. Devins, Marhoun and I agreed that we should reach consensus with OM about next steps before following up with the MIA.

40. Shortly following the March 15 meeting, I conferred Messrs. Devins, Marhoun and others at Harbinger and FG Life who attended the meeting. Everyone concurred that the MIA would require a substantial change to the investment guidelines for a reinsurance transaction to be approved. As a result, we did not believe that addressing the MIA's independent, second reason for denial—the unrealized gains issue—mattered. Even if we addressed the MIA's concerns about the unrealized gains issue, the MIA's independent concern about the investment guidelines would have prohibited approval.

11

41. My engagement on this matter terminated shortly after the March 15 MIA meeting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in ~~Baltimore, Maryland~~ Chicago, Illinois on this 1st day of ~~September,~~ October 2013.

Ralph S. Tyler