UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HARBINGER F&G, LLC,
                             Plaintiff,

v.

OM GROUP (UK) Limited,
                             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 12-civ-5315 (RA)

ECF Case

## DECLARATION OF LAIRD ZACHEIS

I, Laird Zacheis, hereby declare as follows:

1.     I am a Principal and consulting actuary with Milliman, Inc. I was retained by Harbinger to provide an independent review of the pricing for the Reinsurance Transaction at issue in this litigation. I have personal knowledge of the statement set forth in this declaration.

### Professional Background

2.     I hold a B.S. (summa cum laude) in mathematics from Yale University and an M.B.A. (high honors) from the University of Chicago. I have over 20 years of experience providing consulting actuarial services in the area of mergers and acquisitions involving life insurance companies. Specifically, I have extensive experience providing consulting services in the areas of capital management and asset/liability analysis. I joined the Milliman firm in 1991 and have been a Principal of the firm for the past 15 years.

### Harbinger's Engagement of Milliman

3.     Milliman was engaged by Harbinger in the fall of 2009.  Our role was to provide actuarial advisory services to Harbinger for the potential acquisition of OM Financial Life Insurance Company from OM Group (UK) Limited ("OM").  After the Acquisition, the company was renamed Fidelity & Guaranty Life Insurance Company ("F&G Life").  F&G Life is a life insurance and annuity company that is domiciled in Maryland and primarily regulated by the Maryland Insurance Administration (the "MIA").

### Reinsurance Transaction

4.     In November 2010, as part of the Acquisition, Milliman was also engaged to review a proposed reinsurance transaction (the "Reinsurance Transaction") between F&G Life and Front Street Re Ltd. ("Front Street"), another subsidiary of Harbinger.  As part of our role, Milliman helped Harbinger evaluate the asset and liability block that would be transferred from F&G Life to Front Street.

5.     Harbinger also asked me to review the reasonableness of the financial terms of the Reinsurance Transaction, and specifically to evaluate whether the pricing methodologies used to price the block of business that would be transferred or "ceded" from F&G Life to Front Street was reasonable from the perspective of an arm's length transaction.

6.     A ceding commission is a fee exchanged between the reinsurance company and the original issuer of a group of policies for transferring the block of business.  A block of business consists of liabilities, *i.e.,* the policies the reinsurer is

2

agreeing to take on, and the assets that support those liabilities. A ceding commission can be thought of as the present value of future profits expected on the block of business discounted at an appropriate interest rate. Depending on the expected profitability of the block of business, the original issuer may have to pay a fee to the reinsurer called a negative ceding commission or the reinsurer may have to pay a fee to the original issuer called a positive ceding commission.

7.  I understood that F&G Life and Front Street had determined that given the block of assets and liabilities that would be transferred to Front Street, there would be a zero ceding commission. Milliman, under my direction, reviewed the pricing methodology used for the cession of annuity blocks to determine whether a zero ceding commission was appropriate. Milliman drafted a memorandum dated November 5, 2010 setting out our conclusion. *See* **Ex. 6**, Defendant's Deposition Exhibit ("DX") 3, at HARB-E0067894-97.[1]

8.  As explained in that memorandum, Milliman determined that the actuarial appraisal value of the business to be ceded to Front Street, based on discount rates typical for actuarial appraisal analyses of comparable blocks in the then-current environment, would have been an estimated $5 million to $(22) million. *See id.* at HARB-E0067895-96. In other words, a ceding commission in the range of $5 to $(22) million would have been fair, reasonable and consistent with actuarial appraisal methodology. This means

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of Olga Kaplan in Support of Plaintiff/Counterclaim Defendant Harbinger F&G, LLC's Motion for Summary Judgment dated October 4, 2013.

that a "positive ceding commission" of between $5 million to $0 or a negative ceding commission of between $22 million to $0 would be considered fair pricing in a transaction between two unaffiliated entities.

9.  Therefore, because a zero ceding commission is within this range of $5 million to $(22) million, I determined that it was consistent with actuarial appraisal methodology and a target discount rate range typically seen for comparable blocks of business in the then-current environment.  *See id.* at HARB-E0067897.

10. It is my understanding that in November 2010, Harbinger provided this memorandum to the MIA and Lewis & Ellis, Inc. ("Lewis & Ellis"), the actuarial firm hired by the MIA to review the Reinsurance Transaction.  The MIA was reviewing F&G Life's Form D submissions, which sought approval of the Reinsurance Transaction from the MIA.  My understanding is that Harbinger provided this memorandum to the MIA in support of the pricing methodologies used to determine that a zero ceding commission was appropriate.

11. I also understand that Harbinger provided the same memorandum to the MIA in December 2011 in response to the MIA's request that F&G Life provide the MIA with any type of appraisal that was performed by a third party on this type of block of business.  I was comfortable with Harbinger resubmitting this memorandum to the MIA in December 2011 because the memorandum clearly discussed the contents and context of our actuarial analysis and the block of business being considered in 2011 was similar to the block of business that was considered in November 2010.

4

## The Inconsistency in the Lewis & Ellis Report

12. In mid-January 2012, I received the MIA's letter denying the Reinsurance Transaction. *See* **Ex. 37**, DX 7, at HARB-E0140248-51 (MIA Jan. 10, 2012 Letter). Shortly after the denial, I reviewed a report from Lewis & Ellis that evaluated the Reinsurance Transaction (the "Lewis & Ellis Report"). **Ex. 40**, DX 8, at HARB-E0136254-65 (Lewis & Ellis Report).

