UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                                       :

HARBINGER F&G, LLC,
                                                                       :

                Plaintiff,
                                                                       :   No. 12-cv-5315 (RA)(AJP)

v.
                                                                              :   ECF Case

OM GROUP (UK) Limited,
                                                                      :

                Defendant.
                                                                       :

------------------------------------------------------------- X

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

 

**WILLKIE FARR & GALLAGHER LLP**
Joseph T. Baio
Benjamin P. McCallen
Casey E. Donnelly
787 Seventh Avenue
New York, New York   10019-6099
Phone:  (212) 728-8000

*Attorneys for Defendant OM Group (UK) Limited*

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendant OM Group (UK) Limited ("OM") respectfully submits this statement of material facts as to which there is no genuine issue to be tried. This statement of material facts is submitted in support of OM's Memorandum of Law in Support of its Motion for Summary Judgment. A copy of the record evidence on which OM relies to support each of the following undisputed material facts is submitted herewith as exhibits to the Declaration of Casey E. Donnelly, dated October 4, 2013.

## THE PARTIES

1.  Plaintiff Harbinger F&G, LLC ("Harbinger") is a wholly-owned subsidiary of Harbinger Group, Inc, a publicly traded company limited by shares, with primary shareholders being Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., and Global Opportunities Breakaway Ltd. (Declaration of Casey E. Donnelly, Ex. 52.[1])

2.  Defendant OM Group (UK) Limited ("OM") is a wholly-owned subsidiary of Old Mutual plc, a public company organized and existing under the laws of England and Wales. (Ex. 53.)

## THE STOCK PURCHASE AGREEMENT

3.  On August 5, 2010, OM and Harbinger signed a Stock Purchase Agreement for the sale of all the outstanding shares of Old Mutual U.S. Life Holdings, Inc. from OM to Harbinger, including the sale of one of OM U.S.'s subsidiaries, OM Financial Life Insurance

---

[1] All references to "Ex." hereafter refer to exhibits annexed to the Declaration of Casey E. Donnelly, dated October 4, 2013, filed in support of this motion.

Company ("OMFLIC"), a Maryland-domiciled life insurance company, for $350 million.  (Ex. 2 at Art. II.)

4. The parties executed the First Amended and Restated Stock Purchase Agreement (the "SPA") on February 17, 2011. (Ex. 3 at Art. II.)

5. OMFLIC was subsequently renamed Fidelity & Guaranty Life Insurance Company ("F&G Life").  (Ex. 4 at 6.)

## THE REINSURANCE TRANSACTION

6. The SPA required that, after closing, F&G Life would submit to the Maryland Insurance Administration ("MIA") an application for approval of a reinsurance transaction between it and Front Street Re, Ltd ("Front Street").  (Ex. 3 §5.21.)

7. The terms of the reinsurance transaction that was to be submitted for regulatory approval to the MIA were contained in the Reinsurance Transaction Term Sheet, attached as Exhibit K to the SPA.  (Ex. 3 §5.21(b); Ex. 6.)

8. The Reinsurance Transaction Term Sheet stated that F&G Life would transfer certain annuity policies to Front Street and that Front Street would indemnify F&G Life for any benefits F&G Life paid to policyholders pursuant to those policies.  (Ex. 6 at 1, 4.)

9. The Reinsurance Transaction Term Sheet provided that F&G Life would transfer to Front Street approximately $3,000,000,000 in assets.  (Ex. 6 at 1.)

10. The proposed reinsurance transaction was subject to the approval of the MIA, F&G Life's regulator.  (Ex. 7 at HARB-E01400248-49.)

11. In evaluating the proposed reinsurance transaction, the MIA Commissioner was required under Section 7-703(f) of Maryland's Insurance Article to determine whether its proposed terms were "fair and reasonable" to F&G Life's policyholders.  (Ex. 7 at HARB-E01400248-49.)

