UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

HARBINGER F&G, LLC,               :   Index No. 12-civ-5315 (RA)
                               :
                 Plaintiff,     :   ECF Case
v.                            :
                             :   Oral Argument Requested
OM GROUP (UK) Limited,       :
                             :
               Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## HARBINGER F&G, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT/COUNTERCLAIM PLAINTIFF OM GROUP (UK) LIMITED'S MOTION FOR SUMMARY JUDGMENT

DEBEVOISE & PLIMPTON LLP
Daniel M. Abuhoff
Olga Kaplan
Sok T. Tea
dmabuhof@debevoise.com
okaplan@debevoise.com
sttea@debevoise.com
919 Third Avenue
New York, New York 10022
212.909.6000

*Counsel to Plaintiff Harbinger F&G, LLC*

Table of Contents

Page

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ................................................................................................3

I.      OM's Motion for Summary Judgment on Harbinger's Breach of Contract Claim
        Should be Denied ...............................................................................3

        A.      The MIA Would Not Approve a Deal Consistent With the Requirements
                of the SPA..............................................................................3

        B.      Harbinger Engaged in Remedial Efforts by Engaging with the MIA and
                OM .......................................................................................7

        C.      Harbinger Did Not Have its Cake and Eat it Too ................................12

II.     OM's Motion for Summary Judgment on its Third Counterclaim Related to
        CARVM Should be Denied ...................................................................15

CONCLUSION.............................................................................................17

Table of Authorities

Page

**CASES**

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013) .......................................................8

*Scott-Macon Sec., Inc. v. Zoltek Cos. Inc*, No. 04-civ-2124 (MBM), 2005 WL 1138476
  (S.D.N.Y. May 12, 2005), *aff'd*, 2007 WL 2914873 (2d Cir. Oct. 4, 2007) ...........................8

Plaintiff/Counterclaim Defendant Harbinger F&G, LLC ("Harbinger"), by its undersigned counsel, respectfully submits this memorandum of law in opposition to Defendant/Counterclaim Plaintiff OM Group (UK) Limited's ("OM") motion for summary judgment on Harbinger's claim that OM breached the First Amended and Restated Stock Purchase Agreement dated February 17, 2011 (the "SPA") by failing to reimburse Harbinger a purchase price adjustment, and on OM's third counterclaim for breach of the SPA related to fees owed for a certain financing known as CARVM.

## PRELIMINARY STATEMENT

OM moves for summary judgment that Harbinger is not entitled to a purchase price adjustment for its purchase of Old Mutual Financial Life Insurance Company ("OMFLIC")[1] from OM (the "Acquisition"). OM concedes that, as part of the Acquisition, the parties contemplated that post-closing OMFLIC would enter into a reinsurance transaction with Harbinger's affiliate Front Street Re Limited ("Front Street") (the "Reinsurance Transaction"), that the Reinsurance Transaction represented significant value for Harbinger, that the Reinsurance Transaction was not approved by the Maryland Insurance Administration (the "MIA"), and that the SPA provided for a purchase price adjustment in case the Reinsurance Transaction was disapproved. OM argues, however, that there should be no purchase price adjustment because, according to OM: (1) the MIA was willing to approve the Reinsurance Transaction if its objections were addressed; (2) once the MIA rejected the Reinsurance Transaction, Harbinger failed to make reasonable best efforts to change the MIA's ruling; and

---

[1]    After the Acquisition closed, OMFLIC was renamed Fidelity & Guaranty Life Insurance Company ("FG Life").

(3) Harbinger did not want the MIA's ruling reversed, but preferred instead to go forward with a different transaction once the purchase price adjustment was paid.  OM purports to have established these three points beyond any genuine dispute of material fact.

OM's motion cannot succeed because it fails to deal squarely with Harbinger's undisputed right under the SPA to decline to make certain changes to the Reinsurance Transaction – even if, without such changes, MIA approval would not be forthcoming.  OM and Harbinger were sophisticated parties represented by experienced counsel.  They recognized the risk that the Reinsurance Transaction would not be approved by the MIA, first, by making MIA approval a condition of closing and, then, by amending the original SPA to provide for a purchase price adjustment if the MIA disapproved the Reinsurance Transaction.  Harbinger was obligated to seek MIA approval in good faith, but the parties agreed that there were certain adverse conditions – like substantive changes to the investment guidelines for the assets to be transferred in the Reinsurance Transaction – that Harbinger need not accept because such changes lessened the value of the Reinsurance Transaction for Harbinger.

