UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
HARBINGER F&G, LLC, : No. 12-civ-5315 (RA)
:
                Plaintiff, : ECF Case
v. :
: Oral Argument Requested
OM GROUP (UK) Limited, :
:
                Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# HARBINGER F&G, LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

DEBEVOISE & PLIMPTON LLP
Daniel M. Abuhoff
Olga Kaplan
Sok T. Tea
dmabuhof@debevoise.com
okaplan@debevoise.com
sttea@debevoise.com
919 Third Avenue
New York, New York 10022
212.909.6000

*Counsel to Plaintiff Harbinger F&G, LLC*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT.................................................................................................................................1

I. Harbinger's Motion for Summary Judgment on Its Breach of Contract Claim for the Purchase Price Adjustment Should Be Granted ............................................1

    A. The Reinsurance Transaction Complied With the SPA ..........................................1

    B. Harbinger Satisfied Its Remedial Efforts Requirement ..........................................4

II. Summary Judgment on OM's Counterclaims Should Be Granted to Harbinger ................7

CONCLUSION..............................................................................................................................10

# **TABLE OF AUTHORITIES**

**CASES**

*Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60 (2d Cir. 2003) ............................ 6

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997) ............................ 6

*Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106 (N.Y. 1984) .......... 7

*Seabury Constr. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 68 (2d Cir. 2002) ............................ 7

**OTHER AUTHORITIES**

Federal Rule of Evidence 803(3) ................................................................................................... 6

Harbinger, by its undersigned counsel, respectfully submits this reply memorandum of law in further support of its motion for summary judgment against OM.[1]

## PRELIMINARY STATEMENT

In its initial papers, Harbinger demonstrated that it is entitled to summary judgment on its claim for a purchase price adjustment under the SPA because the MIA would not approve the parties' proposed Reinsurance Transaction notwithstanding Harbinger's best efforts. In opposition, OM argues that Harbinger's efforts ceased prematurely; as we demonstrate below, that was not the case. OM also argues that Harbinger should have proposed an alternative transaction to the MIA. As Harbinger demonstrated in its response to OM's summary judgment motion, given the MIA's objections, there was no viable alternative consistent with the SPA.

OM's opposition papers also include an argument not advanced in its summary judgment papers, namely, that the ceding commission in the Reinsurance Transaction proposed to the MIA was not consistent with the parties' agreed-upon Term Sheet. We demonstrate below that the ceding commission was consistent with the Term Sheet. Because there has already been significant briefing of Remedial Efforts, we discuss the ceding commission issue first.

## ARGUMENT

**I.     Harbinger's Motion for Summary Judgment on Its Breach of Contract Claim for the Purchase Price Adjustment Should Be Granted**

    **A.     The Reinsurance Transaction Complied With the SPA**

OM relies on the provision of the Term Sheet in the SPA addressed to ceding commissions, which provides as follows:

---

[1] All abbreviations and capitalized terms used in this brief have the same meaning as they do in Harbinger's brief filed in support of its summary judgment motion ("Harb. Br.") and Harbinger's brief filed in opposition to OM's summary judgment motion ("Harb. Opp. Br.").

> Ceding Commission. [TBD: anticipate a negative ceding commission of between $80 million and $120 million, consistent with actuarial analysis.] Term Sheet at 1 (language bracketed in original).

A ceding commission is a fee exchanged between a reinsurance company and the original issuer of a group of policies to ensure that the transferred assets are sufficient to support the transferred insurance liabilities (or "block of business") at an expected level of profitability. If, for example, the assets are insufficient to cover expected future liabilities at the expected profitability level, the originator (in this case, FG Life) would be expected to pay "a negative ceding commission" to the reinsurer (in this case, Front Street) to cover the expected difference.

As reflected in the brackets and open-ended language of the Term Sheet "[TBD . . . consistent with actuarial analysis]," it was impossible for the parties to set a ceding commission at the time of the Original SPA (dated August 5, 2010), because, among other reasons, the assets for the Reinsurance Transaction were not yet selected. Later, after the assets had been selected, Milliman, Inc., Harbinger's actuarial consultant, determined that the ceding commission should be between $5 million and $(22) million. Zacheis Decl. ¶¶ 7-9. The ceding commission was set in this range, at zero.

