UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

HARBINGER F&G, LLC,

                         Plaintiff,                 No. 12-cv-5315 (RA)(AJP)

v.                                    ECF Case

OM GROUP (UK) Limited,           **ORAL ARGUMENT**

                       Defendant.      **REQUESTED**

-------------------------------------------------------------- X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT OM GROUP (UK) LIMITED'S <u>MOTION FOR SUMMARY JUDGMENT</u>

**WILLKIE FARR & GALLAGHER LLP**
Joseph T. Baio
Benjamin P. McCallen
Casey E. Donnelly
787 Seventh Avenue
New York, New York  10019-6099
Phone:  (212) 728-8000

*Attorneys for Defendant OM Group (UK) Limited*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT................................................................................................................................2

I.     HARBINGER'S FAILURE TO MAKE REMEDIAL EFFORTS FOR 150
       DAYS REQUIRES THAT SUMMARY JUDGMENT BE GRANTED TO OM
       ON HARBINGER'S CLAIM FOR A PURCHASE PRICE ADJUSTMENT. .................2

II.    OM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS
       COUNTERCLAIM FOR BREACH OF CONTRACT UNDER § 5.14(C). .....................7

CONCLUSION.............................................................................................................................10

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                  <u>Page</u>

*Bank of China v. NBM LLC,*
    359 F.3d 171 (2d Cir. 2004)............................................................................................ 7

*Bloor v. Falstaff Brewing Corp.,*
    601 F.2d 609 (2d Cir. 1979)............................................................................................ 4

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,*
    310 F. Supp. 2d 556 (S.D.N.Y. 2003)........................................................................... 10

*British Int'l Ins. Co. v. Seguros la Republica, S.A.,*
    342 F.3d 78 (2d Cir. 2003).............................................................................................. 9

*Cruz v. Fxdirectdealer,*
    720 F.3d 115 (2d. Cir. 2013)........................................................................................... 2

*Grossman v. Melinda Lowell Attorney at Law, P.A.,*
    703 F. Supp. 282 (S.D.N.Y. 1989)................................................................................. 3

*Iroquois Master Fund, Ltd. v. Cel-Sci Corp.,*
    No. 09-CV-8912, 2011 U.S. Dist. LEXIS 31977 (S.D.N.Y. Mar. 28, 2011) ................... 4

*Landmark Ventures, Inc. v. Wave Sys. Corp.,*
    No. 11-Civ-8440, 2012 U.S. Dist. LEXIS 125341 (S.D.N.Y. Sept. 4, 2012) ................... 8

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
    183 F.3d 155 (2d Cir. 1999)............................................................................................ 6

*U.S. v. Haynes,*
    729 F.3d 178 (2d Cir. 2013)............................................................................................ 7

OM respectfully submits this memorandum of law in further support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Harbinger did not make Remedial Efforts for 150 days, as required by the SPA. This fact alone means that OM's motion for summary judgment must be granted because Harbinger failed to satisfy the necessary conditions precedent to obtaining a purchase price adjustment. After meeting with the MIA on March 15, 2012, Harbinger unilaterally concluded that the MIA would deny approval of every possible transaction consistent with the SPA. At that point, Harbinger's representatives simply put down their pencils, except to draft a premature and meritless demand letter on April 6, 2012, seeking $50 million from OM. Harbinger's argument that the MIA would not approve any alternative transaction is pure speculation founded on inadmissible hearsay, which cannot be considered on summary judgment. Even if Harbinger somehow could prove that the MIA held an objection to every feasible revision of the proposed transaction, that fact still would not excuse Harbinger from its contractual obligation to exercise, in good faith and for a period of 150 days, reasonable best efforts to convince the MIA that its concerns were unfounded. The few insignificant actions Harbinger claims to have undertaken after March 15 cannot support a finding that Harbinger discharged its contractual obligations. Accordingly, OM should be granted summary judgment on Harbinger's claim for a purchase price adjustment.