13. From these documents, I understood the MIA and Lewis & Ellis to have two objections to the Reinsurance Transaction, which concerned: (1) the investment strategy of the trust; and (2) the reasonability of the ceding commission. Phil Gass, the Managing Director of Investments at Harbinger, asked me for my thoughts on the latter objection concerning the ceding commission. In connection with that request, Mr. Gass asked that I review the Lewis & Ellis Report.

14. I carefully reviewed the analysis and conclusions of the Lewis & Ellis Report which was prepared by Michael Mayberry, an actuary with Lewis & Ellis. At Harbinger's request, I wrote a memorandum analyzing the statements in the Lewis & Ellis Report (the "Milliman Memorandum"). *See* **Ex. 47**, DX 12, at HARB-E0001215-16. It is my understanding that the Milliman Memorandum was provided to the MIA on or about February 9, 2012 as part of an attempt by Harbinger and F&G Life to respond to the MIA's concerns regarding the pricing for the Reinsurance Transaction. Prior to the memorandum's submission to the MIA, I participated in several internal discussions with Harbinger, F&G Life, Front Street, and their counsel about the best approach to take in this memorandum. I also recall turning around several drafts of the memorandum.

5

15. There are two methodologies for valuing a block of business—book yield approach and market yield approach. A market yield approach evaluates assets based on their market value at the time of the analysis, and the future investment income projection, used to determine the value of the business, is based on market yields. A book yield approach evaluates assets based on their reported book value at the time of the analysis, and the future investment income projection is based on book yields. Note that market values of assets fluctuate with the market forces, particularly with changes in the interest rate environment. Whereas with the book yield approach, asset values are recorded at their purchase price or "book value" and do not fluctuate with market forces. It is the market convention to value a block of business on a book yield basis due to the long term nature of insurance liabilities and the need to maintain asset yields supporting liability interest rate requirements.

16. The Lewis & Ellis Report accepted my analysis that for a substantially consistent block of business a range of value for the ceding commission would be $5 million to $(22) million. It concluded that, therefore, "an initial ceding allowance of 0 is within the range of present value of future profits one might expect with this type of business." **Ex. 40**, DX 8, at HARB-E0136260. As I mentioned above, this analysis was based on a ***book yield method.***

17. The Lewis & Ellis Report found problematic, however, that the block of business to be transferred had an unrealized market gain of approximately $230 million. ***Id.*** That meant that if the assets were sold on the open market, they would bring in a premium of $230 million. Mr. Mayberry then reasoned that because $230 million is not

6

within the actuarial appraisal range from $5 million to $(22) million, then the transfer of assets would not be fair and reasonable to F&G Life. However, Mr. Mayberry did not make any adjustment for the reduction in future earnings, and therefore the reduction in value of the inforce business that would result if the assets were in fact sold on the open market.

18. The analysis contained in the Lewis & Ellis Report is inconsistent with the independent analysis Milliman prepared. The Lewis & Ellis Report conflated the book yield method with the market yield method in its analysis—*i.e.*, compared apples with oranges. In other words, Lewis & Ellis was taking the value of the business based on book yields and then assuming that the unrealized market gain in the asset portfolio was additional value to the reinsurer.

19. As explained in the Milliman Memorandum, if Lewis & Ellis wanted to factor in the unrealized gain in the portfolio, then the value of the business, by definition, has to be determined on a market yield basis, not a book yield basis. As I explained in the Milliman Memorandum, if the ceding commission were determined on a market yield basis then the value of the business to be reinsured would have been between the estimated ranges of $(225) million to $(231) million on a pre-tax basis. *See* **Ex. 47**, DX 12, at HARB-E0001216. Accordingly, an unrealized gain in the asset portfolio of $230 million, plus the negative value of the inforce business on a market yield basis, would be entirely consistent with a ceding commission of zero.

20. Under the Reinsurance Transaction, as proposed, the total value of the block of business is consistent with a zero ceding commission, and the valuation was

7

consistent with an actuarial appraisal under either the book yield or market yield approach.

### The MIA Meetings

21.     Harbinger and F&G Life scheduled two meetings with the MIA to address the issues outlined in the MIA's disapproval letter.  The first meeting occurred in mid-February 2012 and the second meeting occurred in mid-March 2012.  Harbinger/F&G Life requested that I participate in both meetings.  They wanted me to be prepared to discuss the reasonability of the ceding commission and to address any questions the MIA might have on the Milliman Memorandum.  It was my belief that I could clear up any confusion concerning the reasonability of the ceding commission by explaining Lewis & Ellis's inconsistency in not applying the book yield approach across the board in their actuarial analysis.

22.     I dialed-in by phone to participate in both meetings.  Lewis & Ellis did not participate in either meeting.  From these meetings, I came to understand that the MIA believed the issue concerning the reasonability of the ceding commission was within Lewis & Ellis's purview to address.  The MIA would not get into a specific discussion related to Milliman's work or the unrealized gain because Lewis & Ellis was not participating.

23.     I was not involved in any other meeting, or had any other conversations, with the MIA or Lewis & Ellis concerning the Reinsurance Transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Chicago, Illinois on this 3rd day of October, 2013.

_____
Laird Zacheis