12. The SPA imposes a variety of post-closing obligations on Harbinger in connection with the proposed reinsurance transaction. Section 5.21(b) of the SPA provides:

> As promptly as practicable following the Closing, Buyer shall cause definitive documentation for a reinsurance transaction between OMFLIC and Front Street Re Ltd. ("Front Street"), substantially on the terms set forth in the term sheet attached hereto as Exhibit K (the "Reinsurance Transaction Term Sheet," and such transaction, the "Reinsurance Transaction"), to be prepared in accordance with the terms and conditions set forth in the Reinsurance Transaction Term Sheet and, except as contemplated in Section 5.21(f)(i), to contain no term or condition that (i) is inconsistent therewith in any respect that would have an adverse economic effect on Seller, or (ii) is inconsistent therewith in any material respect unless (in the case of the preceding clause (ii)), following written notice from Buyer to Seller that Buyer proposes to include in such definitive documentation terms or conditions that are inconsistent in a material respect with the Reinsurance Transaction Term Sheet, Seller reasonably determines that such proposed terms or conditions would not make receipt of any required Governmental Approval materially less likely. Buyer shall give Seller a reasonable opportunity to review and provide comments on such documentation prior to the submission of such documentation to any Governmental Entity.

(Ex. 3 §5.21(b).)

13. Section 5.21(c) of the SPA provides:

> Following the Closing, Buyer shall as promptly as practicable make, and cause its applicable Affiliates to make, all filings and notifications with all Governmental Entities that may be or may become reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Reinsurance Transaction, including Buyer causing a "Form D" or other application to be filed in each jurisdiction where required by applicable insurance Laws in connection with the Reinsurance Transaction (including in connection with any proposed appointment by OMFLIC of Harbinger Capital Partners as investment manager for a portion of the assets in the Funds Withheld Account). Buyer shall commit in such filings to capitalize Front Street with at least $80,000,000 at or before the closing of the Reinsurance Transaction. Buyer shall have responsibility for the filing fees associated with its "Forms D" or other applications in connection with the Reinsurance Transaction.

(Ex. 3 §5.21(c).)

14. Section 5.21(d) of the SPA provides:

> Following the Closing, Buyer shall, and shall cause its Affiliates, including OMFLIC to, use reasonable best efforts to obtain as promptly as practicable all Governmental Approvals that are necessary under applicable Law to consummate and make effective the Reinsurance Transaction. Buyer shall, and shall cause its Affiliates to, take all

reasonable actions as may be requested by any such Governmental Entities to obtain as promptly as practicable after the Closing all such Governmental Approvals. The parties shall cooperate with the reasonable requests of each other in seeking such Governmental Approvals as promptly as practicable after the Closing. Neither Seller nor Buyer shall take or cause to be taken any action that it is aware or reasonably should be aware would have the effect of materially delaying, impairing or impeding the receipt of any such Governmental Approvals of the Reinsurance Transaction following the Closing.

(Ex. 3 §5.21(d).)

15. Section 5.21(d) of the SPA provides:

In the event that a Governmental Entity requires that the terms of the Reinsurance Transaction be changed or altered in a manner that materially and adversely affects the economic benefits reasonably expected to be derived by Buyer thereunder, each of Buyer and Seller shall use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof ("Remedial Efforts").

(Ex. 3 §5.21(d).)

16. Section 5.21(d) of the SPA also provides that "neither party shall have an obligation to so negotiate in good-faith such alternative terms for a period of more than 150 days." (Ex. 3 §5.21(d).)

17. Section 5.21(d) of the SPA provides:

In the event Buyer reasonably believes that, even with the use of Remedial Efforts, any required Governmental Approval would be highly likely to be obtained, or if obtained would be highly likely to impose an Adverse Reinsurance Transaction or Condition, Buyer may request Seller's consent to shorten or eliminate the 150-day period for conducting Remedial Efforts and Seller shall consider such request in good faith.

(Ex. 3 §5.21(d).)