On one level, OM concedes this right, stating in its brief "that there were certain, material changes [to the Reinsurance Transaction] that Harbinger could refuse to make." Mem. Supp. Def.'s Mot. Summ. J. 6 ("OM's Br."), Doc. No. 44.  OM fails, however, to come to grips with the fact that the MIA's objections – in particular, its objections to the SPA's investment guidelines – were fundamental and could not be addressed without Harbinger's acceptance of adverse conditions.  Despite Harbinger's extensive efforts, the Reinsurance Transaction could not be approved.  Even the alternative transaction proposed by OM contained adverse conditions that, under the SPA, would have resulted in the full $50 million purchase price adjustment of which OM now complains.

2

OM is correct that Harbinger ultimately entered into an alternative transaction, but this transaction did not compensate Harbinger for its inability to enter into the Reinsurance Transaction contemplated by the SPA.  The alternative was a radically different, scaled back transaction that saddles Harbinger with restrictions on management of below-investment-grade assets that make it far less valuable than the original Reinsurance Transaction.  OM's theory that Harbinger would abandon the opportunity for the original Reinsurance Transaction for the transaction in place now – plus a $50 million purchase price adjustment – is contrary to the evidence and easily debunked.

OM also moves for summary judgment with respect to the CARVM facility.  Essentially, OM argues that the parties' agreement to maintain the existing arrangement meant that compensation would increase from 250 to 400 basis points.  This interpretation is supported by neither the SPA nor evidence of the parties' intent.

## ARGUMENT[2]

I.    **OM's Motion for Summary Judgment on Harbinger's Breach of Contract Claim Should be Denied**

    A.    **The MIA Would Not Approve a Deal Consistent With the Requirements of the SPA**

OM argues that the MIA was willing to approve the original Reinsurance Transaction "if its objections could be addressed."  OM's Br. at 8.  For support, OM relies on comments like the MIA's statement in the letter disapproving the Reinsurance Transaction that "we remain willing

---

[2]    For the Statement of Facts, Harbinger respectfully refers the Court to the facts set out in the Memorandum of Law in Support of Harbinger's Motion for Summary Judgment, Doc. No. 33, and the Statement of Undisputed Material Facts in Support of Harbinger's Motion for Summary Judgment, Doc. No. 34, which are both incorporated by reference herein; and Harbinger's Statement of Additional Undisputed Material Facts at pages 36 to 47, filed herewith.

to work with the parties should they desire to propose a transaction which does not potentially adversely affect the interests of F&G Life's policyholders. . . ."[3] *Id.*

OM's argument fails because the MIA's objection with respect to the interests of FG Life's policyholders could not be addressed – without imposing adverse conditions that undermined the value of the Reinsurance Transaction and that Harbinger was not obligated to accept. The SPA protected Harbinger's interest by providing that "[n]otwithstanding any other provision" of the SPA, Harbinger "shall not be required to take any action… or otherwise agree to or accept" an Adverse Reinsurance Transaction Condition or Restriction ("Adverse Condition"). SPA at Section 5.21(d).[4] An Adverse Condition includes, among others, substantive changes to the investment guidelines applicable to the Reinsurance Transaction.[5] *Id.* at Section 5.21(d)(D). The MIA, however, consistently adhered to a position that struck at the heart of the Reinsurance Transaction, that the replacement of investment-grade assets resulting in $1 billion of below-investment-grade assets to be managed in accordance with the agreed set of

---

[3]   In fact, OM puts forward no evidence even suggesting that the MIA was agreeable to allowing the Reinsurance Transaction to go forward without imposing an Adverse Condition. Instead, OM cites evidence that the MIA was open to a revised transaction – a point which is undisputed and obvious – but does nothing to show that Harbinger could have done an alternate transaction consistent with the SPA. *See, e.g.*, OM's Br. at 9 (citing Declaration of Casey E. Donnelly dated October 4, 2013 ("Donnelly Decl."), Doc. No. 45, Exhibits 21 and 19 for the proposition that the MIA was "open to working with [Harbinger] to revise [the] deal"); *id.* at 11 (citing Donnelly Declaration Exhibits 7, 12, 18, 20, 21, and 35 for the proposition that "the MIA was willing to work with Harbinger on a reinsurance transaction").

[4]   The SPA is attached as Exhibit 1 to the Kaplan Declaration and as Exhibit 3 to the Donnelly Declaration.