Actuarial analysis of the appropriate ceding commission is typically done using a book value basis, not a market value basis. The ceding commission here was analyzed by Milliman on a book value basis. *Id.* ¶ 16. Lewis & Ellis, Inc., the actuarial consultant for the MIA, did not object to Milliman's work, but raised a question as to the assets being transferred because they carried with them an unrealized market gain of $230 million. *Id.* ¶¶ 16-17. Unrealized gain is a concept relevant to the market value methodology, not the book value methodology used by Milliman. As Milliman explained to the MIA, performing the actuarial analysis on a market value basis would have required a comparison between the assets with an unrealized gain and the negative value of the business to be reinsured, which was between $(225) million and $(231)

2

million on a pre-tax basis.  *Id.* ¶ 19.  This market value analysis, therefore, also supported a ceding commission of zero.  *Id.*

Harbinger was confident it would prevail on this point if Lewis & Ellis were re-engaged.  This issue was moot, however, because the MIA's objections to the amount of assets to be transferred to the Trust Account, and managed in accordance with the Trust Account Investment Guidelines agreed upon by the parties in the SPA, could not be resolved.  Cheliotis Decl. ¶ 28; Devins Decl. ¶ 32.

OM makes three arguments.  First, OM argues, based on the unrealized gain, that the ceding commission was $230 million, and the Term Sheet capped the amount of negative ceding commission at $120 million.  OM Opp. Br. 7-8.  In fact, the ceding commission was zero and, as the Term Sheet required, had been determined in accordance with Milliman's actuarial analysis.  OM did not perform an actuarial analysis, and there is no dispute in the record concerning the accuracy of Milliman's analysis.

Second, OM argues that the unrealized gain represented $230 million "in unearned profits" that Harbinger "harvest[ed]."  *Id.* at 1, 7-8.  As discussed above, the $230 million in gains was offset by the negative value of the business as accounted for in Milliman's ceding commission analysis.  There was no additional profit for Front Street.  Lemay Opp. Decl. ¶¶ 4-10 (stating harvesting unrealized gains did not result in profit for Front Street or Harbinger); Zacheis Decl. ¶¶ 17-19; Kaplan Decl. Ex. 47 at HARB-E0001216 (explaining that it is a mistake to look at unrealized gains as additional value to Front Street).

Third, OM argues that Harbinger should have followed through with the MIA to confirm their agreement that Lewis & Ellis had mistakenly conflated market and book values.  OM Opp. Br. 13.  OM's counsel acknowledges, as it must, that the investment guideline issue was a hurdle

3

to the transaction going forward (Donnelly Opp. Decl. Ex. 95 ¶ 5), but argues that it is "not unreasonable to believe that if Harbinger had appeased one of the MIA's specific concerns, that could have moved Harbinger closer to obtaining MIA approval," because – according to OM's counsel – "it is virtually impossible to predict with certainty how a regulator will respond." Donnelly Opp. Decl. Ex. 94 ¶ 14. Such argument is speculative, at best, and provides no basis for finding that Harbinger failed to meet its obligation to act in good faith.

### B. Harbinger Satisfied Its Remedial Efforts Requirement

OM argues that Remedial Efforts were required under the SPA because, in its letter disapproving the Reinsurance Transaction, the MIA indicated a willingness "to work with the parties." OM Opp. Br. 9-10. The SPA calls for Remedial Efforts, however, only "[i]n the event that a Governmental Entity requires that the terms of the Reinsurance Transaction be changed or altered" in a manner that is materially adverse. SPA at Section 5.21(d). The MIA made no such specific requirement but rather found core aspects of the Reinsurance Transaction unacceptable. OM ignores the parties' sensible agreement to limit the Remedial Efforts obligation to circumstances where the steps required for governmental approval were relatively clear.