Summary judgment should also be granted on OM's third counterclaim. The question the Court must decide on OM's motion is narrow: does the fee contained in § 5.14(c)

---

[1]     Defined terms have the same meaning as in OM's opening brief (hereafter, "OM Br."), filed Oct. 4, 2013, OM's opposition to Harbinger's motion for summary judgment ("OM Opp."), filed Nov. 5, 2013 and footnote 1 of OM's Counter-Response to Harbinger's Counterstatement of Additional Undisputed Facts, filed Dec. 6, 2013. References to "Ex." are to exhibits of the Declaration of Casey E. Donnelly and the Supplemental Declaration of Casey E. Donnelly, dated Oct. 4, 2013 and Dec. 6, 2013, respectively.

of the SPA replace the fee contained in Article V of the 2008 CARVM Treaty, or do both fees remain in effect after closing of the SPA in order to compensate different entities for different services rendered?  There is no basis within the four corners of the SPA to conclude that the parties intended to eliminate the fee under the 2008 CARVM Treaty.  Absent some textual basis for its position, Harbinger's argument fails as a matter of law, and OM's motion should be granted.

## ARGUMENT

I.    **HARBINGER'S FAILURE TO MAKE REMEDIAL EFFORTS FOR 150 DAYS REQUIRES THAT SUMMARY JUDGMENT BE GRANTED TO OM ON HARBINGER'S CLAIM FOR A PURCHASE PRICE ADJUSTMENT.**

In order to satisfy its Remedial Efforts obligation under the SPA, Harbinger was required to pursue "all reasonable methods" to seek MIA approval of the reinsurance transaction.[2]  *Cruz v. Fxdirectdealer*, 720 F.3d 115, 124-25 (2d Cir. 2013).  Harbinger failed to take several critical actions to further MIA approval.  Among other things, Harbinger never proposed any alternative transaction terms to the MIA, never met with the MIA Commissioner about the substantive terms of the proposed transaction and never met with Lewis & Ellis to address what Harbinger believed were clear errors in the actuarial report relied upon by the MIA.  (*See* OM Br. 19-20.)  In fact, after March 15, 2012 – *i.e.*, day 65 of the 150 day Remedial Efforts period – Harbinger did not take any significant action to further MIA approval of the reinsurance transaction.  (*Id*. 17-21.)  Instead, having unilaterally concluded that the MIA would not approve a reinsurance transaction on the terms set forth in the SPA, Harbinger ceased all engagement with the MIA and simply let the clock run out on its Remedial Efforts obligation.  This failure

---

[2]    In its opposition, Harbinger all but abandons the argument that it never owed Remedial Efforts, relegating the point to a footnote – despite having derailed the Remedial Efforts process in April 2012 by claiming that it owed OM no such duties.  (Harb. Opp. 10, n.7; Ex. 26.)  As OM explained previously, Harbinger clearly owed Remedial Efforts under the SPA.  (*See* OM Br. 7-8 and 10-12, OM. Opp. 9-10.)

alone entitles OM to summary judgment as a matter of law.  *See Grossman v. Melinda Lowell Attorney at Law, P.A.*, 703 F. Supp. 282, 284 (S.D.N.Y. 1989) (best efforts not satisfied where "at least 50 days still remained" to perform the contractual obligation and "there were many other avenues that were easily explorable").

In its opposition, Harbinger presents a bullet-point list of ten actions it claims satisfied its Remedial Efforts obligation.  (Harb. Opp. 8-9.)  This list is entirely irrelevant.  Not one of these purported instances of  "engag[ing] the MIA" took place after March 15, 2012.[3]

Harbinger next offers a set of bullet points containing purported Remedial Efforts made after March 15.  (*Id*. 9.)  However, none of the actions identified by Harbinger involve engagement with the MIA; the list cites only interactions with OM.  Section 5.21(d) of the SPA requires Harbinger to develop "alternative terms that are acceptable to" the MIA.  (Ex. 3 § 5.21(d).)  Given that Harbinger did not have a single communication with the MIA after March 15, 2012, it cannot credibly claim that it spent 150 days making Remedial Efforts to ascertain terms that would be "acceptable" to the regulators.

In addition, the actions identified by Harbinger are either purely ministerial in nature (*e.g.*, "request[ing] to meet with OM" and "notify[ing] OM" that it would reject OM's May 2 proposal) or duplicative of other conduct described in the same list.  In fact, all of Harbinger's purported Remedial Efforts after March 15, 2012 fall into one of two categories: (i) meetings with OM in April and May of 2012, or (ii) consideration of the alternative term sheet developed by OM.  (Harb. Opp. 9.)  Neither provides a basis to deny OM's motion.