18. Section 5.21(d) of the SPA defines an "Adverse Reinsurance Transaction Condition or Restriction" as:

any condition or restriction imposed by a Governmental Entity: (A) that is not customarily imposed in transactions of the type contemplated by the terms of the Reinsurance Transaction; (B) that requires the taking of any action, including the inclusion in the definitive documentation for the Reinsurance Transaction of any terms or

conditions that are in substance inconsistent with the substantive terms set forth in the Reinsurance Transaction Term Sheet, that would adversely affect in any material respect the economic benefits reasonably expected to be derived by Buyer in connection with the Reinsurance Transaction; (C) that restricts, precludes or conditions the appointment by Front Street (or OMFLIC, if applicable) of Harbinger Capital Partners as investment manager of assets to be deposited into the Trust Account or the Funds Withheld Account as contemplated in the Reinsurance Transaction Term Sheet with an aggregate value of at least $750,000,000 or restricts, prohibits or conditions the payment by Front Street to Harbinger Capital Partners of Harbinger Capital Partner's customary compensation; or (D) that requires any substantive change to the investment guidelines applicable to the assets in the Trust Account or Funds Withheld Account as set forth in the Reinsurance Transaction Term Sheet.

(Ex. 3 §5.21(d).)

19. Section 5.21(e) of the SPA provides:

Subject to applicable Law relating to the sharing of information, Buyer shall promptly notify Seller of any communication it or any of its Affiliates receives from any Governmental Entity relating to the matters that are the subject of the Reinsurance Transaction, permit counsel for Seller to review in advance, and consider in good faith the views of Seller in connection with, any proposed written communication to any Governmental Entity in connection with the transactions contemplated by the Reinsurance Transaction, and provide Buyer with copies of all correspondence, filings or communications between Buyer or its Affiliates or any of its or their Representatives, on the one hand, and any Governmental Entity or members of the staff of any Governmental Entity, on the other hand. . .

(Ex. 3 §5.21(e).)

20. Section 5.21(e) of the SPA further provides:

Buyer shall not, and shall cause its Affiliates to not, participate or agree to participate in any meeting with any Governmental Entity relating to the matters that are the subject of the Reinsurance Transaction unless it consults with Seller in advance and, to the extent permitted by such Governmental Entity, gives Seller the opportunity to attend and participate at such meeting (other than any such meeting or portion thereof that is devoted to Buyer's Protected Information).

(Ex. 3 §5.21(e).)

21. Section 5.21(e) of the SPA further provides:

Buyer further covenants and agrees not to extend any waiting period associated with any Governmental Approval for the Reinsurance Transaction or enter into any agreement

with any Governmental Entity not to consummate the transactions contemplated by the Reinsurance Transaction, except with the prior written consent of Seller.

(Ex. 3 §5.21(e).)

22.     Section 5.21(f)(ii) of the SPA provides:

The Purchase Price as finally determined in accordance with Article II is subject to reduction following the Closing Date as described below (the "<u>Post-Closing PP Reduction</u>"): …If (A) the Reinsurance Transaction or a substantially similar transaction with Front Street or another Affiliate of Buyer is (1) disapproved in writing by the Maryland Insurance Administration, (2) not approved by the Maryland Insurance Administration on or before the date that is the second anniversary of the Closing Date, or (3) approved by the Maryland Insurance Administration, but such approval imposes any Adverse Reinsurance Transaction Condition or Restrictions, and (B) with respect to each of the preceding sub-clauses (1), (2) and (3), Buyer has performed its obligations under <u>Section 5.21(d)</u> with respect to Remedial Efforts, and Buyer is otherwise in compliance with each of its material obligations to seek such approval as set forth above in this <u>Section 5.21</u>, the Post-Closing PP Reduction shall equal $50,000,000.

(Ex. 3 §5.21(f)(ii).)

### THE MIA'S DENIAL OF THE REINSURANCE TRANSACTION AND HARBINGER'S RESPONSE

23.     On July 26, 2011, F&G Life submitted an application to the MIA seeking approval of the reinsurance transaction.  (Ex. 9.)

24.     On December 21, 2011, Philip Falcone, Harbinger's founder and chief executive, sent an email to Philip Gass, Harbinger's primary businessperson on the deal.  Mr. Falcone asked: "What happens if [MIA] say no.  Can we do appeal?"  Mr. Gass stated: "We collect 50MM from Seller.  With Seller out of the way, we can easily modify deal to meet MIA concerns, then re-file."  (Ex. 15.)