[5]   The SPA also restrictes as Adverse Conditions changes that resulted in Harbinger managing less than $750 million of assets as contemplated by the SPA (Section 5.21(d)(C)); and substantive changes to the terms of the Reinsurance Transaction that materially affect Harbinger's expected economic benefits (Section 5.21(d)(B)).

investment guidelines (the "Trust Account Investment Guidelines") posed too great a risk to

policyholders.  *See, e.g.*, Devins Decl. ¶ 31; Tyler Decl. ¶ 36.[6]

      The MIA expressed this concern, about classes of below-investment-grade assets allowed

by the Trust Account Investment Guidelines that the MIA regarded as risky, as early as October

2010.  Kaplan Decl. Ex. 5 at HARB-E0125382.  The MIA then identified this as a principal issue

in its January 10, 2012 letter disapproving the Reinsurance Transaction, and confirmed this as a

gating item in the March 15, 2012 meeting with Harbinger.  Kaplan Decl. Ex. 37; Devins Decl. ¶

31; Tyler Decl. ¶ 36.  The record is replete with evidence on this score:

- "We also noted some concerns with several of the limitations expressed in the Trust Account Investment Guidelines, and we respectfully request that the company re-examine the propriety of these limits.  First, the outer boundaries of limits on exposure to obligations with NAIC Designations of 5 and/or 6 are slightly higher than the limits for these securities that qualify as reserve investments." Kaplan Decl. Ex. 5 at HARB-E0125382 (MIA letter, October 6, 2010).

- "[W]e believe that the structure of the proposed transaction potentially adversely affects the interests of F&G Life's policyholders.  This is a result of the significant increase in the amount of below-investment-grade assets ultimately supporting F&G Life's policyholder

---

[6]   Where applicable, Harbinger refers herein to the following declarations and exhibits thereto submitted in support of its motion for summary judgment:  (*i*) Declaration of Konstantinos (Gus) Cheliotis dated October 3, 2013 ("Cheliotis Decl."), Doc. No. 35; (*ii*) Declaration of Michael D. Devins dated October 2, 2013 ("Devins Decl."), Doc. No. 36; (*iii*) Declaration of Phillip J. Gass dated October 3, 2013 ("Gass Decl.), Doc. No. 37; (*iv*) Declaration of Jean-Francois Lemay dated September 30, 2013 ("Lemay Decl."), Doc. No. 38; (*v*) Declaration of Eric L. Marhoun dated September 26, 2013 ("Marhoun Decl."), Doc. No. 39; (*vi*) Declaration of Ralph S. Tyler dated October 1, 2013 ("Tyler Decl."), Doc. No. 40; and (*vii*) Declaration of Olga Kaplan dated October 4, 2013 ("Kaplan Decl."), Doc. No. 42. Harbinger also refers herein to the following declarations and exhibits thereto submitted in opposition to OM's motion for summary judgment:  (*i*) Declaration of Sok T. Tea dated November 5, 2013 ("Tea Decl."); and (*ii*) Declaration of Jean-Francois Lemay dated November 5, 2013 ("Lemay Opp. Decl.").

obligations under the proposed transaction." Kaplan Decl. Ex. 37 at HARB-E0140250 (MIA denial letter, January 10, 2012).

- "With respect to the investment guidelines issue, Alex Hart made clear that MIA would not approve a revised transaction absent a change of the [investment] guidelines." Kaplan Decl. Ex. 57 at HARB-E0165268 (Letter from Ralph Tyler discussing March 15, 2012 MIA meeting)

- "Mr. Hart spoke in detail about the reasons for the MIA's denial. From Mr. Hart, I understood that he was concerned that the investment guidelines permitted the Trust Account too much discretion, up to $1 billion could to be invested in below-investment-grade assets. Mr. Hart was concerned with both the amount of below-investment-grade assets and the quality of the below-investment grade assets. Mr. Hart clearly communicated that any proposed transaction would have to address, in a significant way, both of these concerns about the investment guidelines." Tyler Decl. ¶ 36 (discussing March 15, 2012 MIA meeting).

- "[The MIA] stated that the investment guidelines gave FG Life discretion to increase significantly the amount of its below-investment-grade assets, which, in turn, increased risk with respect to FG Life's portfolio. . . . [B]oth the absolute amount of below-investment-grade assets and the proportion of below-investment-grade assets relative to the rest of the proposed investment portfolio were not acceptable." Devins Decl. ¶ 31 (discussing the March 15, 2012 MIA meeting).

- "At [the March 15] meeting, the MIA staff objected to the investment guidelines, specifically concerning the size of, and quality of assets in, the trust account because, in their view, the existing guidelines created significant risks to FG Life they would not tolerate." Cheliotis Decl. ¶ 27.