Harbinger, of course, engaged in Remedial Efforts anyway – because it sought the economic benefits of the Reinsurance Transaction. *See* Harb. Br. 13-16. OM argues that Harbinger failed by ceasing Remedial Efforts too soon, after being rebuffed a second time by the MIA in March 2012. OM Opp. Br. 12. Remedial Efforts, however, was the obligation of "each of Buyer *and Seller* [to] use its reasonable best efforts and *cooperate* and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the exiting terms." SPA at Section 5.21(d) (emphasis supplied). Harbinger did exactly this; on being rebuffed by the MIA, Harbinger turned to OM to try to come up with terms consistent with the SPA that would satisfy

4

the MIA. *See* Harb. Opp. Br. 9-10 (listing Harbinger's efforts after March 15, 2012).[2] Those efforts, which extended until the end of the relevant period, were unsuccessful. *Id.*[3]

OM next contends that material issues with respect to the March 15 meeting are subject to genuine factual dispute. OM Opp. Br. 14-16. To the contrary, the evidence with respect to the March 15 meeting is remarkably consistent. All of the witness statements – including the declaration of OM's counsel, Kirk Lipsey – and the documents contemporaneously prepared indicate the MIA's concern over the investment guidelines.[4] *See* Donnelly Opp. Decl. Ex. 95 ¶ 5; Harb. Opp. Br. 5-6. The MIA's comments at the meeting made clear to Harbinger that the MIA could not be satisfied on this score without Adverse Conditions under the SPA that the parties were not required to accept.[5] Harb. Opp. Br. 5-6. Mr. Lipsey concedes that Harbinger's counsel, Mr. Devins, made just this observation when the meeting ended. Donnelly Opp. Decl. Ex. 95 ¶ 6. Mr. Lipsey states that he was not so sure of the MIA's position following the meeting, but circumstances proved Mr. Devins correct. *Id.* ¶ 5; Harb. Br. 14-17. When OM was asked to provide an alternative transaction to the MIA, it could only propose a structure

---

[2] OM seeks to dismiss evidence of meetings between Harbinger and OM after March 15, 2012 on grounds that they were for settlement purposes. *See, e.g.*, OM's Resp. 56.1 Stmt. at 50. Communications with respect to proposals to the MIA were contemplated under the SPA in fulfillment of the parties' Remedial Efforts obligation. Further, OM relies on these meetings in its own summary judgment brief. OM Opp. Br. 18-19; OM Br. 12.

[3] Furthermore, Harbinger's April 6, 2012 purchase price notice did not result in "months [ ] lost debating Harbinger's contractual duties." OM Opp. Br. 13. To the contrary, Harbinger continued to engage with OM, encouraged OM to meet with Harbinger as soon as possible, and met with OM on April 25, 2012. *See* Harb. Opp. Br. 9.

[4] OM suggests that the testimony of Barry Ward is not consistent. In fact, Mr. Ward led efforts to gain approval of the initial application to the MIA but not the effort to reverse the MIA's negative determination. *See* Cheliotis Decl. ¶ 21; Marhoun Decl. ¶ 26; Tyler Decl. ¶ 14. Mr. Ward testified that he did not remember what the MIA had to say at the March 15, 2012 meeting. Tea Reply Decl. Ex. 6 at 243:13-19 (Ward Dep.).

[5] Mr. Lipsey's testimony that the MIA would not draw a specific line (Donnelly Opp. Decl. Ex. 95 ¶ 5) does not detract from the overwhelming evidence that the transaction contemplated by the SPA was on the wrong side of the line.

inconsistent with the terms in the SPA that would have triggered the full purchase price adjustment.[6] Harb. Br. 14-15.

OM argues that Harbinger's evidence concerning the March 15, 2012 meeting is inadmissible hearsay. But the MIA's statements at the March 15 meeting to the effect that the Reinsurance Transaction contemplated by the SPA created undue risk are not offered for the truth – Harbinger in fact disputes this very fact – but to show the MIA's state of mind. Federal Rule of Evidence 803(3) "allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997); *see also Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 66 n.2 (2d Cir. 2003).