---

[3]    Most of the purported conduct identified by Harbinger would not satisfy its contractual obligations in any event. (*See* Harb. Opp. 8-9.) Several of the supposed efforts consist of nothing more than clerical work, such as scheduling, and then postponing, a meeting. (*Id.* (second and fourth bullet points).) Reading the nine page Lewis & Ellis report makes the list, as does seeking to meet with Lewis & Ellis – even though Harbinger never actually followed through and scheduled that meeting. (*Id.* 9, 12.)

It is an undisputed fact that Harbinger did not work with OM on an alternative transaction at the April and May meetings.  The meetings were brief and were not even attended by the individuals at Harbinger who were supposedly in charge of developing alternative transactions.  (Lemay Decl. ¶¶ 12-13; Ex. 150 (Ritchie Tr.) at 181:16-187:8, 200:16-202:6) (OM expected Harbinger would organize meeting of individuals capable of devising an alternative transaction); Ex. 145 ("Duncan Tr.") at 166:4-166:22.)  Although OM suggested revised terms and alternative structures for the transaction, Harbinger "kept a poker face" and gave no "insight into [its] interests."  (Ex. 85 (Harbinger "did not feel inclined to make an effort to file another transaction").)  In fact, by the time it met with OM, Harbinger was already poised for litigation.  On April 6, 2012, three weeks before the initial meeting, Harbinger sent OM a demand for immediate payment of $50 million, claiming that it had no obligation to make Remedial Efforts and that the MIA would not approve any transaction consistent with the SPA.  (Ex. 26.)  Thus, the meetings were not good faith negotiations to develop a potential alternative transaction, as Harbinger would have this Court believe, but were expressly designated by Harbinger as negotiations "for settlement purposes only."[4]  (*See* Ex. 147 (Gass Tr.) at  272:25-273:15; Ex. 85.)  No finder of fact could conclude that those two settlement meetings satisfied Harbinger's Remedial Efforts obligation.  *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614-15 (2d Cir. 1979) (pursuit of self-interested profit is not "best efforts").

Harbinger likewise cannot defeat summary judgment by citing its review of the alternative term sheet developed by OM.  (Harb. Opp. 9.)  Harbinger played no role in developing this term sheet, declined to contribute terms when OM asked for its cooperation and

---

[4]     The designation of those meetings and related correspondence "for settlement purposes only" not only belies the contention that the meetings were conducted in fulfillment of Harbinger's Remedial Efforts obligation, but also means that this evidence is inadmissible on summary judgment.  *See* Fed. R. Evid. 408; *Iroquois Master Fund, Ltd. v. Cel-Sci Corp.*, No. 09-CV-8912, 2011 U.S. Dist. LEXIS 31977, at *17 (S.D.N.Y. Mar. 28, 2011) (evidence inadmissible when designated "For Settlement Purposes Only.").

refused to even discuss OM's proposal with the MIA.  (Ex. 147 (Gass Tr.) at 275:18-285:16; Ex. 85.)  The SPA imposed on Harbinger an obligation to affirmatively engage the MIA to obtain approval of a transaction.  (Ex. 3 § 5.21(d).)  Harbinger's reliance on work generated by OM only highlights how few efforts Harbinger made.[5]  Harbinger's lack of good faith is particularly evident considering it was surreptitiously working on terms for the Revised Reinsurance Transaction at the same time OM was pleading for Harbinger to cooperate on alternatives.

While Harbinger argues that it provided OM "with financial information to aid OM in crafting an alternative proposal" (Harb. Opp. 9), Harbinger never provided OM with the critical information it requested about Harbinger's investment strategy and expected returns.  (Ex. 40.)  The June 8, 2012 letter cited by Harbinger is in fact a settlement letter.[6]  (Ex. 135 (designated "For Settlement Purposes Only").)  Moreover, the letter contains only a generic financial summary in response to OM's queries and brushes off the majority of OM's request, dismissively referring OM to Harbinger's MIA filings, which did not contain the information OM needed.