25.     Eric Marhoun, F&G Life's general counsel, testified that on December 22, 2011, the MIA informed F&G Life, via telephone call, that it had determined that the reinsurance transaction "was being disapproved because the Department felt it was not in the interest of policyholders because of the structure of the investments contemplated relative to the reserve

credit trust and concerns about the other asset characteristics involved in the transaction." (Ex. 11 (Deposition Transcript of Eric Marhoun ("Marhoun Tr.")) at 34:3 – 36:11.)

26. On December 22, 2011, Mr. Gass wrote an email to Mr. Falcone stating that "Maryland said no" but that the MIA was "open to a revised deal if we can address their concerns." Mr. Gass also stated: "Most important next step—need to make sure we claim under $50MM." (Ex. 12.)

27. Barry Ward, F&G Life's Chief Financial Officer, testified that on the December 22, 2011 call, the MIA gave F&G Life the option of withdrawing the application, but F&G Life declined that opportunity and instead told the MIA that "it would be helpful" to get the denial "in writing so we can better understand it." (Ex. 13 (Deposition Transcript of Barry Ward) at 110:17-112:22.) Neither Mr. Ward nor any other representative of F&G Life or Harbinger consulted OM before making the decision to decline to withdraw the application.

28. On December 22, 2011, Harbinger's in-house counsel, Gus Cheliotis, emailed Michael Devins, Harbinger's outside counsel at Debevoise and Plimpton LLP, and stated, "Mike, what's next for $50m under SPA?" (Ex. 16.)

29. At approximately 9:30 pm on December 23, 2011, Mr. Devins sent an email to OM's counsel, Kirk Lipsey, informing him that the MIA had decided not to approve the reinsurance transaction. (Ex. 10.)

30. On January 10, 2012, the MIA sent a letter to F&G Life regarding the proposed reinsurance transaction. (Ex. 7.)

31. In its January 10 letter, the MIA identified two aspects of the proposed transaction that "would potentially adversely affect the interests of policyholders and which are not fair and reasonable to F&G Life." (Ex. 7 at HARB-E0140248-49.)

32.     The MIA's January 10 letter stated that one of its two concerns was that Front Street could default on "its obligations under the treaty" since it was "unclear that FSR could safely generate sufficient investment returns" from the Trust Account, "given its plans to invest in below investment grade assets."  (Ex. 7 at HARB-E0140250.)

33.     The January 10 letter stated that the MIA's second objection to the terms of the reinsurance transaction was the "realized gain of approximately $230 million" that Front Street would receive in connection with the assets transferred from F&G Life.  (Ex. 7 at HARB-E0140250.)

34.     The MIA's January 10 letter also stated, "Although we must deny the transaction as proposed, we remain willing to work with the parties should they desire to propose a transaction which does not potentially adversely affect the interests of F&G Life's policyholders and which is fair and reasonable to F&G Life."  (Ex. 7 at HARB-E0140250.)

35.     On January 15, 2012, Mr. Gass wrote to Jean-Francois Lemay, Front Street's Chief Investment Officer, and stated:  "Think about if we did a 1.5bn deal, w 500 of Harbinger managed, what would we do the same/different (ie, fwh vs. trust, investment guidelines, level of surplus capital, etc).  We pretty much have free reign to recraft, but only got one more shot at this."  (Ex. 43.)

36.     On January 21, 2012,  Mr. Gass sent an email to Mr. Falcone that stated:  "Focus first is making sure we get our 50mm, which the clock is ticking already."  Mr. Gass also stated:  "We are already in the process of restructuring the deal.  The key issue on timing to resubmit will be to make sure we don't jeopardize our 50mm."  (Ex. 17.)

37. On February 8, 2012, Mr. Gass sent an email to Harbinger's Vice President and Corporate Controller that stated: "we have 150days to negotiate w/OM. So every day counts…." (Ex. 32.)

38. On February 13, 2012, Mr. Gass sent an email to Mr. Cheliotis and others. Mr. Gass stated: "at this point just focused on getting a deal in the door." Mr. Gass also stated: "I was thinking about what a revised FGL deal could look like – I keep coming back to all funds withheld (which could get them over the 'top up' risk component). And besides direct harbinger management, we have other angles (ie, asset based lending, real estate, potentially high yield through cutwater, if we acquire them…)." (Ex. 44.)