- "Mr. Hart stated that the MIA disapproved the transaction because the percentages of highly distressed assets allowed in the investment guidelines to the trust account were not consistent with the standards that the MIA applied to affiliated transactions. Mr. Hart stated that the percentages of NAIC 5 and NAIC 6 assets permitted by the investment guidelines were too high and were detrimental to the interest of FG Life's policyholders. Mr. Hart was clear that the MIA would not approve any transaction without a substantial change to the investment guidelines." Marhoun Decl. ¶ 32 (discussing the March 15, 2012 meeting).

There is no evidence to the contrary. OM's argument that the MIA expressed a willingness to talk does not get to the critical issue, that is, whether the MIA was accepting of a reinsurance transaction that did not alter the SPA's investment guidelines. The answer to this question, incontrovertibly, is no.

### B.    Harbinger Engaged in Remedial Efforts by Engaging with the MIA and OM

OM argues that Harbinger failed to satisfy its "obligation to pursue for a full 150 days 'all reasonable methods' to obtain approval of the proposed reinsurance transaction. . . ." OM's Br. at 3. In fact, Harbinger's duty was more nuanced. The SPA provides that if a

> Governmental Entity requires that the terms of the Reinsurance Transaction be changed or altered in a manner that materially and adversely affects the economic benefits reasonably expected to be derived by Buyer thereunder, each of Buyer and Seller shall use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof ("Remedial Efforts"); provided that neither party shall have an obligation to so negotiate in good faith such alternative terms for a period of more than 150 days. SPA at Section 5.21(d)).

Thus, (i) if the MIA "requires that the terms of the Reinsurance Transaction be changed or altered," both Buyer and Seller have an obligation to take "Remedial Efforts," (ii) the Remedial Efforts obligation is that "each of Buyer and Seller shall use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms" that are acceptable to the MIA and "provide benefits substantially similar to the benefits provided under the existing" Reinsurance Transaction, and (iii) neither party shall have an obligation to negotiate for "a period of more than 150 days." *Id.* Furthermore, as described above, in performing Remedial Efforts, Harbinger could not be compelled to accept changes that were Adverse Conditions. *Id.*

7

Under New York law, the term "reasonable efforts" is used interchangeably with "best efforts." *See Scott-Macon Sec., Inc. v. Zoltek Cos. Inc*, No. 04-civ-2124 (MBM), 2005 WL 1138476, at *14 (S.D.N.Y. May 12, 2005), *aff'd,* 2007 WL 2914873, at *1 (2d Cir. Oct. 4, 2007). The duty of "best efforts" requires "a party to make such efforts as are reasonable in light of that party's ability and the means at its disposal. . . ." *See id.* (quoting E. Farnsworth, *Contracts*, § 7.17 (3d ed. 2004)); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013). In complying with this obligation, Harbinger "may exercise discretion, within its good faith business judgment, in devising a strategy for achieving its ultimate goal." *Zoltek*, 2005 WL 1138476, at *14.

Harbinger fully satisfied this requirement. First, after the MIA's disapproval, Harbinger (in coordination and full cooperation with OM), engaged the MIA to understand the rationale for the disapproval and the framework for a potentially approvable transaction:

- Harbinger hired Ralph Tyler, a former Commissioner of the MIA to advise Harbinger and FG Life on obtaining approval of the Reinsurance Transaction or an acceptable alternative. Tyler Decl. ¶¶ 10-14; Devins Decl. ¶ 22.

- Harbinger scheduled a meeting with the MIA Commissioner for January 23, 2012. Tyler Decl. ¶ 16 (citing Kaplan Decl. Ex. 39).

- Harbinger requested and reviewed the MIA's actuarial report which the MIA relied upon in reaching its decision. Tyler Decl. ¶ 17 (citing Kaplan Decl. Ex. 40).

- With OM's consent, Harbinger postponed the January 23, 2012 meeting to review the MIA's actuarial report. Tyler Decl. ¶ 18; Devins Decl. ¶ 23 (citing Kaplan Decl. Ex. 41 at HARB-E0162197).

- Harbinger sought to meet with the MIA's actuaries to address errors in the actuarial report. Kaplan Decl. Ex. 44 at HARB-E0027012-15.

- When Harbinger was not allowed to meet with the actuaries, Harbinger submitted a detailed report responding to the errors in the actuarial report. Kaplan Decl. Exs. 45, 47.