Finally, OM argues Harbinger failed to share with OM "four different solutions to the MIA's concerns" that Harbinger had developed internally to address the MIA's concerns. OM Opp. Br. 17-18. In fact, each of these alternative structures would have constituted Adverse Conditions under the SPA or failed to address the MIA's concerns. For that reason, these were not viable alternatives. *See* Donnelly Opp. Decl. Ex. 71 at 162:12-166:12 (Lemay Dep.) (explaining letter of credit structure was not viable because it "didn't address [the MIA's] concern [about] below-investment-grade [assets]"); Tea Reply Decl. Ex. 3 at 181:5-183:10 (Lemay Dep.) (explaining an all Funds Withheld structure would require material change in the investment guidelines); Donnelly Opp. Decl. Ex. 76 at 98:2-8 (Gass Dep.) (testifying that "all the

---

[6] OM contends that the SPA did not stipulate that Harbinger will manage $1 billion of below-investment-grade assets, but rather $1 billion of any class of assets. OM Opp. Br. 18-19 n.14. OM's argument is incorrect. The SPA provided that Harbinger would submit a reinsurance transaction to the MIA substantially on the terms in the Term Sheet, and Term Sheet provided that Harbinger would be able to manage $1 billion in the Trust Account in accordance with the investment guidelines, which provided that the entire Trust Account could be invested in below-investment-grade assets. (Section 5.21(b); Term Sheet).

structures that [Harbinger] had evaluated couldn't meet the different objectives of the economic benefits and different terms under the SPA"); Lemay Decl. ¶ 13 (same).

The futility of seeking MIA approval of a transaction similar to that contemplated by the SPA is graphically demonstrated by the Revised Reinsurance Transaction that Harbinger was compelled to accept. This transaction was rife with Adverse Conditions detrimental to Harbinger. OM chides Harbinger for attempting to "justify its inaction" during Remedial Efforts "based on the economics of a proposal that it claims it had not yet developed." OM Opp. Br. 19. This, of course, misses the point. The Revised Reinsurance Transaction, which differed markedly from the terms contemplated in the SPA, contained the most favorable terms Harbinger could negotiate.[7]

## II.  Summary Judgment on OM's Counterclaims Should Be Granted to Harbinger

*First Counterclaim*. OM disputes that the requirements in Section 5.21 of the SPA are conditions precedent, rather than standalone obligations that support an independent claim. Clearly, though, Harbinger has no independent obligation to seek MIA approval of the Reinsurance Transaction; instead efforts to seek approval are a condition of Harbinger qualifying for the purchase price adjustment. The cases cited by OM are not to the contrary.[8]

OM also claims that Harbinger failed to fulfill its obligation to "attempt in good faith" to resolve this dispute. Yet OM admits that a senior officer of Harbinger conferred several times concerning the parties' disputes before this litigation commenced, and that Harbinger offered to

---

[7]  In fact, the MIA resisted even this much less favorable deal and asked Harbinger to consider decreasing the amount of below-investment-grade assets even lower from $500 million to $100 million. Kaplan Decl. Ex. 66 at HARB-E0158406.

[8]  In *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 112-13 (N.Y. 1984), the Court of Appeals affirmed dismissal of a breach of contract claim because non-performance of a condition precedent excused performance but did not state an independent claim. *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002), is inapposite—the case does not relate to conditions precedents.

negotiate again days before the litigation was filed.  *See* OM's Resp. 56.1 Stmt. at 54-55 (¶ 98).  Subsequently, of course, the parties engaged in mediation, which failed.

**Second Counterclaim**.  OM's claims that Harbinger did not put forth "best efforts" in dealing with the MIA because it sought to keep secret an "Action" brought against it by the SEC.  SPA at Section 4.5.  As above, this alleged grievance is about a condition precedent (Harbinger's best efforts) and does not state a cause of action.  Furthermore, Harbinger's SEC dealings were fully disclosed to the MIA.  These points, to which OM makes no response, are dispositive of the Second Counterclaim.