Harbinger can only offer the Court excuses for why it made no Remedial Efforts after March 15, 2012.  Harbinger first argues it was free to sit on its hands because "the MIA

---

[5]      Harbinger has yet to accurately describe OM's May 2 proposal, which calls into doubt whether it ever seriously considered that proposal.  (*See* Harb. Opp. 9; OM C.Stmt. Nos. 92-96; *see also* Ex. 145 (Duncan Tr.) at 165:8-167:24; Ex. 85 (describing Harbinger's lack of engagement with OM's proposed term sheet).) Contrary to Harbinger's description, OM's proposal gave Harbinger $1 billion in assets to manage.  (Ex. 37 at OM-HARB-0005490-91; Ex. 3 § 5.21(d).)  It was also compatible with the investment strategy Harbinger expected to follow.  (Ex. 37; Ex. 152 (Ward Tr.) at 145:3-145:25; Ex. 83 at HARB-E0132021; Ex. 84 (Harbinger's conversion of assets to below-investment-grade would be "gradual over time").)

[6]      Harbinger misleads the Court about the true nature of the June 8 letter.  Harbinger's filing fails to attach the letter's final two pages, which demonstrate that the "financial information" was provided in the context of settlement discussions and not as part of good faith negotiations about potential alternative transactions.  (*Compare* Tea Decl. Ex. 4 *with* Ex. 135.)  Similarly, Harbinger's reliance on its June 16, 2012 email to OM as an example of a post-March 15 Remedial Effort also fails, as that email is little more than a threat that "if we do not soon receive a constructive [settlement] proposal from you backed by an earnest motivation to reach a compromise, we will pursue litigation."  (Harb. Opp. 9; Ex. 138.)  This missive hardly qualifies as "cooperat[ing] and negotiat[ing] in good faith to agree to alternative terms that are acceptable" to the MIA.  (Ex. 3 § 5.21(d).)

would not approve a deal" absent a change to the Trust Account Investment Guidelines.  (Harb.

Opp. 4-7, 10.)  Under § 5.21(d) of the SPA, however, if Harbinger held a "reasonable belief" that

MIA approval of the reinsurance transaction would require a change to the Trust Account

Investment Guidelines, it was required to undertake Remedial Efforts to convince the MIA

otherwise.  (Ex. 3 §5.21(d).)  If Harbinger believed that "even with the use of Remedial Efforts"

the MIA could not be convinced, its only remedy was to seek OM's consent to terminate the

Remedial Efforts period.  (*Id.*)  Harbinger concedes that it did not do this.  (Harb. Opp. 11.)

Harbinger ignored the SPA's carefully-negotiated process for terminating the Remedial Efforts

period if it deemed further efforts to be futile.  Having failed to invoke this remedy, Harbinger

cannot now claim that "futility" justified its failure to make Remedial Efforts for 150 days.

Moreover, Harbinger has not pointed to any competent evidence demonstrating

that the MIA "would not approve a deal" consistent with the SPA.  Instead, it relies exclusively

on inadmissible hearsay that the Court must disregard.[7]  (Harb. Opp. 2, 4-7; *see also* OM Opp.

16-17); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)

(hearsay not "competent evidence" and cannot be considered on summary judgment).

As a last resort, Harbinger argues that it must have made Remedial Efforts

because "economic reality" indicates that Harbinger stood to gain financially from approval of

the reinsurance transaction.  (Harb. Opp. 13.)  What Harbinger's theoretical argument ignores are

the actual facts evidenced by Harbinger's communications during the Remedial Efforts period.

OM has cited document after document revealing that Harbinger decided immediately after the

MIA's denial to prioritize collecting $50 million from OM over pursuing a revised application to

---

[7]    Harbinger's claim that OM is to be faulted for not affirmatively establishing that the MIA would have
approved the proposed transaction (or an alternative transaction) is a red herring.  (*See, e.g.*, Harb. Opp. 4,
n. 3.)  At issue on this motion is whether Harbinger fulfilled its duty to make Remedial Efforts – not
whether OM can establish that such efforts, had they actually occurred, would have been successful.

the MIA.  (*See, e.g.*, Ex. 15 (after denial Harbinger would "collect 50MM from Seller" and then

"modify deal to meet MIA concerns, then re-file"); Ex. 17 ("[t]he key issue on timing to

resubmit will be to make sure we don't jeopardize our 50mm."); *see also* OM Br. 8-9, 20-21.)