39. On February 14, 2012, Harbinger met with the MIA Commissioner. The substantive objections of the MIA to the proposed reinsurance transaction were not discussed. (Ex. 18; Ex. 19 (Deposition Transcript of Michael Devins ("Devins Tr.") at 190:2 – 191:18.)

40. Mr. Marhoun testified regarding the MIA Commissioner's statements during the February 14, 2012 meeting: "I don't believe she ever said that because I don't believe that she would ever negotiate. I believe what she said is this: I will not tell you what transaction will be approved. We respond to proposals and we tell you, once you propose them or discuss them with us, whether they'll be approved or not." (Ex. 11 (Marhoun Tr.) at 187: 2-18.)

41. On February 14, 2012, Mr. Gass sent Mr. Cheliotis an email with the subject line, "my notes from the MIA mtg." In the body of the email, Mr. Gass wrote: "Denial letter isn't final, but provide us w/ guidance on material/threshold issues." Mr. Gass also wrote: "Was express that MIA understands benefits to the deal [,] wants to get deal right . . . open to working with us to revise deal." (Ex. 21.)

42. On February 15, 2012, Mr. Ward sent an email to Mr. Marhoun and Leeland Launer, F&G Life's Chief Executive Officer. The email's subject line was: "MIA meeting (confidential and privileged)." Mr. Ward stated: "Commissioner Goldsmith gave us two paths: request a hearing if we desire further information on the Form D transaction and why it was denied; or work with her staff on the two areas of concern (investment guidelines and unrealized gains) so we can develop a new transaction that could be approved." (Ex. 18.)

43. On February 15, 2012, Mr. Gass sent an email to Mr. Falcone that stated: "the clock on the 50MM continues to tick, and if we can't get to a restructured deal w/OM by June 11, or a restructured deal requires a change to the investment guidelines and we get less than 1Bn, we are entitled to the price adjustment." Mr. Gass also wrote, "We will continue to pursue this aggressively given our obligations under the SPA." (Ex. 20.)

44. On March 15, 2012, Harbinger had a meeting with the staff of the MIA. The MIA Commissioner was not in attendance. (Ex. 22; Ex. 23 (Deposition Transcript of Plaintiff's FRCP 30(b)(6) Representative Gus Cheliotis ("Cheliotis 30(b)(6) Tr.") at 97:13- 98:16).)

45. Mr. Devins's handwritten notes from the March 15, 2012 meeting indicate that the MIA asked the parties to submit a renewed application demonstrating why the deal was not unfairly generous to Front Street at F&G Life's expense. (Ex. 24, at HARB-P0000632.)

46. An April 17, 2012 email authored by Ralph Tyler, outside counsel for Harbinger, indicates that at the conclusion of the March 15, 2012 meeting, the MIA offered to re-hire its outside actuaries to work with Harbinger on an revised proposal. (Ex. 25.)

47. Harbinger never subsequently met with the MIA's actuaries concerning the proposed reinsurance transaction. (Ex. 23 (Cheliotis 30(b)(6) Tr.) at 115:18-21.)

48.     Harbinger did not engage in any substantive discussions with the MIA Commissioner about the terms of the proposed reinsurance transaction or an alternative transaction, either at the March 15, 2012 meeting or any other time.  (Ex. 23 (Cheliotis 30(b)(6) Tr.) at 97:13 – 98:16.)

49.     The March 15, 2012 meeting was the final discussion Harbinger had with the MIA about the proposed reinsurance transaction.  (Ex. 19 (Devins Tr.) at 274:4 – 275:14.)

50.     On March 30, 2012, Mr. Gass sent an email to Mr. Falcone that stated:  "When we are ready to go to Maryland, we have a deal structure ready that we think they'd be okay with (deal a little smaller – we get 600M of assets to mange)."  Mr. Gass also stated: "before we go back to Maryland w/a proposal, we need to send OM notice that they ow[e] 50MM immediately, not after the 150 day restructuring period.  And get them out of the mix."  Mr. Falcone stated:  "That would work."   (Ex. 33.)