- Harbinger met with the MIA on February 14, 2012. In advance of the meeting, Harbinger strategized on the best approach for the meeting and reviewed talking points. Tyler Decl. ¶¶ 27-29.

- Harbinger met with the MIA on March 15, 2012. In advance of the meeting, Harbinger strategized on the best approach for the meeting and reviewed talking points. *Id.* ¶¶ 34-40; Devins Decl. ¶¶ 29-31.

- Prior to the March 15 meeting, Mr. Tyler requested that the MIA engage in frank discussion at the meeting to which the MIA agreed. Tyler Decl. ¶ 33 (citing Kaplan Decl. Ex. 53 at HARB-E0165259).

- Throughout, Harbinger coordinated and cooperated with OM on communications and strategies for engaging with the MIA. Devins Decl. ¶¶ 18-33.

Then, after the depth of the MIA's objections to the Reinsurance Transaction became clear, Harbinger engaged with OM to work towards a revised transaction. Gass Decl. ¶¶ 28-35. In that connection, Harbinger did as follows:

- Harbinger requested to meet with OM to discuss alternative transactions. *Id.* ¶ 28.

- Harbinger met in person with the OM on April 25, 2012 to discuss alternative transactions. *Id.* ¶ 29.

- Harbinger considered OM's alternative proposal received on May 2, 2012. *Id.* ¶¶ 30-33; Devins Decl. ¶ 35.

- Harbinger discussed the proposal on a teleconference with OM on or around May 4, 2012. Devins Decl. ¶ 35; Gass Decl. ¶ 33.

- Harbinger met with OM in person on or around May 11, 2012 to discuss the alternative proposal. Gass Decl. ¶ 34.

- Harbinger notified OM that OM's proposal would constitute an Adverse Condition. Kaplan Decl. Ex. 62 at HARB-E0112014.

- Harbinger provided OM on June 8, 2012 with financial information to aid OM in crafting an alternative proposal. Tea Decl. Ex. 4.

- Throughout, Harbinger reiterated, including as late as June 16, 2012 (more than 150 days after the MIA's disapproval), that it was open to exploring any alternative proposal from OM. OM, however, never provided any other proposal. Gass Decl. ¶¶ 28-35; Cheliotis Decl. ¶¶ 29-33; Tea Decl. Ex. 5.

9

In accordance with the SPA, Harbinger used its reasonable best efforts to work towards an alternative proposal, first with the MIA and then with OM, for a period exceeding 150 days, which ended on June 8, 2012.

After the March 15, 2012 meeting, Harbinger saw no solution to the MIA's objections that did not require an Adverse Condition.  Devins Decl. ¶ 32; Cheliotis Decl. ¶ 28.  Indeed, material changes to the Trust Account Investment Guidelines or decreasing the amount of below-investment-grade assets under Harbinger's management to below $750 million would trigger the full purchase price adjustment coming due under the SPA.  SPA at Section 5.21(d).  Harbinger then turned to OM to determine whether it could craft a viable alternative transaction.  Gass Decl. ¶ 28; Devins Decl. ¶ 33.  OM could not.  OM's single proposal – that Harbinger manages only $500 million of below-investment-grade assets, rather than the $1 billion in the Reinsurance Transaction agreed upon by the parties – would have constituted an Adverse Condition that triggered the full purchase price adjustment that OM disputes today.  Kaplan Decl. Ex. 61 at OM-HARB-0005487-501.

OM characterizes Harbinger's sending two notices of purchase price adjustment as inconsistent.  OM's Br. at 10.  In fact, Harbinger sent OM the first notice on April 6, 2012 to preserve its position that, because the MIA had not "require[d] that the terms of the Reinsurance Transaction be changed or altered," the Remedial Efforts clause of the SPA was never triggered.[7]

---

[7]     In fact, the Remedial Efforts obligation was never triggered as Harbinger argues in its motion for summary judgment.  Harbinger incorporates this argument from the Memorandum of Law in Support of Harbinger's Motion for Summary Judgment at 14.  Should the Court agree and find that Remedial Efforts was never triggered then OM's motion for summary judgment based on Harbinger's failure to undertake such efforts should be denied.

Devins Decl. ¶ 37 (citing Kaplan Decl. Ex. 59 at HARB-E0029395-97).  At the same time, Harbinger sought to have the Reinsurance Transaction approved.  For this purpose, Harbinger engaged in Remedial Efforts and, on July 6, 2012 sent OM a purchase price reduction notice on this basis.  *See* Devin Decl. ¶ 38 (citing Kaplan Decl. Ex. 64).