The so-called Action Harbinger kept secret was a grand jury subpoena dated January 4, 2010.  But, as of August 5, 2010, Harbinger had not heard anything from the USAO for approximately five months, and indeed, the USAO never initiated an action as a result of its subpoena.  Harbinger's 56.1 Stmt. ¶¶ 113-14.  Nor were any SEC Actions "threatened in writing."  SPA at Section 4.5.  OM cites an SEC letter dated June 28, 2010, but this letter requests that Harbinger "voluntarily" produce documents and explains that the "inquiry" should "not be construed . . . that any violation" occurred.[9]  Donnelly Opp. Decl. Ex. 69 at HARB-E0147633, 635.  The SEC did not make a threat of litigation until the issuance of Wells Notices in December 2011—a year and a half *after* the representation and ten months *after* the amended SPA had been executed.  Harbinger's 56.1 Stmt. ¶ 114.

OM argues that Harbinger failed to disclose the seriousness of the government inquires.  There is no evidence, however, to support this contention.  OM's most senior deal team member testified that in mid-November 2010 (three months before the SPA was signed) all of OM's

---

[9]  The fact that Harbinger sent a notice to its insurance carrier does not indicate that an Action was "threatened in writing" as contemplated by the SPA.  Harbinger's insurance coverage defines "Claim" far broader than "Action" under the SPA.  *See* Donnelly Opp. Decl. Ex. 70 at HARB-E0178797.  Despite this broad definition, the insurance carrier found that the events did not constitute a "Claim."  Tea Reply Decl. Ex. 1 at HARB-E0150492-94.

questions were asked and "emphatic[ally]" answered about the investigations.  Tea Reply Decl. Ex. 2 at 191:1-25 (Broadley Dep.).

*Third Counterclaim*.  The plain meaning of the SPA, supported by the parties' contemporaneous understanding, contemplates a single fee of 250 basis points for OM's obligation to provide CARVM financing.  *See* Harb. Br. 20-22; Harb. Opp. Br. 15-17.  OM contends that the pertinent provision is ambiguous, but that would require the existence of two alternative interpretations of the agreement that make sense.  OM's interpretation does not.

OM argues that the "financing" fee due under the SPA is distinct from the "reinsurance" due under the 2008 CARVM Treaty.  This interpretation is inconsistent with both agreements.  The 2008 CARVM Treaty obligated OM Re or its affiliate to post collateral so that OMFLIC could get "full credit for the reinsurance."  Likewise, Section 5.14(c) of the SPA required OM or its affiliate to provide financing to "enable [OMFLIC] to take full credit" for the reinsurance.  This is the exact same obligation.

As for the admissions of Chris Read, who represented that the 250 basis points under the SPA subsumed the 150 basis points under the CARVM Treaty, OM argues that Mr. Read was a "junior employee" and his understanding was mistaken.  *See* OM Opp. Br. 22.  In fact, Mr. Read was a draftsperson of Section 5.14(c), and the OM person charged with communicating its position on CARVM fees to Harbinger.  Marhoun Decl. ¶ 42; Tea Reply Decl. Ex. 4 at 61:9-62:8 (Read Dep.); Tea Reply Decl. Ex. 5 at 213:20-215:5, 224:7-14 (Ritchie Dep.).  Thus, at the time the parties entered into the SPA, both counterparts understood that OM's compensation for providing the CARVM financing was 250 basis points.  OM's contention that sometime in March 2011 – after the SPA was signed – a conversation with OM's Alex Duncan caused Mr.

9

Read's view to evolve is neither here nor there. *See* OM Opp. Br. 22; Donnelly Opp. Decl. Ex. 87 at 103:4-113:25.

## **CONCLUSION**

For the reasons stated above, Harbinger's motion for summary judgment should be granted in its entirety.

Dated: New York, New York
December 6, 2013

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: __/s/ *Daniel M. Abuhoff*__
Daniel M. Abuhoff (dmabuhoff@debevoise.com)
Olga Kaplan (okaplan@debevoise.com)
Sok T. Tea (sttea@debevoise.com)

919 Third Avenue
New York, New York 10022
(212) 909-1031

*Counsel for Plaintiff Harbinger F&G, LLC*