Harbinger has not even attempted to offer actual evidence of a contrary intention.[8]

      By not making Remedial Efforts for 150 days, Harbinger failed to satisfy a

condition precedent to a purchase price adjustment.  As a result, OM's motion must be granted.

## II.    OM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT UNDER § 5.14(C).

      The parties agree upon several critical points in connection with OM's claim for

breach of § 5.14(c) of the SPA.  The parties agree that § 5.14(c) of the SPA unambiguously

obligated Harbinger to pay a fee to OM.  (Harb. Opp. 15-16.)  The parties also agree that Article

V of the 2008 CARVM Treaty obligated OMFLIC/F&G Life to pay a fee to OM Re.  (Ex. 47 at

Art. V; Harb. C.Stmt. at No. 69.)  The only dispute is whether the fee under § 5.14(c) of the SPA

replaced the fee in Article V of the 2008 CARVM Treaty.  Because there is no basis in the four

corners of the SPA to conclude that the parties intended the SPA fee to replace the 2008

CARVM Treaty fee, OM's motion for summary judgment should be granted.

---

[8]    Harbinger's opposition repeats arguments contained in its moving brief regarding the economic benefits of the Revised Reinsurance Transaction.  Those arguments are irrelevant to whether Harbinger made Remedial Efforts after March 15, 2012, and OM thus respectfully refers the Court to its prior refutation of those arguments.  (*See* OM Opp. 19-20.)  Similarly, Harbinger argues that its harvesting of unrealized gains is not "economic profit" because that process had a "net neutral impact on Front Street's balance sheet." (Harb. Opp. n.8.)  There is a veritable avalanche of evidence to the contrary.  (*See, e.g.*, Ex. 54 (the "extra cash" from unrealized gains serves as compensation); Ex. 61 (regarding "the extra cash from FWH asset gainers. . . . Concern is [the MIA] say this is too rich a deal for FSR"); Ex. 140 (FSR's "profitability" relies on transfer of most lucrative assets); Ex. 65 (economics "improve" if URG can be harvested); *see also* OM C.Response to Harb. C.Stmt. at No. 46.)  In addition, the sworn testimony Harbinger offers regarding the Revised Reinsurance Transaction must be disregarded because it falls within the scope of FRE 702 but is not offered by an expert witness.  (*Compare* Nov. 5, 2013 Lemay Decl. ¶ 6, Gass Decl. ¶¶ 14-17, 38-40 *with U.S. v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013); *Bank of China v. NBM LLC*, 359 F.3d 171, 181-82 (2d Cir. 2004).)

Had the parties intended for the SPA fee to replace the fee owed under Article V of the 2008 CARVM Treaty, it would have been easy to make that intention clear in the SPA. However, § 5.14(c) of the SPA nowhere mentions the fee owed under Article V of the 2008 CARVM Treaty, let alone states that the parties intended to terminate that charge. Absent a clear statement of the parties' intent to void the fee under Article V of the 2008 CARVM Treaty, the Court should not read such an intent into the document. *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11-Civ-8440, 2012 U.S. Dist. LEXIS 125341, at *12-13 (S.D.N.Y. Sept. 4, 2012) ("Had the parties intended this restriction, they could have included such language. They did not, and the Court will not do so now 'under the guise of interpreting the writing.'").

Harbinger's argument that the parties intended the SPA to replace the 2008 CARVM Treaty fee (yet made no mention of this intention in the SPA) is even more incredible considering that the two provisions compensated different entities for different services. The 2008 CARVM Treaty was an *insurance policy* for the reinsurance of certain annuity obligations of F&G Life. (Ex. 47 at HARB-E0026793 ("This Agreement is an indemnity reinsurance agreement solely between Cedent [OMFLIC, now F&G Life] and Reinsurer [OM Re] . . . .").) Article V of the 2008 CARVM Treaty clearly labels the fee F&G Life was to pay OM Re as an "expense and risk" fee, which compensated OM Re for the risk it assumed in reinsuring F&G Life's annuity policy obligations. (*Id.* at Art. V.) On the other hand, the fee due under § 5.14(c) of the SPA was for a financing facility that OM maintained (in the form of a letter of credit to OM Re) for Harbinger's benefit. (Ex. 3 § 5.14(c); *see* OM Br. 14-16.)