51.     Harbinger sent OM a letter, dated April 6, 2012, that demanded payment of a $50 million Post-Closing PP Reduction.  (Ex. 26.)

52.     Harbinger's April 6, 2012 letter stated:

> If, on January 10, the MIA had required that the terms of the Reinsurance Transaction be changed or altered, this would have triggered an obligation on the part of Buyer and Seller to use their reasonable best efforts to negotiate in good faith, for no longer than 150 days, for alternative terms that provide benefits substantially similar to the existing terms ("Remedial Efforts").  Neither at the time of the disapproval nor at any other time prior thereto, however, did the MIA require that the terms of the Reinsurance Transaction be changed or altered.  The MIA flatly disapproved the transaction.  Therefore, there is no obligation to take Remedial Efforts.

(Ex. 26 at HARB-E0029395-96.)

53.     Harbinger's April 6, 2012 letter did not seek OM's consent to shorten or eliminate the 150 day Remedial Efforts period.  Nevertheless, the letter stated:

- 11 -

> In our meetings and discussions the MIA has made it clear that it will not approve any reinsurance transaction without a substantive change to the investment guidelines applicable to the assets in the Trust Account as set forth in the Reinsurance Transaction Term Sheet.

(Ex. 26 at HARB-E0029396.)  At no other time did Harbinger seek OM's consent to shorten or eliminate the Remedial Efforts period.  (Ex. 26.)

54. In the months following the receipt of the MIA's January 10 letter, Harbinger did not suggest to OM or the MIA any revised terms to the transaction.  (Ex. 36 (Deposition Transcript of Gus Cheliotis) at 179:20 – 180:6; Ex. 19 (Devins Tr.) at 269:14 - 21.)

55. OM prepared an alternative term sheet for a potential reinsurance transaction and transmitted it to Harbinger.  Harbinger rejected this alternative term sheet and never submitted it to the MIA.  (Ex. 37; Ex. 38 (Deposition Transcript of Alex Duncan ("Duncan Tr.")) at 166:4 – 167:24.)

56. On April 24, 2012, Alex Duncan, OM's Director of Finance-Capital, met with Mr. Gass in New York to discuss alternative transactions.  (Ex. 39 (Deposition Transcript of Philip J. Gass ("Gass Tr.")) at 268:8 – 270:19.)

57. The April 24, 2012 meeting between Mr. Duncan and Mr. Gass lasted less than 45 minutes.  (Ex. 39 (Gass Tr.) at 268:8 – 270:19.)

58. On May 11, 2012, Mr. Duncan met with Mr. Gass in New York for a second time.  The meeting lasted less than thirty minutes.  (Ex. 39 (Gass Tr.) at 270:20 - 271:12.)

59. On May 31, 2012, OM sent a letter to Harbinger requesting information regarding the financial benefits Harbinger reasonably expected from the proposed reinsurance transaction, so that OM could attempt to develop suitable alternative terms.  (Ex. 40 at HARB-E0160916.)

60. Harbinger did not provide OM with the information it sought in its in May 31, 2012 letter.  (Ex. 38 (Duncan Tr.) at 186:7 – 189:5.)

61. On July 6, 2012, Harbinger sent OM a second notice demanding payment of a full $50 million Post-Closing PP Reduction. (Ex. 41.)

62. Harbinger filed this action against OM for breach of contract. (Ex. 1.)

63. On July 18, 2012, Mr. Gass sent an email with the subject line "FSR deal" to Mr. Ward and Mr. Cheliotis, among others. Mr. Gass stated: "We settled on a conceptual revised deal structure that should address all the issues MIA had (structure and size)." (Ex. 42.)

64. On September 28, 2012, F&G Life submitted a new application to the MIA for approval of a reinsurance transaction between F&G Life and Front Street that involved the transfer of $1.5 billion in assets from F&G Life to an account under Front Street's control. (Ex. 45.)

65. On December 13, 2012, the MIA granted approval of F&G Life's September 28, 2012 application. (Ex. 46.)

66. Under the terms of the approved transaction, a Harbinger affiliate serves as the asset manager for the $1.5 billion in assets. Harbinger is permitted to invest up to $500 million of the $1.5 billion in below-investment-grade securities. (Ex. 45 at HARB-E0137021-30.)