OM also seeks to draw a negative inference from the fact that Harbinger did not exercise its right to request that the 150 day Remedial Efforts period be shortened.  Harbinger could have requested a shortened period, but was not required to do so.  *See* SPA at Section 5.21(d).  Instead of seeking to cut the period short, Harbinger chose to continue working with OM towards a possible alternative reinsurance transaction.  *See, e.g.*, Tea Decl. Ex. 2 at HARB-E0162254; Devins Decl. ¶ 36 (citing Kaplan Decl. Ex. 62); Cheliotis Decl. ¶ 33; Gass Decl. ¶¶ 34-35. Harbinger did not seek a shorter Remedial Efforts period so that the parties could, in fact, undertake Remedial Efforts.

OM also argues that Harbinger failed to employ reasonable best efforts because it did not take certain "affirmative steps" to obtain MIA approval.

– *Proposing an alternate transaction*: Harbinger did not propose an alternative transaction to OM or the MIA because, given the MIA's objections, Harbinger did not have a viable solution under the SPA.  Nor did OM.  Devins Decl. ¶¶ 33-36.

– *Meeting with MIA representatives without the Commissioner*: Harbinger met with the MIA Commissioner on February 14, 2012.  The meeting on March 15, 2012 was attended by several representatives of the Commissioner including Neil Miller, Associate Commissioner; Alex Hart, the MIA Investment Specialist; and Van Dorsey, the Assistant Attorney General.  *See* Devins Decl. ¶ 30.  In advance of that meeting, Ralph Tyler, a former MIA Commissioner who Harbinger and FG Life hired to represent them before the MIA, requested that the MIA engage

11

in a substantive conversation about the rationale for disapproval, so Harbinger could understand the framework for a potentially approvable transaction.  Tyler Decl. ¶ 33 (citing Kaplan Decl. Ex. 53 at HARB-E0165259).  The MIA agreed to this request.  *Id.*  Harbinger used its best judgment, as informed by regulatory experts like Ralph Tyler and Michael Devins, Harbinger's outside counsel, to attain clarity about the MIA's position.

> – *Discussions with MIA's actuarial firm*:  Harbinger believed the MIA's concerns about unrealized gains could be remedied through further discussions, including discussions with the MIA's actuarial firm, but it would have done nothing to address the other independent reason for the denial—the Trust Account Investment Guidelines.  Tyler Decl. ¶ 40; Devins Decl. ¶ 32; Cheliotis Decl. ¶ 28.

> – *Responding to OM's request of Harbinger for financial data*:  OM sought financial information from Harbinger by letter dated May 31, 2012.  Harbinger responded with financial information on June 8, 2012.  OM never followed up with another request or made another proposal for the revised reinsurance plan.  *See* Tea Decl. Ex. 4; Tea Decl. Ex. 5 at HARB-E0111581.

## C.     Harbinger Did Not Have its Cake and Eat it Too

OM argues that the Court should conclude that Harbinger did not take reasonable best efforts because, by pursuing a revised reinsurance transaction with the MIA in September 2012 ("Revised Reinsurance Transaction"), Harbinger attempted to "reap the benefits of a reinsurance transaction worth tens of millions of dollars while also pocketing a $50 million bonus from OM." OM's Br. at 2.  According to OM, Harbinger was enabled in this way to "hav[e] its cake and eat[ ] it, too."  *Id.*  In fact, Harbinger has been damaged far in excess of $50 million because of the

12

MIA's rejection of the Reinsurance Transaction and the parties' inability to revise the transaction in line with the benefits expected from the Reinsurance Transaction. *See* Lemay Decl. ¶¶ 19-22; Gass Decl. ¶¶ 39-42. Harbinger seeks in this action to enforce the parties' agreement to share the risk of the MIA's disapproval via the purchase price adjustment.

According to OM, as soon as the Reinsurance Transaction was denied, instead of pursuing a modification to the Reinsurance Transaction that was acceptable to the MIA, and would not have necessitated the purchase price adjustment, Harbinger focused on a transaction it could submit for MIA approval once Harbinger's obligations to OM had come to an end. OM's Br. at 2, 18, 20. In fact, Harbinger contemplated a full range of potential alternative transactions, including some transactions that would comply with the SPA and others that would not. *See* Lemay Decl. ¶¶ 12-13; Tea Decl. Ex. 8 at 251:13-256:8 (Lemay Dep.). But OM's suggestion that Harbinger would forsake an opportunity to enter into a reinsurance transaction that would have been acceptable to the MIA, without Adverse Conditions, ignores economic reality.