In addition, the parties to the two agreements were entirely different. The parties to the 2008 CARVM Treaty were OMFLIC (now called F&G Life) and OM Re (the Irish subsidiary of OM that provided F&G Life with reinsurance coverage). Neither of those entities

are parties to the SPA.  Instead, the SPA is an agreement between their respective corporate parents (Harbinger and OM).  To find in Harbinger's favor, the Court would have to conclude that Harbinger and OM completely abandoned corporate formalities and intended the SPA to funnel monies originally owed to OM Re straight to its parent company OM, even though OM Re remained liable for providing reinsurance coverage under the 2008 CARVM Treaty.  There is no basis in the text of the SPA for this conclusion and it should be rejected.

   In order to defeat OM's motion, Harbinger must identify a basis in the text of the SPA to support its argument that the SPA's financing facility fee was meant to replace the 2008 CARVM Treaty's expense and risk fee.  *British Int'l Ins. Co. v. Seguros la Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003).  It cannot do so.

   Harbinger first argues that if the SPA fee was not a replacement for the 2008 CARVM Treaty fee, the amount owed to OM would vary based solely on the form of financing OM chose to provide.  (Harb. Opp. 16 ("if OM chose to provide 'replacement letters of credit' or 'other financing' it would be owed a fee of only 250 basis points, but would be owed a fee of 400 basis points if it provided financing 'through existing . . . letters of credit.'").)  As explained above, this argument fails because it is based on the incorrect assumption that the fees due under § 5.14(c) of the SPA and Article V of the 2008 CARVM Treaty are both "financing" fees.  To the contrary, the Article V expense and risk fee was not a "financing" charge for the letter of credit, but rather compensation to OM Re for its assumption of risk in reinsuring OMFLIC/F&G Life's CARVM obligations.  (Ex. 47 at Art. V; Ex. 150 (Ritchie Tr.) at 211:12-212:12.)

   Harbinger next argues that Article I, § 14(a) of the 2008 CARVM Treaty is the "exact same obligation" as the financing arrangement established in § 5.14(c) of the SPA, and that there is "no logical basis" for Harbinger to pay twice for that obligation.  (Harb. Opp. 16.)

But Article I, § 14(a) of the 2008 CARVM Treaty merely imposes a general obligation on OM Re to comply with U.S. insurance laws.[9]  (Ex. 47 at Art. I § 14.)  It does not describe how OM Re might obtain financing, if necessary, and it certainly does not impose any fees for that obligation.[10]

It is clear and unambiguous that the financing fee owed under § 5.14(c) of the SPA is distinct from the expense and risk fee owed under Article V of the 2008 CARVM Treaty. Accordingly, OM's motion for summary judgment should be granted.

## CONCLUSION

For the foregoing reasons, Defendant OM Group (UK) Limited respectfully requests that the Court grant its motion for summary judgment and (i) dismiss Harbinger's claim for breach of contract in its entirety, and (ii) find that Harbinger breached § 5.14(c) of the SPA.

Dated: New York, New York
       December 6, 2013

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Joseph T. Baio
          Joseph T. Baio
       Benjamin P. McCallen
       Casey E. Donnelly
       787 Seventh Avenue
       New York, New York  10019-6099
       Phone:  (212) 728-8000
       *Attorneys for Defendant OM Group (UK) Limited*

---

[9]     Section 14(a) reads:  "If required in order to allow Cedent full credit for reinsurance, Reinsurer shall comply with any necessary financial security requirements imposed by insurance laws and regulations of the State of Maryland and of any other state of jurisdiction with respect to which Cedent may otherwise be ineligible for reserve credit for the reinsurance ceded under this Agreement."  (Ex. 47 at Art. I § 14.)

[10]    The remainder of the arguments offered by Harbinger rely exclusively on extrinsic evidence (Harb. Opp. 17), and therefore cannot be considered on a motion for summary judgment where, as here, OM has demonstrated that the agreement is susceptible to only one reasonable interpretation.  *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 561 (S.D.N.Y. 2003).