67. Mr. Lemay testified regarding the amount of capital gains that Front Street was able to realize from the transferred asset portfolio: "We harvested –it's—I'm not sure the exact number. I could probably give you a range. I think its between 50 and 75 million. It could be that, that sort of ballpark." (Ex. 30 (Deposition Transcript of J. F. Lemay ("Lemay Tr.") at 295:5 – 298:15.)

### F&G LIFE'S CARVM REINSURANCE

68. In 2008, F&G Life (then owed by OM and called OMFLIC) entered into a reinsurance agreement with an Irish reinsurance company owned by OM called Old Mutual

Reassurance (Ireland) Ltd. ("OM Re").  The contract was known as the 2008 CARVM Treaty.  (Ex. 47.)

69. In connection with the reinsurance arrangement, F&G Life agreed to pay OM Re a fee as provided in Article V of the 2008 CARVM Treaty provides:  "For each Accounting Period, the Expense and Risk Charge shall be calculated as the product of (a) 37.5 basis points and (b) amount of the statutory reserve credit inuring to Cedent from this Agreement."  (Ex. 47 at Art. V.)

70. OM provided financial support in the form of a letter of credit for the reinsurance arrangement set forth in the 2008 CARVM Treaty.  (Ex. 48.)

71. When Harbinger purchased OMFLIC, OM agreed that it would maintain the letter of credit supporting the 2008 CARVM Treaty, for a fee.  (Ex. 49 (Deposition Transcript of Philip A.J. Broadley) at 214:13-24.)

72. Section 5.14(c) of the SPA provides:

Seller shall support or cause an Affiliate of Seller to support ceded annuity reserves through existing or replacement letters of credit or other financing sponsored by Seller or such Affiliate (the "CARVM Facility") that enable OMFLIC to take full credit on its statutory financial statements (assuming OMFLIC's statutory reserves are determined in accordance with the same methodologies that were used by OMFLIC immediately prior to the Closing in determining statutory reserves, consistently applied) for the annuity portion of the Business reinsured by OM Re from OMFLIC under the 2008 CARVM Treaty (the "CARVM Business") until the earliest to occur of: (i) replacement of the CARVM Facility by a facility or facilities that enable OMFLIC to take full credit on its statutory financial statements for all CARVM Business; (ii) December 31, 2015; and (iii) the occurrence of a Non-Qualifying Change of Control.  Buyer shall pay to Seller by Wire Transfer, quarterly in arrears on the last Business Day of each calendar quarter until the CARVM Facility is terminated or all obligations of Seller thereunder have been fully satisfied, a facility fee equal to 250 basis points, calculated on a per annum basis, multiplied by the outstanding amount of letters of credit (and/or other lender-provided security) maintained under the terms of the CARVM Facility.

(Ex. 3 §5.14(c).)

73. After OMFLIC's purchase by Harbinger, OM maintained the letter of credit as required by Section 5.14(c). (Ex. 50 at ¶119.)

74. In response to OM's invoices to Harbinger for the 250 basis point fee established by Section 5.14(c) of the SPA, Harbinger paid OM a fee of only 100 basis points multiplied by the amount of the outstanding letter of credit. (Ex. 50 at ¶122.) In addition to the fees owed to OM Re from F&G Life under the 2008 CARVM Treaty, Harbinger paid OM a fee of only 100 basis points multiplied by the amount of the outstanding letter of credit for the entire period during which OM maintained that letter of credit. (*Id*.)

75. On September 12, 2012, Harbinger obtained replacement financing for OM's letter of credit. (Ex. 23 (Cheliotis 30(b)(6) Tr.) at 143:16-22.)

Dated: New York, New York
October 4, 2013

**WILLKIE FARR & GALLAGHER LLP**

By:   /s/   Joseph T. Baio
         Joseph T. Baio
Benjamin P. McCallen
Casey E. Donnelly
787 Seventh Avenue
New York, New York   10019-6099
Phone:  (212) 728-8000

*Attorneys for Defendant OM Group (UK) Limited*