A transaction that retained the ability to manage $1 billion in below-investment-grade assets in accordance with the original investment guidelines would have been, if it were approved by the MIA, a financial boon to Harbinger. By contrast, the Revised Reinsurance Transaction ultimately approved by the MIA was half the total size of the original ($1.5 billion instead of $3 billion), capped the below-investment-grade assets which Harbinger would manage at $500 million (instead of $1 billion), and contained a much more conservative set of investment guidelines. Devins Decl. ¶ 40. The difference in value between this Revised Reinsurance Transaction and the original far exceeds the $50 million purchase price adjustment. If one assumes, as Harbinger did, that a return on investment-grade assets would be 5% and that the return on below-investment-grade assets would be 20%, or even a more conservative return of

15% or 10%, then the inability to convert $500 million of assets to below-investment grade, results in an *annual* lesser return on those assets of $75 million, $50 million, or $25 million, respectively. Gass Decl. ¶ 39. Under all scenarios, the present value of the loss to Harbinger is well in excess of $50 million.[8] *Id.*

OM seeks to make much of Harbinger emails focusing on its entitlement to the purchase price adjustment. But Harbinger's awareness of its contractual rights did not detract from its efforts to have the Reinsurance Transaction approved. In fact, many of the communications that OM cites elicited responses referring to its continuing efforts. For instance, in response to Mr. Gass' statement that in the event of disapproval Harbinger "collect[s] $50MM from Seller," which OM excerpts in its brief, Mr. Cheliotis, Harbinger's in-house counsel, responded: "Not completely accurate… we have to go through process w/ OM per SPA."[9] Donnelly Decl. Ex. 15 at HARB-E0166025. The communications also indicate how Harbinger was constrained in its dealings with the MIA by OM's interest in avoiding the purchase price adjustment. For instance, Mr. Gass wrote following the March 15, 2012 meeting: "We had a mtg w/ Maryland a couple weeks back – they were pretty open on how we get to a deal, some of the terms we can work

---

[8]   Harbinger did not experience an immediate economic profit of $75 million from the Revised Reinsurance Transaction as OM contends. OM mischaracterizes the testimony of Mr. Lemay, Front Street's Chief Investment Officer. Mr. Lemay testified that Front Street harvested "unrealized gains" from the assets transferred from FG Life to Front Street of between $50 to $75 million. Mr. Lemay never testified that that constituted an immediate profit for Front Street. To the contrary, the realization of the gain was not economic profit for Harbinger or Front Street and had a net neutral impact on Front Street's balance sheet. *See* Lemay Opp. Decl. ¶¶ 3-10.

[9]   In another strategy discussion, after the notice of the disapproval, Mr. Cheliotis laid out Harbinger's strategy: "[b]etter to involve MIA asap so we can actually try to get deal done (best efforts) via tri-partite discussions and if fail we have much stronger claim against OM – they can't claim we didn't try." Tea Decl. Ex. 2 at HARB-E0162254.

14

with.  But the issue is OM – the proposed changes would result in full 50MM from OM."
Donnelly Decl. Ex. 33 at HARB-E0167128.

At bottom, there was no strategy available to Harbinger based on eschewing the original
Reinsurance Transaction.  On the contrary, the MIA's refusal to approve the Reinsurance
Transaction caused Harbinger a substantial loss.  That loss has just been compounded by OM's
refusal to honor its obligation under the SPA to adjust the purchase price.

## II.   OM's Motion for Summary Judgment on its Third Counterclaim Related to CARVM Should be Denied

OM argues that it is entitled to summary judgment on its third counterclaim for fees
associated with the financing of CARVM reserves.  According to OM, the SPA requires
Harbinger to pay OM a fee of 250 basis points per annum, but does not supplant the 2008
CARVM Treaty pursuant to which, prior to the Acquisition, OMFLIC paid a fee of 150 basis
points per annum for providing identical financing.  OM's Br. at 15, 23.  On this basis, OM
argues that it is owed not 250 basis points for the CARVM financing, but 400 basis points.[10]
Such an interpretation is inconsistent with the SPA, unsupported by the 2008 CARVM Treaty,
and contradicted by contemporaneous evidence of the parties' understanding.

The SPA contemplates a single fee of 250 basis points for OM's obligation to provide
CARVM financing.  Although OM's argument purports to rely on the unambiguous language of
Section 5.14(c), OM fails to cite the entirety of the provision.  In fact, Section 5.14(c) gave OM
different methods by which it could fulfill its obligation to provide financing.  It provides:

---

[10]   OM argues that the payment due under the 2008 CARVM Treaty and the SPA are calculated
pursuant to different metrics, the amount of reserves ceded verses the amount of the
outstanding letters of credit, respectively.  OM's Br. at 15.  However, since the letters of
credit must match the amount of ceded reserves, the calculation is fundamentally the same.

> Seller shall support or cause an Affiliate of Seller to support ceded annuity reserves ***through existing or replacement letters of credit or other financing*** sponsored by Seller or such Affiliate (the "CARVM Facility") that enable [FG Life] to take full credit on its statutory financial statements . . . [for] the Business reinsured by OM Re from OMFLIC under the 2008 CARVM Treaty. Buyer shall pay to Seller. . . until the CARVM Facility is terminated . . . a facility fee equal to 250 basis points, calculated per annum basis, multiplied by the outstanding amount of letters of credit. . . .  SPA at Section 5.14(c) (emphasis added).

OM, therefore, could have chosen –as it did – to provide the financing by keeping in place the 2008 CARVM Treaty and maintaining the letter of credit as it had done before the Acquisition. OM, however, could have chosen a different structure like "replacement letters of credit" or even "other financing."  Irrespective of how OM met this obligation, the fee would be 250 basis points.  To read this clause otherwise, would mean that if OM chose to provide "replacement letters of credit" or "other financing" it would be owed a fee of only 250 basis points, but would be owed a fee of 400 basis points if it provided financing "through existing . . . letters of credit."

As OM concedes, when excess reserves are financed through reinsurance to an offshore reinsurer, part of the financing arrangement includes posting collateral like letters of credit because it is the only way to ensure that OMFLIC receives proper accounting credit for the reinsurance.  OM's Br. at 14.  For this reason, the 2008 CARVM Treaty obligated OM's affiliate, Old Mutual Reassurance (Ireland) Limited ("OM Re") to post collateral so that OMFLIC could get "full credit for the reinsurance."  Donnelly Decl. Ex. 47 at HARB-E0026795 (Section 14(a)).  Likewise, the SPA required that OM or its affiliate was to provide financing and that such financing arrangement "enable [OMFLIC] to take full credit" for the reinsurance.  SPA at Section 5.14(c). This is the same exact obligation.  There is no logical basis for OM's argument that Harbinger should make two payments to provide for the same obligation.

16

The evidence shows that the parties' contemporaneous understanding was that the 250 basis point obligation under the SPA included all costs that would be associated with the CARVM Facility.  For instance, in response to OM's bid instruction, Harbinger, on May 27, 2010, provided a bid proposal stating, "As the *entire consideration* for OM Re maintaining this [CARVM] reinsurance in place through December 31, 2015, the ceding company shall pay an annual premium of 250 basis points."  Gass Decl. ¶ 47 (quoting Kaplan Decl. Ex 4 at HARB-E0008778 (emphasis added)).  In fact, OM understood the CARVM agreement just as Harbinger did.  In an email to Eric Marhoun, the General Counsel of OMFLIC, dated December 20, 2010, Chris Read, a member of OM's deal team and Mr. Marhoun's colleague, wrote: "Having considered at [OM] plc our preference is not to amend the [2008 CARVM Treaty] and instead to have a separate quarterly payment of the ***additional financial costs (ie 100bps)*** directly to OM in line with [the SPA]."  Marhoun Decl. ¶ 43 (quoting Kaplan Decl. Ex. 7 at HARB-E0112682 (emphasis added)).  Likewise, prior to the close of the Acquisition, Mr. Read in a meeting with Mr. Marhoun – while colleagues at OM – discussed the extra 100 basis point fee that would be due under the SPA, the difference between the 150 basis points due under the CARVM Treaty and the 250 basis points due under the SPA.  Marhoun Decl. ¶ 42.

For these reasons, OM's motion for summary judgment on its third counterclaim related to CARVM should be denied.

## CONCLUSION

For the reasons stated above, Harbinger respectfully requests that OM's motion for summary judgment be denied in its entirety.

17

Dated:  New York, New York
        November 5, 2013

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: ___ /s/ *Daniel M. Abuhoff*
    Daniel M. Abuhoff (dmabuhoff@debevoise.com)
    Olga Kaplan (okaplan@debevoise.com)
    Sok T. Tea (sttea@debevoise.com)

919 Third Avenue
New York, New York 10022
(212) 909-1031

*Counsel for Plaintiff Harbinger F&G, LLC*

18