UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HARBINGER F&G, LLC,

                 Plaintiff,

     v.

OM GROUP (UK) LIMITED,

                Defendant.

**12 Civ. 05315 (CRK)[1]**

**OPINION AND ORDER**

---

CLAIRE R. KELLY, Judge:

       Plaintiff, Harbinger F&G, LLC ("Harbinger"), commenced this breach of contract action against Defendant, OM Group (UK) Limited ("OM"), to secure payment of a post-closing purchase price adjustment pursuant to the First Amended and Restated Stock Purchase Agreement ("SPA").[2]  Under the SPA, Harbinger purchased all of the outstanding shares of capital stock of Old Mutual Financial Life Insurance Company ("OMFLIC") from OM.[3]  Joint Pretrial Order App. 1 ¶ 4, Oct. 16, 2014, ECF No. 90 ("JPTO Stipulated Facts").   After its acquisition (the "Acquisition") by Harbinger, OMFLIC was renamed Fidelity & Guaranty Life Insurance Company ("F&G Life").[4]  JPTO Stipulated Facts ¶ 7.  Under the SPA, OMFLIC was to enter into

---

[1] Judge Claire R. Kelly of the United States Court of International Trade, sitting by designation.

[2] Harbinger F&G, LLC was previously called Harbinger OM, LLC.  Compl. 1, July 9, 2012, ECF No. 1.  The SPA was between Harbinger OM, LLC and OM.  Harbinger "was a wholly-owned subsidiary of Harbinger Group, Inc., a publicly traded company limited by shares, with primary shareholders being Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., and Global Opportunities Breakaway Ltd." Joint Pretrial Order App. 1 ¶ 1, Oct. 16, 2014, ECF No. 90 ("JPTO Stipulated Facts").  OM "is a wholly-owned subsidiary of Old Mutual plc, a public company organized and existing under the laws of England and Wales."  JPTO Stipulated Facts ¶ 2.

[3] OMFLIC was "a Maryland-domiciled life insurance company."  JPTO Stipulated Facts ¶ 4.

[4] F&G Life "is a wholly-owned subsidiary of Fidelity & Guaranty Life Holdings, Inc., a Delaware corporation and a wholly-owned subsidiary of Harbinger F&G. Harbinger F&G is a wholly owned subsidiary of Harbinger Group Inc., a Delaware corporation . . . ."  PTX 54.004.

a post-closing reinsurance transaction ("Reinsurance Transaction") with Front Street Re Ltd. ("Front Street"), an insurance company owned indirectly by Harbinger.  JPTO Stipulated Facts ¶ 7; Defendant's Counter-Statement to Plaintiff's Statement of Undisputed Material Facts ¶ 4, Nov. 5, 2013, ECF No. 51 (undisputed).   This transaction required the approval of Maryland regulators.  The SPA provided that if such approval was not obtained and Harbinger fulfilled other certain contractual conditions precedent, Harbinger would be entitled to a post-closing purchase price reduction ("PP Reduction") that is the subject of dispute in this action.  In response to Harbinger's claim for the PP Reduction, OM asserted nine affirmative defenses and counterclaimed for breach of contract, arguing (1) that Harbinger breached several of its obligations under the SPA; (2) that Harbinger breached its representations and warranties under the SPA by failing to disclose any pending or written threats of action against Harbinger or its affiliates; and (3) that Harbinger breached the SPA § 5.14(c) by failing to pay the full amount of a quarterly facility fee owed to OM for OM's continued maintenance of an existing letter of credit.

On May 27, 2014, the court denied the parties' motions for summary judgment on Harbinger's breach of contract claim and OM's first counterclaim for Harbinger's breach of its obligations under the SPA.  The court granted summary judgment in favor of Harbinger on OM's second counterclaim for breach of representation and warranty, and granted partial summary judgment in favor of OM on its third counterclaim for Harbinger's failure to pay the full amount of the quarterly facility fees.  Thereafter, the court held a bench trial, from October 20, 2014 to October 27, 2014, to resolve all remaining issues.  The court finds that Harbinger has demonstrated it is entitled to the PP Reduction amount it seeks under the SPA.  OM is entitled to the monies claimed for the full amount of the quarterly facility fees.  OM did not provide any legal theory in its Post-Trial Proposed Findings of Fact and Conclusions of Law regarding its affirmative defenses

three through eight (respectively, waiver and estoppel, impossibility, unclean hands, good faith and fair dealing, prevention, and the duty to mitigate).[5]  To the extent that OM proffered factual evidence at trial regarding its affirmative defenses three through eight, the court finds that OM has failed to meet its burden to prove any of these defenses by a preponderance of the evidence.

## GENERAL BACKGROUND

Harbinger and OM dispute OM's obligation to pay the $50 million PP Reduction provided for in the SPA.  The parties agreed to the PP Reduction in the event that the Reinsurance Transaction contemplated by the SPA was not approved by the relevant regulators, here the Maryland Insurance Administration ("MIA").

The PP Reduction would only be due if certain conditions under the SPA were met.  First, the SPA § 5.21(b) and § 5.21(c) required Harbinger to prepare and file approval documentation for a Reinsurance Transaction between OMFLIC, who entered into the transaction as F&G Life, and Front Street, specifically a Form D,[6] substantially on the terms set forth in the term sheet agreed to by the parties.  Second, the SPA § 5.21(d) required Harbinger to use reasonable best efforts to obtain governmental approval for the Reinsurance Transaction, required both parties to cooperate with any reasonable requests from each other in pursuit of MIA approval, and prevented

---

[5] OM's ninth affirmative defense asserts Harbinger failed to satisfy the same conditions precedent under the SPA as OM points to in its first counterclaim for breach of contract.  OM's ninth affirmative defense is that "Harbinger failed to satisfy the conditions precedent to payment of a Post-Closing PP Reduction, as set forth in § 5.21(f)(ii) of the SPA.  OM contends that Harbinger's failure to satisfy the conditions precedent in §§ 5.21(b), (c), (d), and (e) of the SPA excuses OM from any obligation to pay Harbinger a Post-Closing PP Reduction." Joint Pretrial Order 8, Oct. 16, 2014, ECF No. 90 ("JPTO").  Because Harbinger's claim for breach and OM's first counterclaim involve proof of the very same facts by a preponderance of the evidence, OM's ninth affirmative defense turns on Harbinger's ability to prove it satisfied its conditions precedent under the SPA.  Therefore, the court addresses both OM's counterclaim and its affirmative defense in its decision on Harbinger's breach of contract claim.

[6] The Form D is an application required under Maryland law to be submitted by interested parties to the MIA for approval of proposed transactions.  See Devins Direct, Trial Tr. 112:9–113:13, Oct. 20, 2014, ECF No. 93.  The Form D included information about the Reinsurance Transaction and the reinsurance agreement between F&G Life and Front Street.  Devins Direct, Trial Tr. 112:23–13.

both parties from taking any action that would materially delay, impair or impede governmental approval.  PTX 1.062.[7]  Third, if obtaining government approval of the Reinsurance Transaction were to require a change to the transaction that would materially and adversely affect the economic benefits Harbinger reasonably expected to receive, the SPA § 5.21(d) required Harbinger and OM to engage in Remedial Efforts.  Remedial Efforts required both Harbinger and OM to use their "reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof . . . ."  PTX 1.063.

Despite these conditions, the SPA Remedial Efforts provision did not require Harbinger to accept any alternate terms containing an Adverse Reinsurance Transaction Condition or Restriction ("Adverse Condition").  PTX 1.063.  Relevant here, the SPA § 5.21(d)(C) defined an Adverse Condition to include anything "that restricts, precludes or conditions the appointment by Front Street (or OMFLIC, if applicable) of Harbinger . . . as investment manager of assets to be deposited into the Trust Account or the Funds Withheld Account as contemplated in the Reinsurance Transaction Term Sheet with an aggregate value of at least $750,000,000," and in § 5.21(d)(D), anything "that requires any substantive change to the investment guidelines applicable to the assets in the Trust Account or Funds Withheld Account as set forth in the Reinsurance Transaction Term Sheet."  PTX 1.063.

---

[7] Harbinger submitted several trial exhibit appendices in Appendix 12 of their Joint Pretrial Order.  Parties' Am. Joint Trial Ex. List 3 at 3.022, 018, 049, 067 ("PTX").  Appendix 12 A was moved into evidence in its entirety in accordance with this court's order.  See Order, Oct. 16, 2014, ECF No. 89.  Appendix 12 B is a list of exhibits Harbinger expected to offer at trial that were objected to by OM.  During trial, the exhibits in Appendix 12 B were moved into evidence subject to reservations made by OM as to their use.  See Trial Tr. 420:8–420:19, Oct. 22, 2014, ECF No. 97.  Appendix 12 C is a list of OM trial exhibits with objections made by Harbinger.  Appendix 12 D is a list of trial exhibits offered by OM that contain evidence which is identical to objectionable portions of Appendix B exhibits.  The court will refer to Harbinger's trial exhibits with the designation "PTX" followed by the number assigned by the parties and to OM's trial exhibits with the designation "DTX" followed by the number assigned by the parties.  Exhibits relied upon from Appendix 12 B are used only for their agreed upon admissible purposes.

The Reinsurance Transaction Term Sheet ("Term Sheet") set the parameters for the Reinsurance Transaction.  The Term Sheet was attached to the SPA as Exhibit K.  PTX 1.062.  The Term Sheet provided that the Premium was to be paid "with up to $1 billion of the Premium on a funds-transferred basis (. . . the "Trust Account %"), and the remaining Premium (at least approximately $2 billion) on a funds-withheld basis (. . . the "Funds Withheld %") . . . ."  PTX 2.001–002.  For the funds-transferred portion of the Premium, Front Street, as the reinsurer, was

> to establish and maintain a reinsurance trust (the "Trust Account") pursuant to a trust agreement with the terms set forth below (the "Trust Agreement").  Up to $1 billion of the Premium shall be paid by transferring to [Front Street], and depositing into the Trust Account, below-investment-grade assets and other assets of [F&G Life] to be agreed by the Parties having an aggregate market value as of the Effective Date equal to such portion of the Premium.

PTX 2.002.  The remaining $2 billion portion of the Premium was to

> be paid on a funds-withheld basis (the "Funds Withheld") with assets to be agreed by the parties that will be valued at statutory book value. The agreed assets to comprise the initial deposit in the Funds Withheld shall comply with [F&G Life's] existing investment guidelines, and all assets thereafter purchased or deposited in the Funds Withheld will be limited to "Funds Withheld Eligible Assets" under the Funds Withheld Investment Guidelines attached hereto as Exhibit B.

PTX 2.002.   The Term Sheet further stated that "the division of Premium between the Trust Account and the Funds Withheld shall be mutually agreed by [F&G Life] and [Front Street]."  PTX 2.002.

The types of assets permitted in the Trust Account were "limited to assets of the types which qualify as admitted assets and . . . which are 'Trust Account Eligible Assets' under the Trust Investment Guidelines set forth as Exhibit A [("Investment Guidelines")]."  PTX 2.002.  The Investment Guidelines ranked the eligible asset categories based on the asset's investment grade.  PTX 2.006.  Investment grade is rated by the National Association of Insurance Commissioners ("NAIC") on a scale of 1 to 6, with NAIC 1–2 being investment grade, while NAIC 3–6 are below

investment grade.  PTX 2.006; Marhoun Direct, Trial Tr. 262:13–19, Oct. 21, 2014, ECF No. 95;

Gass Direct, Trial Tr. 306:3–19, Oct. 21, 2014, ECF No. 95; Bannigan Direct, Trial Tr. 685:15–

22, Oct. 23, 2014, ECF No. 99.  The maximum percentage-value Harbinger was permitted to invest

in each category was a percentage of F&G Life's entire asset portfolio, not only the assets in the

Trust Account.  Bannigan Cross, Trial Tr. 794:10–795:4, Oct. 24, 2014, ECF No. 101; Marhoun

Direct, Trial Tr. 276:9–277:25.  F&G Life's entire asset portfolio was valued at roughly $15

billion.  PTX 269; Marhoun Direct, Trial Tr. 277:21–25.  Harbinger could invest up to 5% of F&G

Life's entire $15 billion portfolio in the Trust Account in the below investment grade category

NAIC 5 to 6 and, of that 5%, could invest up to 3% in the below investment grade category NAIC

6.  PTX 2.006.

    Harbinger submitted the Form D application to the MIA on July 26, 2011.  PTX 54.  The

Reinsurance Transaction was not approved by the MIA.  See PTX 149.  The MIA's January 10,

2012 letter denying the Reinsurance Transaction provided two reasons for the rejection.  First, the

MIA pointed to a "significant increase in the amount of below-investment-grade assets ultimately

supporting F&G Life's policyholder obligations under the proposed transaction."  PTX 149.004.

Second, the MIA articulated a concern that Front Street's sale of certain assets transferred to it as

part of the Reinsurance Transaction would "produce a realized gain of approximately $230

million," and that this would be "an unreasonable profit given the valuation range on the

transferred business . . . ."  PTX 149.004.  At issue before the court is whether Harbinger is entitled

to the PP Reduction.  More specifically, the court must determine whether Harbinger: (1) filed

documentation substantially on the terms set forth in the Term Sheet agreed to by the parties,

particularly with respect to the ceding commission provision; (2) used its reasonable best efforts

to obtain MIA approval of the Reinsurance Transaction; and (3) used Remedial Efforts to secure

an alternative transaction.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The Original SPA

1. Harbinger and OM entered into a Stock Purchase Agreement on August 5, 2010 (the "Original SPA").  JPTO Stipulated Facts ¶ 3.

2. The Original SPA contained, as a condition of closing, a Reinsurance Transaction, to be executed in accordance with the Reinsurance Transaction Term Sheet and the Investment Guidelines ("Original Term Sheet" and "Original Investment Guidelines"), attached to the Original SPA as Exhibit J. See, e.g., PTX 3.018, 049; DTX 325; Cheliotis Direct, Trial Tr. 53:12–55:4, Oct. 20, 2014, ECF No. 93.

3. The Original Term Sheet provided that Front Street's reinsurance obligations were conditioned on payment of "$1 billion of the Premium on a funds-transferred basis, and the remaining Premium (approximately $2 billion) on a funds-withheld basis," with the $1 billion to be deposited in a trust account ("Trust Account") for Harbinger to manage. DTX 325 at HARB-E0010642, 43–44.

4. Both Harbinger and OM understood that there was a risk that the MIA might not approve the Reinsurance Transaction contained in the Original SPA.  Cheliotis Direct, Trial Tr. 55:17–21; Bannigan Direct, Trial Tr. 702:20–23.

5. Harbinger and OM knew the amount of below investment grade assets ("BIGs" or "below investment grade assets") the Reinsurance Transaction called for Harbinger to manage in the Trust Account could be problematic for the MIA.  Duncan Cross, Trial Tr. 511:7–11, Oct. 22, 2014, ECF No. 97; Bannigan Cross, Trial Tr. 791:25–796:23; Marhoun Direct, Trial Tr. 262:13–265:3; PTX 10; PTX 308; PTX 316; PTX 337.003.

6. The MIA indicated its concern with the Original SPA Form D filing to the parties.  PTX 100.  Specifically, the MIA expressed concern with the allowable limits of BIGs in the Trust Account Investment Guidelines.  The MIA requested that the parties "re-examine the propriety of these limits."  PTX 100.002.

7. OM and Harbinger agreed that Harbinger would withdraw the Form D and then the two of them would renegotiate the Original SPA.  Cheliotis Direct, Trial Tr. 55:15–56:22; PTX 310.003. Harbinger withdrew the Form D on February 18, 2011.  PTX 95; PTX 310.

**The Amended SPA (the "SPA")**

8.    The parties entered into the SPA on February 17, 2011.  JPTO Stipulated Facts ¶ 4.

9.    "The SPA is a valid and binding contract."  JPTO Stipulated Facts ¶ 5.

10.   "The Acquisition closed on April 6, 2011."  JPTO Stipulated Facts ¶ 6.

**The Reinsurance Transaction in the SPA**

11.   The SPA eliminated the Reinsurance Transaction as a closing condition to the Acquisition.  Instead, the SPA made the Reinsurance Transaction a post-closing activity.  See PTX 1.062; PTX 310.003.  See also Devins Direct, Trial Tr. 111:1–8; Duncan Direct, Trial Tr. 447:2-447:14, Oct. 22, 2014 ECF No. 97; Bannigan Direct, Trial Tr. 698:1–7.

12.   OM recognized that the MIA still had concerns regarding the amount of BIGs permitted in the Investment Guidelines.  Bannigan Cross, Trial Tr. 792:5–793:12; Lipsey Direct, Trial Tr. 863:11–18, Oct. 24, 2014, ECF No. 101.

13.   The Reinsurance Transaction was to be between F&G Life, as the ceding party, and Front Street, as the reinsurer, or cedant.  See PTX 1.062; PTX 2.001; PTX 54.001.

14.   The Reinsurance Transaction called for F&G Life to cede $3 billion in liabilities on certain annuity policies to the reinsurer, Front Street.  PTX 2.001; PTX 54.004–005; Cheliotis Direct, Trial Tr. 53:25–54:6; Bannigan Direct, Trial Tr. 689:14–22.

15.   The SPA § 5.21(b) required the Reinsurance Transaction to be in accordance with the Term Sheet attached to the SPA as Exhibit K.  PTX 1.062.

16.   The Term Sheet provided that

> [a]s consideration for the assumption by [Front Street] of risks and liabilities under the Agreement, the Premium shall equal 100% of [F&G Life's] Statutory Reserves (defined below) (which are expected to be approximately $3 billion) for the Underlying Policies, calculated as of the Effective Date.  "Statutory Reserves" means, as of a given date, the gross reserves of [F&G Life] with respect to the Benefits, calculated in accordance with statutory accounting practices prescribed or permitted by the [MIA].

> PTX 2.001.  See also PTX 54; DTX 40.  The Term Sheet provided that "the Premium shall be paid as follows immediately upon execution, with up to $1 billion of the Premium on a funds-transferred basis (. . . the "Trust Account %"), and the remaining

Premium (at least approximately $2 billion) on a funds-withheld basis (. . . the "Funds Withheld %") . . . ."  PTX 2.001–002.

17.  For the funds-transferred portion of the Premium, "[u]p to $1 billion of the Premium shall be paid by transferring to [Front Street], and depositing into the Trust Account, below-investment-grade assets and other assets of [F&G Life] to be agreed by the Parties having an aggregate market value as of the Effective Date equal to such portion of the Premium."  PTX 2.002.  See also PTX 54.004–005; Cheliotis Direct, Trial Tr. 53:2–6.

18.  The Term Sheet further stated that "the division of Premium between the Trust Account and the Funds Withheld shall be mutually agreed by [F&G Life] and [Front Street]."  PTX 2.002.  See also PTX 54.

19.  The Term Sheet stated that the Trust Agreement "[s]hall acknowledge the appointment . . . of Harbinger . . . or an affiliate thereof designated by [Front Street] as asset manager . . . for the Trust Account."  PTX 2.003.

20.  The Term Sheet limited Harbinger's total management of asset value, explaining that "the Agreement may provide for the appointment of [Harbinger] as asset manager of certain of the assets to be held on a Funds Withheld basis, provided that the value of all assets in the Trust Account and Funds Withheld that are proposed to be managed by [Harbinger] is no more than $1 billion in the aggregate."  PTX 2.003.  See also PTX 1.064–065; PTX 54.005.

21.  During the renegotiation of the SPA, the Term Sheet was altered so that it no longer required the full $1 billion be deposited in the Trust Account.  Instead, the Term Sheet allowed up to $1 billion in assets to be deposited in the Trust Account.  Bannigan Direct, Trial Tr. 700:16–701:4.  Under the Original SPA, Harbinger could only manage assets in the Trust Account.  See DTX 325 at HARB-E0010643–44.  Under the SPA, Harbinger could choose to manage assets in both the Trust and Funds Withheld Accounts.  If Harbinger chose to manage less than $1 billion in the Trust Account, the remaining balance could be managed in the Funds Withheld Account.  Bannigan Direct, Trial Tr. 699:7–701:7.  See also DTX 325.001–002; PTX 2.001–002.

22.  The assets managed by Harbinger in the Trust Account were subject to the Trust Account Investment Guidelines, attached to the Term Sheet as Exhibit A.  PTX 2.002, 006–010.  See also Devins Direct, Trial Tr. 112:21–114:11; Cheliotis Direct, Trial Tr. 55:1–3; PTX 54.005–006.

23.  The investment of the maximum $1 billion in asset value Harbinger could manage was further restricted by the Trust Account Investment Guidelines' percentage-value limits that applied to each investment grade category of assets.  PTX 269; Bannigan 685:22–686:13.  Two of the investment grade categories in the Trust Account Investment Guidelines relevant here, NAIC 5 to 6 and NAIC 6, were below investment grade categories.  PTX 2.006; Gass Direct, Trial Tr. 306:3–19.

24. The Trust Account Investment Guidelines provided that the percentage-value limits were to be applied to F&G Life's entire Asset Portfolio.  PTX 269; Bannigan Cross, Trial Tr. 794:10–795:4.  F&G Life's assets at the time were around $15 billion.  PTX 269; Marhoun Direct, Trial Tr. 276:9–277:25; Bannigan Cross, Trial Tr. 794:10–795:1.

25. Of the maximum $1 billion in asset value Harbinger was permitted to manage in the Trust Account, Harbinger could choose to invest a value of between 0% and 5% of F&G Life's entire $15 billion portfolio in the NAIC 5 to 6 category.  However, Harbinger could only invest a value of between 0% and 3% in the NAIC 6 category.  PTX 2.002, 006.

26. The Term sheet provided for a ceding commission: "[TBD: anticipate a negative ceding commission between $80 million and $120 Million, consistent with actuarial analysis.]"  PTX 2.001. A positive ceding commission here would have reflected an additional purchase price payment from Front Street to F&G Life for the value of the liabilities and the business those liabilities would generate.  See Bannigan Direct, Trial Tr. 690:17–691:2; Zacheis Direct, Trial Tr. 422:8–10; Lemay Direct, Trial Tr. 395:25–396:21, Oct. 22, 2014, ECF No. 97; PTX 49.  A negative ceding commission would have required F&G Life to further compensate Front Street for the liabilities Front Street was assuming, in addition to the assets being transferred to support the Reinsurance Transaction.[8]  Bannigan Direct, Trial Tr. 690:17–691:2; Lemay Direct, Trial Tr. 395:25–396:21.

**Harbinger's Expected Economic Benefit under the Reinsurance Transaction**

27. Had it not been for the $1 billion management limit under the Term Sheet, the Trust Account Investment Guidelines would permit Harbinger to invest up to 10% of F&G Life's entire $15 billion asset portfolio in BIGs, a total of $1.5 billion.  PTX 2.006; PTX 269.  Under the Trust Account Investment Guidelines Harbinger could invest up to 5% of $15 billion, or $750 million, in the NAIC 5 to 6 category.  PTX 2.006; PTX 269; Marhoun Direct, Trial Tr. 276:9–277:25.  Harbinger also had the option to invest a portion of that $750 million in category NAIC 6, more specifically, up to 3% of $15 billion, or $450 million.  PTX 2.006; PTX 269; Marhoun Direct, Trial Tr. 276:9–277:25.  However, Harbinger could not have invested the full 5% in the NAIC 5 to 6 category as well as the full 3% in the NAIC 6 category.  See PTX 2.002, 006.

28. Harbinger expected to be able to manage at least $750 million in the Trust Account.  See PTX 269; Marhoun Direct, Trial Tr. 263:1–25, 276:9–278:8.

29. Harbinger believed that it could manage up to $1 billion in BIGs in the Trust Account.  Cheliotis Direct, Trial Tr. 54:2–6; Devins Direct, Trial Tr. 113:14–24; DTX 325; DTX 8 at HARB-E0008778, HARB-E0008780; PTX 4; DTX 10 at HARB-E0017419.  It expected that it would be able to convert all assets in the Trust Account to BIGs within

---

[8] Harbinger and OM argue about whether or not the unrealized gains on the assets transferred to Front Street constitute a negative ceding commission as that term was used in the SPA.

several months of the Reinsurance Transaction.  PTX 109.003; DTX 146; Gass Cross, Trial Tr. 329:14–331:3, Oct. 21, 2014, ECF No. 95.

30.     The primary economic benefit created for Harbinger by the Reinsurance Transaction emanated from Harbinger's ability to manage as many BIGs as possible in the Trust Account, here up to $1 billion.  Gass Direct, Trial Tr. 305:14–307:6; PTX 12.003.

## Conditions Precedent within § 5.21 of the SPA

31.     The SPA § 5.21(b) required:

> As promptly as practicable following the Closing, Buyer shall cause definitive documentation for a reinsurance transaction between OMFLIC and Front Street . . . , substantially on the terms set forth in the term sheet attached hereto as Exhibit K (the "Reinsurance Transaction Term Sheet," and such transaction, the "Reinsurance Transaction"), to be prepared in accordance with the terms and conditions set forth in the Reinsurance Transaction Term Sheet and, except as contemplated in Section 5.21(f)(i), to contain no term or condition that (i) is inconsistent therewith in any respect that would have an adverse economic effect on Seller, or (ii) is inconsistent therewith in any material respect unless (in the case of the preceding clause (ii)), following written notice from Buyer to Seller that Buyer proposes to include in such definitive documentation terms or conditions that are inconsistent in a material respect with the Reinsurance Transaction Term Sheet, Seller reasonably determines that such proposed terms or conditions would not make receipt of any required Governmental Approval materially less likely. Buyer shall give Seller a reasonable opportunity to review and provide comments on such documentation prior to the submission of such documentation to any Governmental Entity.

> PTX 1.062

32.     The SPA § 5.21(c) required:

> Following the Closing, Buyer shall as promptly as practicable make, and cause its applicable Affiliates to make, all filings and notifications with all Governmental Entities that may be or may become reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Reinsurance Transaction, including Buyer causing a "Form D" or other application to be filed in each jurisdiction where required by applicable insurance Laws in connection with the Reinsurance Transaction (including in connection with any proposed appointment by OMFLIC of Harbinger . . . as investment manager for a portion of the assets in the Funds Withheld Account).  Buyer shall commit in such filings to capitalize Front

Street with at least $80,000,000 at or before the closing of the Reinsurance Transaction.  Buyer shall have responsibility for the filing fees associated with its "Forms D" or other applications in connection with the Reinsurance Transaction.

PTX 1.062.

## Conditions Precedent and Important Provisions of § 5.21(d) of the SPA

33.   The SPA required each party to make reasonable best efforts to effectuate the Reinsurance Transaction via § 5.21(d), which stated:

> Following the Closing, Buyer shall, and shall cause its Affiliates, including OMFLIC to, use reasonable best efforts to obtain as promptly as practicable all Governmental Approvals that are necessary under applicable Law to consummate and make effective the Reinsurance Transaction.  Buyer shall, and shall cause its Affiliates to, take all reasonable actions as may be requested by any such Governmental Entities to obtain as promptly as practicable after the Closing all such Governmental Approvals. The parties shall cooperate with the reasonable requests of each other in seeking such Governmental Approvals as promptly as practicable after the Closing. Neither Seller nor Buyer shall take or cause to be taken any action that it is aware or reasonably should be aware would have the effect of materially delaying, impairing or impeding the receipt of any such Governmental Approvals of the Reinsurance Transaction following the Closing.

PTX 1.062–063.

34.   The SPA further provided for the parties to use Remedial Efforts in § 5.21(d):

> In the event that a Governmental Entity requires that the terms of the Reinsurance Transaction be changed or altered in a manner that materially and adversely affects the economic benefits reasonably expected to be derived by Buyer thereunder, each of Buyer and Seller shall use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof ("Remedial Efforts"); provided that neither party shall have an obligation to so negotiate in good faith such alternative terms for a period of more than 150 days . . . .

PTX 1.063.

12

35.     The SPA provided for a shortening of the Remedial Efforts period in § 5.21(d) which stated

> that in the event Buyer reasonably believes that, even with the use of Remedial Efforts, any required Governmental Approval would be highly unlikely to be obtained or, if obtained, would be highly likely to impose an Adverse Reinsurance Transaction Condition or Restriction, Buyer may request Seller's consent to shorten or eliminate the 150-day period for conducting Remedial Efforts and Seller shall consider such request in good faith.

PTX 1.063.

36.     The SPA § 5.21(d) also identified certain Adverse Conditions which Harbinger would not be required to undertake, otherwise agree to, or accept:

> Notwithstanding any other provision of this Agreement, Buyer shall not be required to take any action under this Agreement pursuant to, or otherwise agree to or accept, any Adverse Reinsurance Transaction Condition or Restriction. "Adverse Reinsurance Transaction Condition or Restriction" means any condition or restriction imposed by a Governmental Entity: (A) that is not customarily imposed in transactions of the type contemplated by the terms of the Reinsurance Transaction; (B) that requires the taking of any action, including the inclusion in the definitive documentation for the Reinsurance Transaction of any terms or conditions that are in substance inconsistent with the substantive terms set forth in the Reinsurance Transaction Term Sheet, that would adversely affect in any material respect the economic benefits reasonably expected to be derived by Buyer in connection with the Reinsurance Transaction; (C) that restricts, precludes or conditions the appointment by Front Street (or OMFLIC, if applicable) of Harbinger . . . as investment manager of assets to be deposited into the Trust Account or the Funds Withheld Account as contemplated in the Reinsurance Transaction Term Sheet with an aggregate value of at least $750,000,000 or restricts, prohibits or conditions the payment by Front Street to Harbinger . . . of Harbinger['s] . . . customary compensation; or (D) that requires any substantive change to the investment guidelines applicable to the assets in the Trust Account or Funds Withheld Account as set forth in the Reinsurance Transaction Term Sheet.

PTX 1.063.

**The Purchase Price Reduction of the SPA**

37.     The SPA § 5.21(f)(i) provided for the PP Reduction, which was added to the SPA for Harbinger's benefit in exchange for the removal of the Reinsurance Transaction as a condition to closing from the Original SPA.  PTX 1.064; Bannigan Direct, Trial Tr. 698:1–7; Devins Direct, Trial Tr. 111:1–8; Duncan Direct, Trial Tr. 447:2–447:14.

38.     The PP Reduction in the SPA § 5.21(f)(i) provided that:

> If the Reinsurance Transaction or a substantially similar transaction with Front Street or another Affiliate of Buyer is approved by the [MIA] on or before the second anniversary of the Closing Date, the Post-Closing PP Reduction will be determined by comparing the Target AUM (defined below) with the value of assets in the reserve credit trust (the "Trust Account") and the funds withheld account (the "Funds Withheld Account") to be established as part of the Reinsurance Transaction that the [MIA] permits be managed by Harbinger . . . at the time of the closing of such transaction (the "Permitted AUM").   If the Target AUM exceeds the Permitted AUM, the Post –Closing PP Reduction shall be equal to the lesser of (x) $50,000,000 and (y) the product of (A) the dollar amount of such excess and (B) 0.20.  For the avoidance of doubt, if the Target AUM is equal to or less than the Permitted AUM, there shall be no Post-Closing PP Reduction.    The "Target AUM" shall be an amount equal to $1,000,000,000; provided, however, that in the event that Buyer or its Affiliates seek approval from the [MIA] to deposit any assets into the Trust Account that do not meet each of the requirements of the Reinsurance Transaction Term Sheet for permissible trust assets (any assets not meeting each of such requirements, the "Alternative Assets"), the Target AUM shall be reduced by the market value of Alternative Assets so sought to be deposited into the Trust Account at the closing of the reinsurance transaction that are not approved by the [MIA].  For the avoidance of doubt, the Reinsurance Transaction Term Sheet requires that the assets in the Trust Account be limited to assets meeting each of the following three requirements: (1) such assets are of the types which qualify as admitted assets under the laws of Maryland (disregarding any rating, duration or concentration limits contained therein to the extent applicable); (2) such assets are SVO listed; and (3) such assets are "Trust Account Eligible Assets" under the Trust Agreement Investment Guidelines.   For the avoidance of doubt, the "Form D" filing or filings to be made by Buyer or its Affiliates in connection with the Reinsurance Transaction shall contemplate that Harbinger . . . will manage assets in the Trust Account and Funds Withheld Account at the time of the closing of such transaction that have an aggregate value equal to $1,000,000,000.

39.    The SPA § 5.21(f)(ii) set forth the conditions that must be satisfied in order for Harbinger to be awarded the PP Reduction:

> If (A) the Reinsurance Transaction or a substantially similar transaction with Front Street or another Affiliate of Buyer is (1) disapproved in writing by the [MIA], (2) not approved by the [MIA] on or before the date that is the second anniversary of the Closing Date, or (3) approved by the [MIA], but such approval imposes any Adverse Reinsurance Transaction Condition or Restrictions, and (B) with respect to each of the preceding sub-clauses (1), (2) and (3), Buyer has performed its obligations under Section 5.21(d) with respect to Remedial Efforts, and Buyer is otherwise in compliance with each of its material obligations to seek such approval as set forth above in this Section 5.21, the Post-Closing PP Reduction shall equal $50,000,000 . . . .

PTX 1.064–65.

40.    Section 5.21(f)(iii) further provided that

> [p]romptly following Buyer's determination of the Post-Closing PP Reduction, if any, Buyer shall prepare and deliver to Seller a written notice containing: (a) the basis for the Post-Closing PP Reduction and supporting evidence thereof, including copies of Buyer's or its Affiliates' Form D filing, all correspondence between Buyer or its Affiliates and the [MIA] and any approval or disapproval order from the [MIA] in respect of the Reinsurance Transaction; (b) Buyer's good faith calculation of the Post-Closing PP Reduction setting forth in reasonable detail each of the components of such calculation; and (c) the work papers used by Buyer in preparing such calculation (collectively, "Buyer's PP Reduction Materials").  Buyer shall also provide to Seller such additional information and documentation related to the Reinsurance Transaction and Buyer's calculation of the Post-Closing PP Reduction as Seller may reasonably request. If Seller agrees with Buyer's determination of the Post-Closing PP Reduction, Seller shall pay the amount of the Post-Closing PP Reduction to Buyer within 45 days following receipt by Seller of Buyer's PP Reduction Materials and such additional information and documentation requested by Seller.  If Seller disagrees with Buyer's calculation of the Post-Closing PP Reduction, the parties shall resolve such disagreement in accordance with Section 12.7.  For the avoidance of doubt, Buyer shall be entitled to deliver to Seller its calculation of the Post-Closing PP Reduction at any time following the earlier to occur of (a) receipt of a written order of the Maryland Insurance Administration with regard to the Reinsurance Transaction and the exhaustion by Buyer of its obligations to seek approval of the Reinsurance Transaction as set forth above in this Section 5.21,

including its obligations under Section 5.21(d) with respect to Remedial Efforts and (b) the second anniversary of the Closing.

PTX 1.065–066.

41. Both OM and Harbinger intended the PP Reduction to be structured as a sliding scale. "So, for instance, if the assets [in the Trust Account] came in the mid range at 875, the calculation should . . . result in a purchase price adjustment of $25 million."  Duncan Cross, Trial Tr. 450:12–450:25.  See also Bannigan Direct, Trial Tr. 703:15–23.

**Post-Closing Activities regarding the Reinsurance Transactions**

42. Following the Acquisition on April 6, 2011, Harbinger changed OMFLIC's name to F&G Life.  JPTO Stipulated Facts ¶ 7.

43. After the Acquisition on April 6, 2011, Harbinger worked with OM to prepare a new Form D to file with the MIA.  Devins Direct, Trial Tr. 112:14–20; Marhoun Direct, Trial Tr. 265:19–266:21; PTX 54; PTX 13; PTX 326.  Harbinger drafted a new Form D to be in accordance with the Term Sheet.  Devins Direct, Trial Tr. 112:14–20; Lemay Direct, Trial Tr. 398:12–399:4, 401:9–402:8; DTX 122; DTX 275.  Harbinger responded to OM's questions regarding the ceding commission and the unrealized gains in the Reinsurance Transaction and the Form D that was to be filed with the MIA. DTX 275; Devins Cross, Trial Tr. 166:2–175:17.  Harbinger provided drafts of the Form D and supporting materials to OM and included OM's comments in the final Form D filed with the MIA.  See PTX 13; DTX 326; PTX 54.

**The Form D for the Reinsurance Transaction**

44. "On July 26, 2011, F&G Life filed a Form D application with the [MIA]."  JPTO Stipulated Facts ¶ 8.

45. Relevant here, the Form D filed on July 26, 2011 explained the proposed Reinsurance Transaction between Front Street and F&G Life:

> Under the Coinsurance Agreement, effective March 31, 2011, the Reinsurer will assume on a coinsurance basis 100% of approximately $3 billion of the Company's gross liability . . . The Company will withhold funds to secure at least 66.667% of the Reinsurer's liability in conformance with Maryland law regarding funds withheld so that the Company will receive financial statement credit for the reinsurance to the amount of the funds withheld. The remainder of the Reinsurer's obligations will be collateralized by a credit for reinsurance trust established and funded by the Reinsurer for the benefit of the Company that meets the requirements of Maryland law for trust funds so that the Company will receive financial statement credit for

the reinsurance in the amount of the funds held in the trust (the "<u>Trust</u>"). . . .

The initial consideration for the reinsurance shall consist of assets that have been agreed by the Company and the Reinsurer having an aggregate book value, as of March 31, 2011, equal to $3 billion. No ceding commission will be paid with respect to the reinsurance.

As indicated above, the Coinsurance Agreement provides that at least $2 billion of the consideration will be retained by the Company on a funds withheld basis, with the remainder to be transferred to the Reinsurer and deposited in the Trust. Under the terms of the Coinsurance Agreement, assets with an aggregate value of up to $1 billion (excluding investment income on such assets) will be managed by Harbinger . . . (the "<u>Asset Manager</u>"). This $1 billion will include all of the assets deposited in the Trust (excluding investment income) and may include a portion of the funds withheld account that, together with the Trust assets, will equal $1 billion (excluding investment income). The Company and the Reinsurer intend that, initially, assets with a fair market value of $1 billion will be deposited in the Trust and assets with a book value of $2 billion will be held on a funds withheld basis, and that therefore the Asset Manager will initially only be managing the assets deposited in the Trust.  As noted above, these assets will be managed by the Asset Manager pursuant to the terms of an Investment Management Agreement between the Reinsurer and the Asset Manager (the "<u>Investment Management Agreement</u>"). . . The assets in the Trust will be managed in accordance with the investment guidelines for the Trust attached to the Coinsurance Agreement, which set forth permitted asset quality percentage and concentration limitations.

PTX 54.004–006.

## <u>Communications with the MIA regarding the Reinsurance Transaction Prior to the Form D Denial</u>

46.     After F&G Life submitted the Form D, F&G Life met and communicated with the MIA numerous times to secure approval of the Reinsurance Transaction.  Marhoun Direct, Trial Tr. 267:23–271:25.

47.     F&G Life met with the MIA to explain the transaction and address any concerns on August 23, 2011.  PTX 88.004; PTX 66.007.

48.     On August 26, 2011, the MIA sent F&G Life a list of specific questions regarding the transaction, to which F&G Life responded on October 4, 2011.  PTX 66; PTX 300.003; PTX 327; Marhoun Direct, Trial Tr. 268:3–269:10.  Harbinger forwarded the MIA's

questions to OM, and OM provided comments on the MIA's questions that were incorporated in F&G Life's response to the MIA.  PTX 4; PTX 88; PTX 89; PTX 134; PTX 327; Marhoun Direct, Trial Tr. 268:13–269:15; Devins Direct, Trial Tr. 117:4–118:6.

49.    On November 10, 2011, F&G Life had a phone call with the MIA's actuarial consultants, Lewis & Ellis, to explain the transaction.  PTX 94; PTX 105.  OM declined to participate, although it was informed in advance.  PTX 19.

50.    The MIA also requested the list of assets to be transferred in the Reinsurance Transaction, which Mr. Eric Marhoun, General Counsel first to OMFLIC and then F&G Life, provided on November 15, 2011.  PTX 143; Marhoun Direct, Trial Tr. 259:9–17.  The list was forwarded to OM that same day.  DTX 40 at HARB-E0098482.

51.    Harbinger and F&G Life had another in-person meeting with the MIA on November 16, 2011, and worked with OM in advance to prepare presentation materials.  PTX 42; PTX 56; PTX 105; PTX 150; PTX 152; PTX 329; DTX 78.  Harbinger communicated its impression of the meeting to OM.  PTX 57.

52.    For the remainder of November and December, the MIA continued to send F&G Life follow-up questions and concerns about the Reinsurance Transaction.  PTX 6; PTX 39; PTX 104.  Harbinger and F&G Life worked to respond to the MIA's concerns, consulted with OM, and Harbinger updated OM periodically about the status of the transaction.  PTX 6; PTX 39; PTX 103; PTX 104; PTX 109; PTX 153; PTX 157; PTX 158; PTX 159.

**The Denial of the Form D**

53.    On December 22, 2011, Mr. Barry Ward, the Chief Financial Officer of F&G Life, Ward Dep. 7:13–17, Apr. 24, 2013, received a phone call from the MIA whereby Mr. Ward was informed the Reinsurance Transaction would not be approved.  Ward Dep. 13:20–14:22.  During the phone call, the MIA gave F&G Life the opportunity to withdraw its Form D, but Mr. Ward declined on behalf of F&G Life.  PTX 180; Devins Direct, Trial Tr. 123:9–15; Ward Dep. Tr. 126:9–24; 129:7–132:24.  Mr. Ward requested a draft of the written denial prior to its issuance, but the MIA refused to provide one.  PTX 180; Ward Dep. Tr. 126:9–24, 129:7–132:24.

54.    Mr. Ward told Harbinger about the phone call.  PTX 291.  On December 23, 2011, Harbinger's outside counsel, Mr. Michael Devins of Debevoise & Plimpton, informed OM, through OM's outside counsel, Mr. Kirk Lipsey of Dewey & LeBoeuf, of the MIA's December 22, 2011 phone call.  PTX 180; Devins Direct, Trial Tr. 122:15–123:15.

55.    Mr. Marhoun, Mr. Konstantinos Cheliotis, in-house counsel for Harbinger, Mr. Phillip Gass, Managing Director of Investments for Harbinger, all were surprised when they learned the MIA had rejected the transaction.  Marhoun Direct, Trial Tr. 274:19–275:6;

Cheliotis Direct, Trial Tr. 52:25, 58:16–24; Gass Direct, Trial Tr. 303:25, 307:24–308:7.  Mr. Marhoun had not seen any other indications that the MIA was going to deny the transaction and was surprised the MIA denied it "this late in the game." Marhoun Direct, Trial Tr. 275:1–6.  Mr. Cheliotis explained that Harbinger had been working on the deal for over two years, and that Harbinger had expected to realize a substantial amount of gain from the Reinsurance Transaction and that it was a vital piece of Harbinger's business.  Cheliotis Direct, Trial Tr. 58:22–59:14.  Mr. Cheliotis believed "[t]hroughout the process with the MIA, we felt that we were addressing their concerns, that we had understood their concerns, and that we were on a path toward approval."  Cheliotis Direct, Trial Tr. 59:1–4.  According to Mr. Gass, he believed if Harbinger did not obtain the MIA's approval for the Reinsurance Transaction, Harbinger would have been "forgoing considerable value in excess of $75 million a year . . . ."  Gass Direct, Trial Tr. 308:20–22.

56.   On January 5, 2012 counsel for OM, Ms. Elizabeth Bannigan, also of Dewey & LeBoeuf, and Mr. Lipsey, asked Harbinger and F&G Life to request that the MIA provide a draft copy of the ruling, but were informed that F&G Life's request for one had already been denied.  DTX 39; PTX 15; PTX 200; Devins Direct, Trial Tr. 123:3–15.

57.   On January 9, 2012, OM requested that Harbinger and F&G Life ask the MIA not to issue a written disapproval of the Form D, or, in the alternative, to withdraw the Form D from the MIA's consideration.  DTX 39; PTX 15; PTX 59; PTX 200; Devins Direct, Trial Tr. 123:20–124:22.

58.   In response, Harbinger asked OM to agree to clarify the implications of such a request under the SPA.  Harbinger was concerned what ramifications the withdrawal of the Form D would have for the timing of the PP Reduction.  DTX 39; PTX 15; PTX 59; PTX 200; Devins Direct, Trial Tr. 123:20–124:22.

59.   OM refused to negotiate or discuss any proposed clarification of the SPA, and it did not agree to any of Harbinger's proposals to take specific action to clarify the SPA. PTX 59.001; Devins Direct, Trial Tr. 123:20–126:12; Duncan Cross, 518:9–22.

60.   By letter dated January 10, 2012, the MIA determined that the Form D application could not be approved as proposed.  JPTO Stipulated Facts ¶ 9; PTX 149.004.

61.   The letter communicated two reasons for the denial.  PTX 149.004.

62.   The first reason given in the January 10, 2012 letter was that the MIA "believe[d] that the structure of the proposed transaction potentially adversely affect[ed] the interests of F&G Life's policyholders."  PTX 149.004.  This, the MIA believed, was as

a result of the significant increase in the amount of below-investment-grade assets ultimately supporting F&G Life's policyholder obligations under the proposed transaction.  Specifically, approximately $528 million of the $1

billion of assets to be initially transferred into the trust account would be investment-grade assets (the remaining assets initially transferred into the trust account would be below-investment grade assets).   The proposed transaction provides that the investment-grade assets would be sold, and the proceeds reinvested in below-investment-grade assets.

PTX 149.004.

63.   Secondly, in connection with the MIA's understanding regarding the sale of the $528 million of investment grade assets, the MIA "believe[d] that the transaction would not be fair and reasonable to F&G Life."  PTX 149.004.  The MIA reasoned that

the parties anticipate[d] that the sale of the approximately $528 million of investment-grade assets will produce a realized gain of approximately $230 million. We believe that this is an unreasonable profit given the valuation range on the transferred business of between $5 million and $(22) million, as determined by F&G Life's consultants, Milliman, Inc.

PTX 149.004.

64.   Harbinger forwarded the MIA's written denial to OM.  PTX 332.

65.   After receiving the denial, Harbinger and F&G Life hired Ralph Tyler with the belief that he was uniquely qualified to lead Harbinger and F&G Life's negotiations with the MIA.  Marhoun, Direct Trial Tr. 275:13–276:8; Tyler Direct, Trial Tr. 574:22–576:9, Oct. 23, 2014, ECF No. 99; Cheliotis Direct, Trial Tr. 59:20–23; Ward, Dep. Tr. 30:16–22.   Mr. Tyler, an attorney himself, had held a variety of public sector positions, including in the Maryland Attorney General's Office, as the City Solicitor of Baltimore, as well as Chief Counsel to the Governor of Maryland.  Tyler Direct, Trial Tr. 573:24–574:16.  Mr. Tyler had also been the MIA Commissioner from September 2007 to January 2010.  Tyler Direct, Trial Tr. 574:16–18.  Additionally, Mr. Tyler had worked closely with the current MIA Commissioner, Theresa Goldsmith, Tyler Direct, Trial Tr. 584:17–24, as well as the MIA Deputy Commissioner Karen Hornig, Tyler Direct, Trial Tr. 576:22–577:6, and was very familiar with members of the MIA staff working on Harbinger's Form D submission.   Tyler Direct, Trial Tr. 580:15–22, 582:3–5, 596:8–12, 597:14–23.

66.   Harbinger and F&G Life worked to understand the MIA's objections.  Harbinger and F&G Life had Mr. Tyler review the MIA's January 10, 2012 denial letter.  Tyler Direct, Trial Tr. 576:15–21.  Within a day of the MIA's January 10, 2012 written denial, Harbinger contacted OM to discuss the denial and both parties agreed that the next step was to schedule a meeting with the MIA.  Devins Direct, Trial Tr. 128–14; PTX 201.001.  On January 13, 2012, OM requested a conference call with Harbinger to better understand the MIA's grounds for the denial, to which Harbinger agreed.  PTX 341.  Harbinger and OM discussed the grounds for the MIA's denial on January 18, 2012.  PTX 206.

67.    Mr. Tyler reached out to the MIA Deputy Commissioner Karen Hornig, and scheduled a meeting for January 23, 2012.  Tyler Direct, Trial Tr. 576:22–577:14; Devins Direct, Trial Tr. 128:18–129:3; PTX 74; PTX 77.  Harbinger updated OM regarding Mr. Tyler's efforts.  PTX 161; PTX 106.

68.    Harbinger and F&G Life worked to draw up talking points in anticipation of the meeting and had internal conversations regarding how to approach the MIA, with the goal of assuaging the MIA's concerns about the Reinsurance Transaction.  PTX 203; PTX 217; PTX 219.

69.    After close of business hours on January 19, 2012, the MIA informed Mr. Tyler by email that it wanted to discuss the report prepared by its own actuarial consultants, Lewis & Ellis, at the meeting scheduled for January 23, 2012.  Devins Direct, Trial Tr. 128:18–129:3; Tyler Direct, Trial Tr. 577:15–578:7; PTX 85; PTX 86.

70.    Neither Harbinger nor F&G Life had received the Lewis & Ellis report, and informed the MIA, as well as OM, of this fact on January 20, 2012.  Devins Direct, Trial Tr. 129:9; Tyler Direct, Trial Tr. 577:15–578:7; PTX 85; PTX 86; PTX 108; PTX 163; PTX 328.

71.    Mr. Tyler requested the Lewis & Ellis report from the MIA, which the MIA provided later that same day, on January 20, 2012.  Devins Direct, Trial Tr. 128:25–129:5; PTX 85; PTX 86; PTX 177.  Harbinger forwarded the report to OM.  Devins Direct, Trial Tr. 129:10–13; PTX 80; PTX 108; PTX 163; PTX 328.

72.    Harbinger and OM believed it would be beneficial to postpone the meeting to better review the Lewis & Ellis report.  Tyler Direct, Trial Tr. 579:7–15; Devins Direct, Trial Tr. 129:5–9; PTX 204; Bannigan Direct, Trial Tr. 725:24–726:5; PTX 164.

73.    By the time Harbinger received the Lewis & Ellis report on January 20, 2012, Harbinger had informed its actuaries of the MIA's denial and then reengaged them to review the Lewis & Ellis report.  Zacheis Direct, Trial Tr. 423:12–21, 425:24–426:7; PTX 177.

74.    Harbinger's actuaries reviewed the report and identified certain points regarding the unrealized gains analysis with which they disagreed.  Devins Direct, Trial Tr. 129:14–130:2; Zacheis Direct, Trial Tr. 424:18–425:2.

75.    On January 23, 2012, Mr. Tyler spoke with MIA Deputy Commissioner Hornig regarding OM, Harbinger, and F&G Life's decision that the best course of action was to schedule an actuarial meeting with Lewis & Ellis.  Tyler Direct, Trial Tr. 579:11–15; Devins Direct, Trial Tr. 129:14–21; Bannigan Direct, Trial Tr. 725:24–726:5; PTX 204.

76.     The MIA refused to allow Harbinger's actuaries to meet with Lewis & Ellis unless F&G Life waived its right to a hearing to contest the MIA's denial.  Tyler Direct, Trial Tr. 581:11–582:5; Devins Direct, Trial Tr. 129:21–24; Gass Direct, Trial Tr. 310:3–6.

77.     In order to secure a meeting with Lewis & Ellis, Harbinger and OM agreed that F&G Life should waive its right to a hearing, and had Ralph Tyler communicate this decision to the MIA on January 31, 2012.  Devins Direct, Trial Tr. 129:16–133:1; Tyler Direct, Trial Tr. 582:6–25; PTX 80; PTX 165; PTX 235.

78.     On February 2, 2012, the MIA unexpectedly reversed course and refused to allow any meeting with its actuaries Lewis & Ellis, despite Mr. Tyler's attempts to change the MIA's mind.  Tyler Direct, Trial Tr. 583:6–20; PTX 14; PTX 197; PTX 198.  Upon consultation with OM, F&G Life sent the MIA a letter on February 7, 2012 requesting it be allowed to withdraw its waiver of its hearing right, which the MIA allowed.  Tyler Direct, Trial Tr. 583:1–586:15; Devins Direct, Trial Tr. 133:2–134:3; PTX 14; PTX 27; PTX 117; PTX 270; PTX 271; PTX 342.

79.     Mr. Tyler convinced the MIA to allow F&G Life to submit a written response to the Lewis & Ellis report and to agree to a meeting with the MIA staff instead.  Tyler Direct, Trial Tr. 586:22–587:16; PTX 27; PTX 84; PTX 263.

80.     With comments from OM, F&G Life submitted a written explanation regarding the Lewis & Ellis report on February 9, 2012.  Devins Direct, Trial Tr. 134:4–135:5; Tyler Direct, Trial Tr. 586:16–587:1; Bannigan Redirect, Trial Tr. 848:11–852:17; PTX 87; PTX 7.

81.     On February 14, 2012, the MIA Commissioner met with representatives from Harbinger and F&G Life, including Mr. John Tweedie, Chief Executive Officer of Front Street, Mr. Ward, Mr. Marhoun, Mr. Tyler, and Mr. Devins in-person, Mr. Zacheis, Mr. Gass, and Mr. Cheliotis by phone, and Ms. Bannigan by phone for OM. JPTO Stipulated Facts ¶ 11; PTX 82; Devins Direct, Trial Tr. 137:4–17; Ward Dep. Tr. 158:17–162:5; Marhoun Cross, Trial Tr. 295:7–12; Tyler Direct, Trial Tr. 589:6–590:4; Zacheis Direct, Trial Tr. 426:11–18, Oct. 22, 2014; Gass Direct, Trial Tr. 309:14–18, 321:12–17; Cheliotis Direct, Trial Tr. 60:12–19; Bannigan Cross, Trial Tr. 797:22–798:5.

82.     Both OM and Harbinger felt that the MIA had refused to discuss anything substantive at the February 14, 2012 meeting.  Bannigan Direct, Trial Tr. 732:21–734:2; Cheliotis Cross, 95:3–95:14; Devins Direct, Trial Tr. 139:8–18; PTX 226.

83.     As a result of the February 14, 2012 meeting, Harbinger and F&G Life believed it had two alternatives posed to it by the MIA.  F&G Life could either appeal the MIA's ruling with a formal hearing, or waive its right to a hearing and meet with MIA staff to discuss the MIA's reasoning for denying the Form D, as well as any alternative terms the MIA might be willing to accept.  PTX 259; PTX 321; Cheliotis Direct, Trial Tr. 60:22–61:6;

Marhoun Cross, Trial Tr. 295:7–12; PTX 226; Devins Direct, Trial Tr. 137:4–17; Tyler Direct, Trial Tr. 590:8–16.

84. OM and Harbinger once again agreed that the best course of action was to waive F&G Life's hearing rights.  Cheliotis Direct, Trial Tr. 62:14–18; Tyler Direct, Trial Tr. 591:8–592:10; Bannigan Direct, Trial Tr. 733:6–735:23; Devins Direct, Trial Tr. 139:8–140:1.  F&G Life communicated this decision to the MIA on February 27, 2012. PTX 21.

85. On March 15, 2012, staff members of the MIA met with Mr. Tyler, Mr. Devins, Mr. Marhoun and Mr. Ward in person, Mr. Cheliotis, Mr. Gass and Mr. Zacheis by phone for Harbinger and F&G Life, and Mr. Lipsey from OM by phone.   JPTO Stipulated Facts ¶ 12; PTX 46; PTX 278; Lipsey Direct, Trial Tr. 876:11–22, 881:5–10, Oct. 24, 2014, ECF No. 101; DTX 323; Devins Direct, Trial Tr. 143:22–25; Zacheis Direct, Trial Tr. 426:11–18; Cheliotis Direct, Trial Tr. 62:20-23; Gass Direct, Trial Tr. 309:14–18; Marhoun Direct, Trial Tr. 278:9–18; Ward Dep. 175:6–22.

86. "The March 15, 2012 meeting with the MIA was the final communication Harbinger or F&G Life had with the MIA or its representatives concerning the proposed reinsurance transaction."  JPTO Stipulated Facts ¶ 13.

87. After the March 15th meeting, Harbinger had a good faith belief that the MIA would not approve the transaction given the level of risk in the Investment Guidelines. Cheliotis Direct, Trial Tr. 62:24–64:14; Devins Direct, Trial Tr. 148:14–25; Marhoun Direct, Trial Tr. 280:3–12; Tyler Direct, Trial Tr. 596:13–597:9.

88. Harbinger communicated to OM that it believed it could not get a deal done without imposing an Adverse Condition.  Cheliotis Direct, Trial Tr. 64:6–21; Devins Direct, Trial Tr. 148:14–150:1; Lipsey Cross, Trial Tr. 914:8–915:21; DTX 324.

89. After the March 15, 2012 meeting, Harbinger tried to develop alternative deal structures.  Mr. Gass instructed the team at Front Street to look into "all the possible scenarios . . . for a revised proposal."  Gass Direct, Trial Tr. 308:24–309:13.  Mr. Jean-Francois Lemay, the Chief Investment Officer at Front Street, headed that team and ran several economic projections based on various adjustments to the Reinsurance Transaction, including a smaller Trust Account, exchanging the assets in the Trust Account for a letter of credit, and also considered the economic implications of increasing Front Street's capital in the surplus account.  Lemay Direct, Trial Tr. 402:14–407:22; Lemay Cross, Trial Tr. 415:17–416:8, 418:19–420:2, Oct. 22, 2014, ECF No. 97; Devins Cross, Trial Tr. 197:24–198:15; Gass Direct, Trial Tr. 308:24–309:13; DTX 235.

90. Despite its efforts to secure approval of a transaction from the MIA, Harbinger sent a letter to OM demanding payment, dated April 6, 2012.  See PTX 20; Cheliotis Direct, Trial Tr. 66:5–13; 73:8–24; Cheliotis Cross, Trial Tr. 103:9–106:23; Devins Direct, Trial Tr. 152:7–18; 153:10–154:10.

91.     Mr. Devins informed OM's counsel, Mr. Lipsey, of the demand letter prior to April 4, 2012 and several days in advance of OM receiving the letter.  Devins Direct, 151:17–152:4; PTX 124.

92.     After Mr. Devins informed Mr. Lipsey of the forthcoming demand letter, Mr. Lipsey followed up with Mr. Devins on April 4, 2012 to discuss working out an alternate proposal, and the two stayed in contact.  Lipsey Cross, Trial Tr. 922:14–24; Devins Direct, Trial Tr. 154:1–8; PTX 124.

93.     However, neither Harbinger nor its counsel believed that OM would pay the PP Reduction in response to Harbinger's April 6 demand letter, but instead hoped to further engage OM in the process.  Cheliotis Direct, Trial Tr. 65:11–66:13, 73:8–23; Cheliotis Cross, Trial Tr. 103:9–105:17; Devins Cross, Trial Tr. 219:7–222:1.

94.     After April 6, 2012, while Harbinger was not convinced an alternative transaction that did not impose an Adverse Condition could be developed and also approved by the MIA, it maintained an interest in investigating how it could get the Reinsurance Transaction approved.  Devins Direct, Trial Tr. 152:22–154:24; Devins Cross, Trial Tr. 198:6–10, 214:6–215:15, 220:6–17; Cheliotis Cross, Trial Tr. 106:5–9.

95.     On April 19, 2012, OM responded to Harbinger's April 6, 2012 letter.  PTX 98; Cheliotis Direct, Trial Tr. 66:15–67:1; Devins Direct, Trial Tr. 154:25–156:2.

96.     In its April 19, 2012 response, OM informed Harbinger that it did "not share [Harbinger's] apparent pessimism as to the prospects for negotiating alternative terms to the Reinsurance Transaction that are acceptable to the [MIA] and provide benefits substantially similar to the benefits provided under the existing terms of the Reinsurance Transaction."  PTX 98.  OM further stated that it was "in the process of preparing a term sheet setting forth such alternative terms and propose[d] to discuss and negotiate these terms with [Harbinger] in good faith, with a view to [F&G Life] submitting a new Form D application to the MIA for a revised reinsurance transaction based on such negotiated terms."  PTX 98.  OM advised Harbinger to expect OM to send "a draft of the term sheet as soon as practicable . . . ."  PTX 98.

97.     After Harbinger received OM's April 19, 2012 response, Mr. Gass reached out to Mr. Duncan on April 27, 2012, to schedule a meeting to discuss alternative transaction structures.  PTX 318.  Mr. Gass asked Mr. Duncan whether he and his team would "be available to meet early next week," and offered to "be available in NY or Baltimore to accommodate."  PTX 318.002.  Mr. Duncan replied:  "I doubt it will be next week due to my diary.  How does yours look the following week. [sic]"  PTX 318.002.  Mr. Gass countered, proposing a sooner meeting "late next week -- given the short window we discussed to review possible alternatives?  I do worry if it gets pushed back to [sic] far, we may run out of time."  PTX 318.002.  Two days later, on April 29, 2012, Mr. Duncan responded again that "those dates won't work," and asked for Mr. Gass' "next availability after Monday [sic] week?"  PTX 318.001.  Furthermore, Mr. Duncan stated that "the short window is your interpretation of the SPA, not ours - we're still waiting

to start the 150 day clock." PTX 318.001.  Mr. Gass continued to offer to be available to have an in person meeting, but on April 30, 2012 when Mr. Duncan suggested May 10 or 11 as potential meeting dates, Mr. Gass responded on May 2, 2012: "Alex - I am free on both dates.  But after further discussing with the Baltimore team who attended the meetings with the MIA, I don't think it makes sense to push back discussions till late next week.  I suggest we have a call this Thurs/Fri to discuss the term sheet to accelerate our discussions, and we can follow up and attempt to make progress in person as you suggest late next week."  PTX 318.001.

98.   On May 2, 2012, OM sent a written proposal for a revised approach to Harbinger.  PTX 319; Devins Direct, Trial Tr. 156:3–18.

99.   The May 2nd proposal altered the amount of the Premium that would have been initially deposited in the Trust Account, stating

> [w]ith respect to the funds-transferred premium, the Reinsurer shall establish and maintain a reinsurance trust (the "Trust Account") pursuant to a trust agreement with the terms set forth below (the "Trust Agreement").  Up to [$1 billion500 million] of the Premium shall be paid by transferring to the Reinsurer, and depositing into the Trust Account, below-investment-grade assets and other assets of Cedent to be agreed by the Parties having an aggregate market value as of the Effective Date equal to such portion of the Premium.

PTX 319.003.

100.  The proposal did provide that

> following the satisfaction of investment performance criteria to be agreed by the [MIA] on the assets in the Trust Account, the Reinsurer will have the right to either (i) transfer assets having an aggregate market value of up to $[500 million] from the Funds Withheld to the Trust Account (with corresponding changes to the Trust Account % and Funds Withheld %) or (ii) convert Funds Withheld assets having an aggregate value of up to $[500] million into assets meeting the investment guidelines for the Trust Account.

PTX 319.003–004.

101.  When Harbinger reviewed the May 2nd proposal, it felt the proposal was incomplete. Devins Direct, Trial Tr. 156:13–157:8; Cheliotis Direct, Trial Tr. 67:15–68:20. Harbinger communicated this view of the proposal to OM during a phone call on May 4, 2012 to clarify whether or not there were any other details OM had in mind. Cheliotis Direct, Trial Tr. 68:11–69:3; Gass Direct, Trial Tr. 321:6–25.  See also; Gass Redirect, Trial Tr. 381:7–18, Oct. 21, 2014, ECF No. 95.

102.   Mr. Gass and Mr. Duncan met in person around May 10 or 11, 2012 to discuss the May 2nd proposal.  DTX 291; Gass Direct, Trial Tr. 322:1–10.

103.   After discussions with OM, Harbinger felt that the May 2nd proposal, without more, constituted an Adverse Condition, and communicated this to OM on May 15, 2012 by letter.  PTX 78; Cheliotis Direct, 67:23–69:3; Devins Direct, Trial Tr. 156:20–157:8.

104.   OM responded on May 18, 2012 to Harbinger's claim that the May 2nd proposal "would result in an Adverse Reinsurance Transaction Condition or Restriction," arguing that Harbinger's letter had "mischaracterize[d] the proposal in order to support Harbinger's untenable conclusion."  DTX 29 at HARB-E0043315.  Furthermore, OM claimed that during the conference call on May 4, 2012, OM stated it "would be willing to discuss appropriate compensation to Harbinger for the delay in the transfer of the full $1 billion of assets into the trust and if [sic] the agreed upon performance criteria were not met." DTX 29 at HARB-E0043315.

105.   Harbinger followed up with a letter on May 23, 2012 rejecting OM's contentions and requesting "a conference call with a senior officer of OM to allow Harbinger and OM to attempt to resolve this dispute in good faith consistent with the terms of the [SPA]." PTX 338.002.

106.   On May 25, 2012, OM replied, disputing Harbinger's characterization of the situation, but agreeing to speak to Harbinger "to discuss terms that can be offered to the [MIA] to address the MIA's concerns and satisfy the terms of the [SPA] . . . ."  PTX 69. Harbinger responded later that same day, stating that it did not believe OM's proposal[9] "was made with a serious intent to resolve [Harbinger's] issues."  DTX 21[10] at HARB-E0029384.  Harbinger asserted that prior to receiving OM's proposal, it had informed OM "Harbinger would consider only a complete proposal," but instead had "received only a partial proposal with no indication of the price adjustment OM was willing to offer."  DTX 21 at HARB-E0029384.  Harbinger stated that "Mr. Duncan would only state that he would consider making compromises such as payments to Harbinger of some amount but refused any specifics."  DTX 21 at HARB-E0029384.  Harbinger further stated that it would "remain open to working with [OM] towards any proposal to the MIA that does not constitute an Adverse Reinsurance Transaction or Condition. We are also open to discussing any alternative settlements, provided that OM makes concrete and complete proposals."  DTX 21 at HARB-E0029385.

107.   On May 28, 2012, during a conference call with Harbinger, OM agreed to send Harbinger a series of questions that would allow OM to provide Harbinger a new proposal.  PTX 70.

---

[9] Harbinger's letter actually states it is discussing "OM's proposal on May 12," but the context provided therein indicates the letter was referring to OM's May 2nd proposal.

[10] DTX 21 is part of Appendix D, which includes exhibits offered by OM that contain evidence identical to the portions of Appendix B exhibits to which OM objected.  See JPTO List of Appendices.  Therefore, the court treats exhibits in Appendix D as containing non-objectionable evidence and will cite to them accordingly.

108.    On May 31, 2012, OM sent Harbinger a letter request for information to assess Harbinger's expected economic benefits from managing the Trust Account. PTX 178.004; Cheliotis Direct, Trial Tr. 69:14–23. OM's objective was to determine an initial amount of BIGs in the Trust Account that would be acceptable to the MIA, and then to establish intervals acceptable to the MIA for when Harbinger could increase the amount of BIGs. PTX 178.004; Duncan Cross, Trial Tr. 552:9–24. OM also requested information so that it could calculate any correspondingly necessary PP Reduction due Harbinger as a result of this transaction structure. PTX 178; Duncan Cross, Trial Tr. 552:9–24.

109.    Harbinger replied with the requested information on June 8, 2012. PTX 306. Harbinger provided information responsive to OM's questions. Cheliotis Direct, Trial Tr. 69:24–70:23; Gass, Tr. at 324:4–9; PTX 306. This information had been provided to OM in the Form D filing and in the responses Harbinger submitted to the MIA's questions and its business plan. PTX 54; PTX 66; PTX 300.003; PTX 327; PTX 4; PTX 88; PTX 89; PTX 134; PTX 327.

110.    Mr. Gass had Mr. Lemay run an economic analysis on the consequences of investing only $500 million in BIGs, as well as investigate alternative transaction structures that might achieve the same economic benefits as investing the full $1 billion in BIGs. PTX 286; DTX 20; Gass Direct, Trial Tr. 324:10–325:12; Lemay Direct, Trial Tr. 408:11–25.

111.    Harbinger sent OM a second letter, dated July 6, 2012, requesting payment of the PP Reduction. PTX 312; Devins Direct Trial Tr. 157:22–158:3.

112.    Omar Asali, the President of Harbinger, and Phillip Broadley, the Group Finance Director of OM, spoke prior to Harbinger commencing litigation. Cheliotis Direct, Trial Tr. 71:9–17.

113.    On July 9, 2012, Harbinger filed this suit against OM. JPTO Stipulated Facts ¶ 14.

## OM's Counterclaim under § 5.14(c) of the SPA

114.    On summary judgment OM argued Harbinger breached its obligation under the SPA § 5.14(c) to pay the full 250 basis points facility fee to OM in exchange for OM's maintenance of an existing letter of credit. Mem. and Order 17, May 27, 2014, ECF No. 68 ("Mem. and Order"). The court held that the SPA § 5.14(c) unambiguously required Harbinger to pay a 250 basis point facility fee. Mem. and Order 19. Damages were to be proven at trial. See Mem. and Order 2.

115.    The SPA § 5.14(c) provided that:

    Seller shall support or cause an Affiliate of Seller to support ceded annuity reserves through existing or replacement letters of credit or other financing sponsored by Seller or such Affiliate (the "CARVM Facility") that enable

OMFLIC [which became F&G Life] to take full credit on its statutory financial statements (assuming OMFLIC's statutory reserves are determined in accordance with the same methodologies that were used by OMFLIC immediately prior to the Closing in determining statutory reserves, consistently applied) for the annuity portion of the Business reinsured by OM Re from OMFLIC under the 2008 CARVM Treaty (the "CARVM Business") until the earliest to occur of: (i) replacement of the CARVM Facility by a facility or facilities that enable OMFLIC to take full credit on its statutory financial statements for all CARVM Business; (ii) December 31, 2015; and (iii) the occurrence of a Non-Qualifying Change of Control.  Buyer shall pay to Seller by Wire Transfer, quarterly in arrears on the last Business Day of each calendar quarter until the CARVM Facility is terminated or all obligations of Seller thereunder have been fully satisfied, a facility fee equal to 250 basis points, calculated on a per annum basis, multiplied by the outstanding amount of letters of credit (and/or other lender-provided security) maintained under the terms of the CARVM Facility.

PTX 1.059.

116.  "After the Acquisition's closing on April 6, 2011, OM maintained a letter of credit as required by [the SPA] Section 5.14(c)."  JPTO Stipulated Facts ¶ 19.

117.  "During the second quarter of 2011, for the 85-day period dating from April 7, 2011 through June 30, 2011, the amount of the letter of credit was $280,000,000."  JPTO Stipulated Facts ¶ 20.

118.  "During the third quarter of 2011, for the 92-day period dating from July 1, 2011 through September 30, 2011, the amount of the letter of credit was $280,000,000."  JPTO Stipulated Facts ¶ 21.

119.  "During the fourth quarter of 2011, for the 21-day period dating from October 1, 2011 through October 21, 2011, the amount of the letter of credit was $280,000,000.  For the 52-day period dating from October 22, 2011 to December 12, 2011, the amount of the letter of credit was $240,000,000.  For the 19-day period dating from December 13, 2011 through December 31, 2011, the amount of the letter of credit was $255,000,000."  JPTO Stipulated Facts ¶ 22.

120.  "During the first quarter of 2012, for the 91-day period dating from January 1, 2012 through March 31, 2012, the amount of the letter of credit was $255,000,000."  JPTO Stipulated Facts ¶ 23.

121.  "During the second quarter of 2012, for the 89-day period dating from April 1, 2012 through June 28, 2012, the amount of the letter of credit was $255,000,000.  For the 2-day period dating from June 29, 2012 through June 30, 2012, the amount of the letter of credit was $265,000,000."  JPTO Stipulated Facts ¶ 24.

122.  "During the third quarter of 2012, for the 92-day period dating from July 1, 2012 through September 30, 2012, the amount of the letter of credit was $265,000,000." JPTO Stipulated Facts ¶ 25.

123.  "During the fourth quarter of 2012, for the 8-day period dating from October 1, 2012 through October 8, 2012, the amount of the letter of credit was $265,000,000." JPTO Stipulated Facts ¶ 26.

124.  "The letter of credit that OM held pursuant to Section 5.14(c) of the SPA was terminated after October 8, 2012." JPTO Stipulated Facts ¶ 27.

125.  "OM billed Harbinger at a rate of 250 basis points against the amount of the letter of credit maintained by OM, in accordance with Section 5.14(c). In total, OM billed Harbinger a total of $10,117,708." JPTO Stipulated Facts ¶ 28.

126.  "To date, Harbinger has paid OM $4,199,971." JPTO Stipulated Facts ¶ 29.

127.  "To date, the total amount billed to Harbinger and still unpaid is $5,917,737." JPTO Stipulated Facts ¶ 30.

## CONCLUSIONS OF LAW[11]

### Jurisdiction

128.  The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (2012). Harbinger was a citizen of New York and Delaware, with headquarters in New York, and organized in Delaware (the company's current headquarters are in Maryland). Joint Pretrial Order ("JPTO") 2.  OM is organized under the laws of England and Wales, with its principal place of business in England.  Thus, there is complete diversity of citizenship.  JPTO Stipulated Facts ¶¶ 1–2; JPTO 2.  Harbinger seeks $50 million in damages, which exceeds the minimum $75,000 amount in controversy requirement. JPTO 2.

### Applicable Law and Legal Standard

129.  New York law governs this dispute.  The SPA § 12.5 contains a choice of law clause, providing that "[t]his Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws thereof."  PTX 1.090.  Further, the parties do not dispute that New York law applies to the claims asserted herein.

---

[11] To the extent any of the foregoing findings of fact are conclusions of law, they are hereby adopted as conclusions of law, and vice versa.

130.    In order to recover on a claim for breach of contract, the plaintiff must prove, by a preponderance of the evidence, that (1) a valid agreement exists; (2) it has performed its contractual obligations; (3) defendant has breached the contract; and (4) plaintiff has suffered damages as a result.  Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted); Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 403–04 (S.D.N.Y. 2004); CMF Investments, Inc. v. Palmer, No. 13-CV-475 (VEC), 2014 WL 6604499, at *2 (S.D.N.Y. Nov. 21, 2014).  Under New York law, a party asserting breach of contract must prove each of the material allegations of the complaint by a preponderance of the evidence.  Barton Grp., Inc. v. NCR Corp., 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) aff'd, 476 F. App'x 275 (2d Cir. 2012) (citing Raymond v. Marks, 116 F.3d 466, at *1 (2d Cir. 1997)); V.S. Int'l, S.A. v. Boyden World Corp., 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994).

131.    A party seeking to enforce a contractual obligation subject to a condition precedent to performance must show it has satisfied all its obligations under the contract by a preponderance of the evidence.  Republic Corp. v. Procedyne Corp., 401 F. Supp. 1061, 1069 (S.D.N.Y. 1975).  See also Rachmani Corp. v. 9 E. 96th St. Apt. Corp., 211 A.D.2d 262, 269 (1st Dep't 1995) (cited in Raymond, 116 F.3d 466, at *1).

132.    For OM's payment obligation under the SPA § 5.21(f)(ii) and (iii) to have arisen, Harbinger must first prove that Harbinger satisfied the conditions precedent under the SPA § 5.21.  As there is no dispute that OM has not paid the $50 million PP Reduction under § 5.21(f), if Harbinger proves by a preponderance of the evidence that it performed its obligations as required by the SPA, OM will have breached the contract under § 5.21(f).

133.    Like the plaintiff's burden to prove breach, a defendant asserting breach of contract as a counterclaim must show plaintiff breached the contract by a preponderance of the evidence.  Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 403 (S.D.N.Y. 2004); V.S. Int'l, S.A., 862 F. Supp. at 1195 (cited in Raymond, 116 F.3d 466, at *1).  OM therefore bears the burden of proof to show by a preponderance of the evidence that Harbinger breached its obligations under the SPA.

134.    The meaning of a contract is a question of law for the court.  Bourne v. Walt Disney Co., 68 F.3d 621, 628–29 (2d Cir. 1995) (quoting Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993)) (citing Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992)).

135.    Under New York law, if a contract is unambiguous it must be interpreted according to its terms without resort to extrinsic evidence.  See, e.g., Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 617 (2d Cir. 2001) (citing W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)).  If there is a reasonable basis to disagree about the meaning of the terms then extrinsic evidence is admissible to show the parties' intent.  Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999) (quoting Bourne, 68 F.3d at 629).

136.     Here, the court has already determined as a matter of law that the Remedial Efforts clause was triggered and began to run on January 10, 2012.  Mem. and Order 7.  Therefore, Harbinger was required to undertake Remedial Efforts through June 8, 2012.

**Harbinger's Expected Economic Benefit Under the SPA**

137.     Under the SPA, Harbinger was obliged to use reasonable best efforts to first obtain the MIA's approval and, after the MIA's denial of the Form D, to undertake Remedial Efforts to reach an agreement with OM on terms that were also acceptable to the MIA.  As stated above, Remedial Efforts required Harbinger to use its reasonable best efforts to "cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof."  PTX 1.063.  Moreover, Harbinger did not need to agree to any terms that would have constituted an Adverse Condition as outlined above.  Therefore, in order to ascertain whether Harbinger fulfilled its obligations under the SPA, it is necessary to determine not only what benefits it expected under the SPA but as a matter of law what benefits were substantially similar to the benefits provided under the SPA.

138.     As a matter of law, the SPA required $750 million be available for Harbinger to manage in the Trust Account.  The SPA, by virtue of the Term Sheet, allowed Harbinger to manage up to 5% of the permitted $1 billion value in the NAIC 5 to 6 investment grade category.  PTX 2.006.  NAIC 5 to 6 assets could only be managed in the Trust Account.  PTX 2.006, 011.  Further, the Investment Guidelines stated these percentages were to be applied to F&G Life's entire Asset Portfolio, which was valued at around $15 billion.  *See* ¶ 27.[12]  Five percent of $15 billion equals $750 million.  Therefore, under the SPA $750 million had to be available for Harbinger's management in the Trust Account.

139.     The SPA entitled Harbinger to manage up to $1 billion in BIGs in the Trust Account by way of the Term Sheet and the Investment Guidelines.  In investing up to 5% of the $1 billion asset value in the Trust Account in the NAIC 5 to 6 category, Harbinger could have up to 3% of the total 5% in the NAIC 6 category.  *See* ¶ 27.

**Conditions Precedent**

**SPA § 5.21(b)**

140.     The court finds that Harbinger has met its burden to show that it satisfied the requirements of § 5.21(b), as Harbinger, with OM's approval, prepared the "definitive documentation for a reinsurance transaction" between F&G Life and Front Street, substantially on the terms set forth in the Term Sheet.

141.     The SPA § 5.21(b) stated:

---

[12] All citations to paragraph numbers, without more, are to paragraphs in this opinion.

Buyer shall cause definitive documentation for a reinsurance transaction between [F&G Life] and [Front Street], substantially on the terms set forth in the [Reinsurance Transaction Term Sheet] . . . to be prepared in accordance with the terms and conditions set forth in the Reinsurance Transaction Term Sheet and, except as contemplated in Section 5.21(f)(i), to contain no term or condition that (i) is inconsistent therewith in any respect that would have an adverse economic effect on Seller, or (ii) is inconsistent therewith in any material respect unless (in the case of the preceding clause (ii)), following written notice from Buyer to Seller that Buyer proposes to include in such definitive documentation terms or conditions that are inconsistent in a material respect with the Reinsurance Transaction Term Sheet, Seller reasonably determines that such proposed terms or conditions would not make receipt of any required Governmental Approval materially less likely. Buyer shall give Seller a reasonable opportunity to review and provide comments on such documentation prior to the submission of such documentation to any Governmental Entity.

PTX 1.0062.

142. Under the SPA, "definitive documentation" included a Form D that complied with the Term Sheet.

143. Harbinger prepared the Form D and supporting documentation for submission to the MIA for the Reinsurance Transaction.   See Devins Direct, Trial Tr. 112:14–20; Marhoun Direct, Trial Tr. 265:19–266:21; PTX 54; PTX 326.

144. OM reviewed the documentation before it was submitted to the MIA, and provided comments which were integrated into the submission.  Devins Direct, Trial Tr. 112:14–114:24; Marhoun Direct, Trial Tr. 266:22–267:22; PTX 13; DTX 326; Devins Cross, Trial Tr. 166:2–171:16; DTX 275.

145. OM has argued that Harbinger failed to satisfy this condition precedent when it submitted the Form D, which OM contends contained $230 million in unrealized gains, exceeding the Term Sheet's negative $120 million ceding commission cap.  Amended Answer ¶¶ 53, 57–60; Defendant OM Group (UK) Limited's Post-Trial Proposed Findings of Fact and Conclusions of Law ¶¶ 67–73, 22–931, 236, Dec. 16, 2014, ECF No. 127 ("OM's Proposed Findings").

146. OM's argument rests on the theory that the unrealized gains inherent in the proposed transaction were in fact a negative ceding commission.  Harbinger argues that a ceding commission is merely a balancing item as it reflected the purchase price for the expected value from the block of business transferred to Front Street.  Zacheis Direct, Trial Tr. 422:8–10; PTX 49; Lemay Direct, Trial Tr. 395:25–396:21, 399:8–12, 400:7–21.  Harbinger asserts a zero ceding commission was appropriate because the assets were specifically chosen to support the liabilities transferred, and that any unrealized

gains would have been reflected in the valuation of both the assets and the liabilities. Zacheis Cross, Trial Tr. 428:2–429, Oct. 22, 2014, ECF No. 97; Lemay Direct, Trial Tr. 398:12–124; PTX 49.

147.   The court does not need to resolve the parties dispute over whether the unrealized gain should be characterized as a ceding commission to find that Harbinger has satisfied its obligations under § 5.21(b).  The Term Sheet explicitly leaves the ceding commission as an open term.  Specifically, the Term Sheet provides for a ceding commission that is "[TBD: anticipate a negative ceding commission between $80 million and $120 million, consistent with actuarial analysis.]"  PTX 2.001.

148.   The court finds that the Term Sheet, and thus the SPA, did not bind the parties to a specific ceding commission.  The language of the contract, "TBD" clearly means "to be determined."  The contract provided for the ceding commission to be determined "consistent with actuarial analysis." OM has not alleged that F&G Life submitted a ceding commission that was not consistent with actuarial analysis, only that the Form D F&G Life submitted to the MIA did not provide for "a negative ceding commission between $80 million and $120 Million."  OM's Proposed Findings ¶¶ 236–239. Therefore, the court finds that because the amount of the ceding commission was an open term under the SPA, F&G Life's submission of a Form D with a ceding commission of zero did not breach its obligations under the SPA § 5.21(b).  Whether the ceding commission was zero, as stated in the Form D, or negative $230 million as OM contends, or some other number,  the amount of the ceding commission could not have caused Harbinger to fail to fulfil § 5.21(b) because the Term Sheet leaves that term as one to be determined.

149.   The SPA § 5.21(b) required Harbinger to prepare definitive documentation that substantially conformed to the Term Sheet, and to allow OM "a reasonable opportunity to review and provide comments on such documentation prior to the submission" to the MIA.  The court finds that Harbinger met its obligation to prepare documentation that was in substantial conformity with the Term Sheet, and that OM had an opportunity to review the documentation prior to its submission to the MIA. Devins Direct, Trial Tr. 112:14–114:24; Marhoun Direct, Trial Tr. 266:22–267:22; PTX 13; DTX 326; Devins Cross, Trial Tr. 166:2–171:16; DTX 275.

**SPA § 5.21(c)**

150.   The court finds that Harbinger has met its burden to show that it satisfied the requirements of the SPA § 5.21(c).  The SPA § 5.21(c) provides that

> [f]ollowing the Closing, Buyer shall as promptly as practicable make, and cause its applicable Affiliates to make, all filings and notifications with all Governmental Entities that may be or may become reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Reinsurance Transaction, including Buyer causing a "Form D" or other application to be filed in each jurisdiction where required by

applicable insurance Laws in connection with the Reinsurance Transaction (including in connection with any proposed appointment by OMFLIC of Harbinger . . . as investment manager for a portion of the assets in the Funds Withheld Account). Buyer shall commit in such filings to capitalize Front Street with at least $80,000,000 at or before the closing of the Reinsurance Transaction. Buyer shall have responsibility for the filing fees associated with its "Forms D" or other applications in connection with the Reinsurance Transaction.

PTX 1.0062.

151. The meaning of an unambiguous contract provision is a question for the court. Bourne, 68 F.3d at 628–29 (quoting Sayers, 7 F.3d at 1094) (citing Seiden Assocs., Inc., 959 F.2d at 428). Here, OM argues that the SPA § 5.21(c) which states that buyer shall make "all filings and notifications with all Governmental Entities that may be or may become reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Reinsurance Transaction" required F&G Life and Harbinger to submit a litany of submissions to the MIA. In its Proposed Findings of Facts and Conclusions of law OM argues that not only was Harbinger required to file the Form D, but was also required to provide all other information that the MIA might have needed to approve any variant of the transaction. OM's Proposed Findings ¶¶ 225–227. For example, OM claims that "Harbinger failed to propose any alternative terms to the MIA during the 150 day Remedial Effort period," that it also "failed to propose a transaction that gave it less assets under management, consistent with Section 5.21(f)(i) of the SPA, to the MIA," that it "did not propose OM's May 2 Term Sheet to the MIA for feedback and negotiation," and that "Harbinger did not propose OM's suggestion of an all-Funds Withheld structure to the MIA for feedback and negotiation." OM's Proposed Findings ¶ 227(h)–(k). These proposals OM claims Harbinger was required to make are not filings as contemplated by § 5.21. They are proposals to the MIA, not filings that are required, necessary or advisable under the law to consummate and make effective the Reinsurance Transaction. Moreover, OM's argument that Harbinger failed to satisfy the conditions precedent of the SPA § 5.21(c) would require the court to interpret § 5.21 in a manner that ignores the rest of the SPA § 5.21.

152. OM's interpretation would require that Harbinger accept any possible changes to the terms of the Reinsurance Transaction to obtain MIA approval regardless of both the Remedial Efforts and Adverse Condition clauses. OM's interpretation of § 5.21(c) would eviscerate the other provisions of the SPA such as the Remedial Efforts and Adverse Condition clauses. This cannot be the meaning of § 5.21(c). The court finds that the SPA §5.21(c), when read in light of the contractual terms of § 5.21 as a whole, requires Harbinger to file the Form D and supporting documentation with the MIA as promptly as practicable and to file any other documentation consistent with the terms of the SPA necessary to obtain MIA approval.

153.    Harbinger worked with OM to draft a new Form D after the Acquisition closed on April 6, 2011.  See ¶ 43.

154.    Harbinger submitted the Form D, its definitive documentation, to the MIA for the Reinsurance Transaction on July 26, 2011.  JPTO Stipulated Facts ¶ 8.  See also PTX 54.

155.    The court further finds that in filing the Form D and supporting documents on July 26, 2011, Harbinger complied with § 5.21(c).

## The SPA § 5.21(d) Reasonable Best Efforts

156.    The court is satisfied that Harbinger has met its burden to show that it used its reasonable best efforts to obtain as promptly as practicable the necessary MIA approvals to consummate and make effective the Reinsurance Transaction under the SPA § 5.21(d).

157.    The SPA § 5.21(d) provides:

> Following the Closing, Buyer shall, and shall cause its Affiliates, including OMFLIC to, use reasonable best efforts to obtain as promptly as practicable all Governmental Approvals that are necessary under applicable Law to consummate and make effective the Reinsurance Transaction.  Buyer shall, and shall cause its Affiliates to, take all reasonable actions as may be requested by any such Governmental Entities to obtain as promptly as practicable after the Closing all such Governmental Approvals. The parties shall cooperate with the reasonable requests of each other in seeking such Governmental Approvals as promptly as practicable after the Closing. Neither Seller nor Buyer shall take or cause to be taken any action that it is aware or reasonably should be aware would have the effect of materially delaying, impairing or impeding the receipt of any such Governmental Approvals of the Reinsurance Transaction following the Closing.

> PTX 1.062–063.

158.    When read in context with § 5.21(b) and § 5.21(c)'s requirements that Harbinger prepare and submit definitive documentation to the MIA that was in accordance with the agreed-upon terms and conditions laid out in the Term Sheet, § 5.21(d) called for Harbinger to use its reasonable best efforts to promptly obtain the MIA's approval of the Reinsurance Transaction terms OM and Harbinger had agreed to in the Term Sheet, as those terms were expressed in the Form D submitted to the MIA.

159.    Based on the same reasoning and in light of Harbinger's duty to use reasonable best efforts, § 5.21(d) required Harbinger to take all reasonable actions requested by the MIA to secure approval of the terms in the Form D that were already agreed to by

Harbinger and OM.  Both Harbinger and OM were required to cooperate with one another's reasonable requests in endeavoring to obtain approval of the previously agreed upon terms in the submitted Form D.  Neither party was permitted to undertake any action that it knew, or reasonably should have known, "would have the effect of materially delaying, impairing or impeding the receipt of" the MIA's approval of the Reinsurance Transaction terms as outlined in the Form D.

160.   Under New York law, the duty to use reasonable best efforts is a best efforts standard.  See, e.g., Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 578 (2d Cir. 2000) (citations omitted) (affirming the district court's construction of the contract's "every effort" clause to require a party to make "every reasonable effort," and proceeding to apply the "best efforts" standard); Robin Bay Assoc., LLC v. Merrill Lynch & Co., No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *7 (S.D.N.Y.  June 3, 2008) (interpreting a contractual standard requiring "reasonable best efforts" based on New York and United States Second Circuit case law on "best efforts").  See also Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 124 (2d Cir. 2013) (quoting Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 613 n.7 (2d Cir. 1979)).

161.   The United States Court of Appeals for the Second Circuit has found best efforts require "at least 'an obligation to act with good faith in light of one's own capabilities.'"  Cruz v., 720 F.3d at 124 (quoting Bloor, 601 F.2d at 613 n.7).  See also Aeronautical Indus. Dist. Lodge 91, 230 F.3d at 578 (citing Western Geophysical Co. v. Bolt Assocs., 584 F.2d 1164, 1171 (2d Cir.1978); Bloor, 601 F.2d at 613–14).  New York courts have not consistently required that the agreement provide a clear definition of best efforts.  Cruz, 720 F.3d at 124 (comparing Strauss Paper Co. v. RSA Exec. Search, 260 A.D.2d 570, 570–71 (2d Dep't 1999) and Timberline Dev. v. Kronman, 263 A.D.2d 175, 180 (1st Dep't 2000) with Van Valkenburgh, Nooger & Neville v. Hayden Publ. Co., 30 N.Y.2d 34, 46–47 (1972) and Maestro W. Chelsea SPE LLC v. Pradera Realty Inc., 38 Misc.3d 522, 529–30 (Sup. Ct., N.Y. County 2012)).  In some cases, New York courts have chosen to imply a standard for best efforts when the contract has failed to provide its own definition.  See, e.g., Town of Roxbury v. Rodrigues, 277 A.D.2d 866, 867 (3d Dep't 2000) ("The parties' contract did not specifically define the term 'best efforts.'  Nevertheless, this court has recognized that the term 'requires that plaintiffs pursue all reasonable methods' for satisfying the necessary contingencies.").  The term "best efforts" has been interpreted to require that a party use all reasonable means to achieve the contractual object at issue.  See, e.g., Aeronautical Indus. Dist. Lodge 91, 230 F.3d at 578 (citations omitted); Robin Bay Assoc., LLC, 2008 WL 2275902, at *7 (citing Kroboth v. Brent, 215 A.D.2d 813, 814 (3d Dep't 1995)); Town of Roxbury, 277 A.D.2d at 867.  However, determining whether a party has made its best efforts "will almost invariably . . . involve a question of fact." Kroboth, 215 A.D.2d at 814 (cited in Robin Bay Assoc., LLC, 2008 WL 2275902, at *7).  See also Shree Shiv Shakti Corp. v. Khalid Props., LLC, 106 A.D.3d 1434, 1437 (3d Dep't 2013) (citations omitted); USAirways Grp., Inc. v. British Airways PLC, 989 F. Supp. 482, 491 (S.D.N.Y. 1997).

162. The covenant of good faith and fair dealing is implied in all contracts. <u>Travellers Int'l, A.G. v. Trans World Airlines, Inc.</u>, 41 F.3d 1570, 1575 (2d Cir. 1994) (citing <u>Van Valkenburgh, Nooger & Neville</u>, 30 N.Y.2d at 45). A good faith state of mind implies that one's actions were taken with proper motivation, but "that a person could have adopted a more prudent course than the course taken does not prevent him from establishing that the course taken was one taken in good faith." <u>Polotti v. Flemming</u>, 277 F.2d 864, 868 (2d Cir. 1960) (cited in <u>Ashokan Water Servs., Inc. v. New Start, LLC</u>, 807 N.Y.S.2d 550, 555–56, 692 (Civ. Ct., N.Y. County 2006)). The duty to act in good faith does not require that the goal be met. <u>See Polotti</u>, 277 F.2d at 868. Good faith imposes on all parties the "implied obligation to exercise good faith not to frustrate the contracts into which they have entered." <u>Grad v. Roberts</u>, 14 N.Y.2d 70, 75 (1964) (quoted in <u>Cross & Cross Properties, Ltd. v. Everett Allied Co.</u>, 886 F.2d 497, 502 (2d Cir. 1989); <u>Lowell v. Twin Disc, Inc.</u>, 527 F.2d 767, 770 (2d Cir.1975)). The duty of good faith prohibits a party from intentionally preventing the performance of another party. <u>See, e.g.</u>, <u>Murphy v. Am. Home Products Corp.</u>, 58 N.Y.2d 293, 311 (1983) (quoting <u>Grad</u>, 14 N.Y.2d at 75). Furthermore, "[t]he boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." <u>Cross & Cross Properties, Ltd.</u>, 886 F.2d at 502 (citations omitted). <u>See also Fishoff v. Coty Inc.</u>, 634 F.3d 647, 653 (2d Cir. 2011) (citations omitted).

163. Harbinger and F&G Life, while consulting with OM, sought the prompt post-closing approval of the Reinsurance Transaction from the MIA. Harbinger and F&G Life, again in consultation with OM, prepared and submitted the Form D. See ¶¶ 42, 44. Harbinger and F&G Life, with OM's knowledge and participation, worked with the MIA to explain the transaction, provide additional information as requested and answer any questions. See ¶¶ 46-52.

164. Harbinger took all reasonable actions requested by the MIA as promptly as was practicable. <u>See</u> ¶¶ 48, 50, 52.

165. While OM requested that Harbinger and F&G Life withdraw the Form D prior to receiving a written denial, OM refused to accommodate Harbinger's reasonable request to clarify the implications of such a withdrawal under the SPA. <u>See</u> ¶ 57–59. Harbinger's request to clarify the time frame for Remedial Efforts if it withdrew the Form D was reasonable. In light of OM's refusal to address such implications, Harbinger was reasonable in refusing OM's request.

166. OM argues that Harbinger failed to comply with a litany of so-called reasonable requests from OM after the MIA denied the Reinsurance Transaction. <u>See</u> OM's Proposed Findings ¶¶ 218–220. What OM calls "requests" are little more than after the fact demands for Harbinger to have achieved an outcome; they are not requests for any specific action. For example, OM claims that Harbinger failed "to have any substantive communications with the MIA Commissioner about the reinsurance transaction or an alternative reinsurance transaction," that it "failed to appease the MIA's concern about the amount of unrealized gains in the asset portfolio expected for

transfer to Front Street during the 150-day Remedial Effort period," and that it "failed to propose any alternative terms to the MIA during the 150-day Remedial Effort period," despite OM's requests.  OM's Proposed Findings ¶ 220(b), (h), (j).  Moreover, OM's use of the word "failures" mischaracterizes Harbinger's conduct.  For example, OM argues that "Harbinger failed to have any communication with Lewis & Ellis during the 150 day Remedial Effort period," that "OM expected the May 11, 2012 meeting would involve good-faith negotiations concerning the May 2 Term Sheet, but Harbinger had decided in advance of the meeting that it would reject OM's proposal without further negotiation," and that "Harbinger did not give any "insight into [its] interests" during the May 11, 2012 meeting, even though OM had traveled from London to New York to negotiate alternative terms."   OM's Proposed Findings ¶ 220(g), (l), (m).  These statements do not accurately represent Harbinger's conduct.  The standard that applies here requires Harbinger to use its reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms.  Harbinger's actions met this standard of conduct.  Harbinger used its reasonable best efforts in cooperating with OM's suggestions in drafting the revised Form D and in responding to the MIA's questions and concerns, with OM's shared desire to schedule meetings with the MIA, and with OM's requests for information from Harbinger and F&G Life about the Reinsurance Transaction  See ¶¶ 43, 48, 66, 77, 80, 84, 109.

167.  Harbinger and F&G Life took no action that would have had the effect of materially delaying, impairing or impeding the receipt of the MIA's approval.  OM argues that Harbinger impeded receipt of the MIA's approval because it knew the MIA would object to the amount of gains allegedly being transferred to Front Street in the Form D.  OM's Proposed Findings ¶¶ 68, 73, 222–223.  This claim is meritless.  Both parties were aware there was a risk a Reinsurance Transaction would not be approved.  See ¶¶ 4–6; Bannigan Cross, Trial Tr. 792:5–793:12; Lipsey Direct, Trial Tr. 863:11–18.  Harbinger worked diligently with the MIA to address any concerns about the transaction and believed that the transaction would be approved.  See ¶¶ 46–52, 55.  Furthermore, OM reviewed and commented on the Form D before it was submitted.  See ¶ 43.

### SPA § 5.21(d) Remedial Efforts

168.  By Memorandum and Order dated May 27, 2014, this Court found that the MIA's denial triggered the "Remedial Efforts" obligation of § 5.21(d) of the SPA. Mem. and Order 7.

169.  The Remedial Efforts clause called for both parties to use reasonable best efforts to cooperate and negotiate in good faith to agree to alternative terms acceptable to the MIA:

> In the event that a Governmental Entity requires that the terms of the Reinsurance Transaction be changed or altered in a manner that materially and adversely affects the economic benefits reasonably expected to be derived by Buyer thereunder, each of Buyer and Seller shall use its

reasonable best efforts and cooperate and negotiate in good faith to agree to alternative terms that are acceptable to such Governmental Entity and provide benefits substantially similar to the benefits provided under the existing terms thereof ("Remedial Efforts"); provided that neither party shall have an obligation to so negotiate in good faith such alternative terms for a period of more than 150 days . . . .

PTX 1.063.

170.    Reasonable best efforts, as stated above, is a best efforts standard, which requires the parties to act in good faith in light of their capabilities towards their contractual obligations.

171.    When read in light of the rest of the provisions of the SPA § 5.21(d), the court finds that the Remedial Efforts obligation to use reasonable best efforts was limited by the language of the Adverse Condition clause, meaning that Harbinger was not required to use its reasonable best efforts to work towards an alternative transaction if that transaction would impose an Adverse Condition on it as defined by the SPA. Therefore, the court finds that in order to satisfy § 5.21(d) Harbinger was required to cooperate and negotiate in good faith with OM, using the best of its abilities and all reasonable means at its disposal, for a period of not less than 150 days, to find an alternate transaction that would satisfy the MIA but that still provided substantially similar benefits, without imposing an Adverse Condition on Harbinger.

172.    The court finds that Harbinger used its reasonable best efforts and cooperated and negotiated in good faith to agree to alternative terms that were acceptable to the MIA and provided benefits substantially similar to the benefits provided under the existing terms.  Upon learning that the transaction would be denied, Harbinger undertook promptly to understand the nature of the MIA's objections.  ¶ 66.  It hired the previous MIA commissioner to assist it in securing a favorable outcome.   ¶ 65.  It reengaged its actuaries to address the MIA's concerns and submitted an additional report to the MIA prepared by its actuaries.   ¶ 73.  It worked with and regularly consulted with OM. ¶¶ 48, 50–52, 58–59, 66, 71, 75, 77, 80, 84.  It contacted the MIA to secure meetings, and met with the MIA twice.   ¶¶ 67, 75–81, 84–85.  It communicated with OM regarding the difficulties in structuring an alternative transaction and sought OM's assistance and input in seeking a resolution. ¶¶ 88–94, 97, 101–103.  Harbinger representatives met with OM representatives about structuring an alternative transaction.   ¶ 102.  Harbinger responded to OM's requests for information to assist OM in developing alternatives.   ¶ 109.  Harbinger spoke with OM to clarify OM's alternative proposal and further reviewed and discussed the terms internally.   ¶¶ 101, 102, 110.

173.    Harbinger continued to cooperate and negotiate in good faith through the 150 day Remedial Efforts period, which ended on June 8, 2012.  Harbinger did not undertake any action to frustrate the goals of the contract or to prevent the MIA's approval of the Form D.  Harbinger acted to the best of its ability to obtain the MIA's approval of the Reinsurance Transaction, and sought to find alternate terms to which both OM and the

MIA could agree.  Harbinger was entitled to substantially similar economic benefits under the terms of the SPA, and reasonably believed that the benefits it was entitled to were outlined in the Term Sheet and the Investment Guidelines.  Thus, Harbinger acted with good faith in attempting to secure an alternate transaction that entitled it to benefits substantially similar to those outlined in the Term Sheet.  See ¶¶ 27–30, 88–89.  Further, Harbinger did not intentionally prevent OM from performing any of its obligations under the SPA § 5.21(d), as Harbinger was consistently ready and willing to discuss alternative terms with OM.  See ¶¶ 66, 71, 80, 84, 90–91, 96, 100–101, 105, 108.

174.   In light of the fact that Harbinger was not required to accept any terms that constituted an Adverse Condition, and that Harbinger was entitled to expect substantially similar economic benefits under the SPA, Harbinger used its reasonable best efforts and cooperated and negotiated in good faith with OM based on its reasonable expectations under the SPA.[13]

175.   Harbinger therefore exercised Remedial Efforts and did so for more than 150 days.

176.   Despite OM's arguments to the contrary, reasonable best efforts here did not require Harbinger to propose any revised terms during the Remedial Efforts period.  See OM's Proposed Findings ¶ 212(a), (b).  Harbinger was only obligated to use its reasonable best efforts to cooperate and negotiate alternative terms that would be acceptable to the MIA and that provided Harbinger with substantially similar economic benefits.

177.   To the extent Harbinger was unable to have any substantive conversations with the MIA Commissioner herself, or the MIA's actuaries at Lewis & Ellis, that was not for lack of effort on Harbinger's part.  See ¶¶ 65–85.  Harbinger made extensive efforts to engage with the Commissioner, her staff, and Lewis & Ellis, as the court found above.

178.   OM argues that Harbinger failed to respond to various MIA requests for information after the March 15th meeting.  See OM's Proposed Findings ¶ 212(g)–(j).  However, OM does not point to evidence that suggests the MIA requested any information from Harbinger after the meeting.  During the meeting, there is evidence that the MIA informed the parties' representatives that certain information might be helpful for the MIA to understand the ceding commission and the alleged amount of unrealized gain in the Reinsurance Transaction, and that certain information might be presented more

---

[13] The parties dispute whether OM judicially admitted that OM's May 2nd proposal constituted an Adverse Condition under the SPA § 5.21(d).  See generally Memorandum of Law Regarding Defendant OM Group (UK) Limited's Judicial Admissions, Jan. 9, 2015, ECF No. 130; Harbinger F&G, LLC's Additional Post-Trial Proposed Findings of Fact and Conclusions of Law, Jan. 9, 2015, ECF No. 131; Defendant OM Group (UK) Limited's Memorandum of Law in Opposition to Harbinger's Assertion Concerning Purported Judicial Admissions by OM, Jan. 9, 2015, ECF No. 132.  In the alternative, Harbinger argued that the court should find that the May 2nd proposal contained an Adverse Condition.  However, the court has found that Harbinger's efforts to agree with OM on alternative terms that provided Harbinger with substantially similar benefits and that were also acceptable to the MIA, satisfied Harbinger's Remedial Efforts obligations under the SPA § 5.21(d).  Whether or not the May 2nd proposal constituted an Adverse Condition is not necessary to the court's determination.  Therefore, the court need not address the judicial admissions argument, nor decide if the SPA § 5.21(d) Adverse Condition language would have applied to the May 2nd proposal, and the pending motions are dismissed as moot.

appropriately.   Devins Direct, Trial Tr. 145:21–146:11, 150:8–151:4; PTX 303.
However, Harbinger believed that its efforts were better spent negotiating a new Term
Sheet with OM.   See ¶¶ 87–88, 93–94, 97.   In light of the facts stated above,
Harbinger's belief and its resulting conduct were reasonable.   Harbinger acted with its
reasonable best efforts to negotiate and agree with OM to alternative terms the MIA
would accept.

179.   OM argues that Harbinger did not engage with OM regarding OM's May 2nd proposal,
and that Harbinger did not provide it with requested financial information. See OM's
Proposed Findings ¶ 214.   OM's arguments are contradicted by the fact that Harbinger
engaged repeatedly with OM regarding the May 2nd proposal and responded to OM's
requests for information.   See ¶¶ 101–110.

180.   Finally, OM argues that Harbinger did not conduct itself in good faith throughout the
parties' efforts to obtain MIA approval for the Reinsurance Transaction.   See OM's
Proposed Findings ¶ 216.   However, the facts demonstrate that Harbinger had no
motive to intentionally sabotage the Reinsurance Transaction, as it believed it would
have received economic benefits beyond the $50 million PP Reduction if the
Reinsurance Transaction had been approved.   See ¶ 55.   Harbinger's repeated efforts
to engage with the MIA and to negotiate with OM belie its good faith attempt to secure
the MIA's approval.   See ¶¶ 65–66, 71, 75, 77, 80, 84, 88–94, 96–97, 100–102, 103,
105, 108–109.

**OM's Counterclaims**

181.   The court finds that OM has failed to meet its burden to show that Harbinger has
breached its obligations under SPA § 5.21.  In its first counterclaim, OM contends that
Harbinger breached its obligations under SPA § 5.21. The court has already found that
Harbinger had met the condition precedents in §§ 5.21(b), (c) and (d) and therefore
OM's counterclaim under SPA § 5.21 must fail.

182.   The court finds that OM has failed to meet its burden to show that Harbinger has
breached its obligations under SPA § 5.3  The SPA § 5.3 required that for reasonable
best efforts:

> Upon the terms and subject to the conditions and other agreements set forth
> in this Agreement, Seller and Buyer (a) shall execute and deliver, or shall
> cause to be executed and delivered, such documents and other papers and
> shall take, or shall cause to be taken, such further actions as may be reasonably
> required to carry out the provisions of the Transaction Agreements and give
> effect to the transactions contemplated by the Transaction Agreements in the
> most reasonably expeditious manner possible, (b) shall refrain from taking
> any actions (other than exercising such party's rights hereunder) that could
> reasonably be expected to impair, delay or impede the Closing and (c) not in
> limitation of any other provision of this Agreement, shall use their respective

> reasonable best efforts to cause all the conditions to the obligations of the other party to consummate the transactions contemplated by this Agreement to be met as soon as reasonably practicable.

PTX 1.049.

183.   OM argues that as Harbinger has failed to satisfy SPA § 5.21(b), (c) and (d) that OM is entitled to recover for breach of SPA § 5.3.  The SPA § 5.21(b), (c) and (d) required Harbinger to promptly prepare and file the definitive documentation with the MIA, as well as all documentation that "may become reasonably necessary," and to use its reasonable best efforts to obtain the MIA's approval of the Reinsurance Transaction. The court has already found that Harbinger has fulfilled its obligations under the SPA. The SPA § 5.3 also required Harbinger to undertake actions that are "reasonably required to carry out the provisions of the Transaction Agreements and give effect to the transactions contemplated by the Transaction Agreements in the most reasonably expeditious manner possible," and to "use their respective reasonable best efforts to cause all the conditions to the obligations of the other party . . . to be met as soon as reasonably practicable."  PTX 1.049.  The court finds that Harbinger acted in a reasonably expeditious manner in satisfying its obligations regarding the Reinsurance Transaction and used it reasonable best efforts to satisfy its conditions precedent as soon as reasonably practicable.  Therefore, OM's counterclaim under SPA § 5.3 must fail.

184.   The court finds that OM has failed to meet its burden to show that Harbinger has breached its obligations under SPA § 12.7.  The SPA § 12.7 provides "[i]n the event of any dispute arising under this Agreement, prior to the commencement of litigation, a senior officer of Buyer and a senior officer of Seller shall attempt in good faith to resolve the dispute consistent with the terms of this Agreement.  If they are unable to resolve the dispute in this manner within a reasonable period of time, the parties may pursue judicial remedies with respect to such dispute."  PTX 1.091.  As a representative of Harbinger, Omar Asali, spoke with a representative of OM, Phillip Broadley, prior to Harbinger commencing litigation, ¶ 112, the court finds that OM's counterclaim under SPA § 12.7 must fail.

## CARVM

185.   By Memorandum and Order dated May 27, 2014, the Court found that § 5.14(c) required Harbinger to make payments to OM equaling 250 basis points calculated against the outstanding amount of the letter of credit maintained by OM, separate from F&G Life's payment obligations to Old Mutual Reassurance (Ireland) Ltd., an OM subsidiary. See Mem. and Order 18.

186.   The SPA § 5.14(c) stated:

> Seller shall support or cause an Affiliate of Seller to support ceded annuity reserves through existing or replacement letters of credit or other financing

sponsored by Seller or such Affiliate (the "CARVM Facility") that enable OMFLIC [which became F&G Life] to take full credit on its statutory financial statements (assuming OMFLIC's statutory reserves are determined in accordance with the same methodologies that were used by OMFLIC immediately prior to the Closing in determining statutory reserves, consistently applied) for the annuity portion of the Business reinsured by OM Re from OMFLIC under the 2008 CARVM Treaty (the "CARVM Business") until the earliest to occur of: (i) replacement of the CARVM Facility by a facility or facilities that enable OMFLIC to take full credit on its statutory financial statements for all CARVM Business; (ii) December 31, 2015; and (iii) the occurrence of a Non-Qualifying Change of Control.  Buyer shall pay to Seller by Wire Transfer, quarterly in arrears on the last Business Day of each calendar quarter until the CARVM Facility is terminated or all obligations of Seller thereunder have been fully satisfied, a facility fee equal to 250 basis points, calculated on a per annum basis, multiplied by the outstanding amount of letters of credit (and/or other lender-provided security) maintained under the terms of the CARVM Facility.

PTX 1.059.

187.     The SPA defined "Business Day" as "any day, other than a Saturday or a Sunday, on which commercial banks in New York, New York, and London, United Kingdom, are open for normal banking business."  PTX 1.008.

188.     For the period from April 7, 2011 through October 8, 2012 OM was entitled to $10,117,708 in facility fees, of which $4,199,971 has been paid.  Therefore, OM is entitled to damages in the amount of $5,917,737.

## Pre and Post-Judgment Interest

189.     OM also argues it is entitled to prejudgment interest, calculated as simple interest, on the $5,917,737 in damages still outstanding, pursuant to N.Y. C.P.L.R. §§ 5001, 5004.

190.     Where prejudgment interest is sought on a claim brought pursuant to state law in a federal diversity action, the award is a substantive issue that is governed by state law.  Adrian v. Town of Yorktown, 620 F.3d 104, 107 (2d Cir. 2010) (citations omitted); Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999) (citations omitted) (explaining that prejudgment interest is a matter of substantive law); Thomas v. iStar Fin., Inc., 629 F.3d 276, 280 (2d Cir. 2010) (citations omitted).

191.     Here, the N.Y. C.P.L.R. §§ 5001 and 5004 govern the prejudgment interest on both Harbinger's and OM's claims.  Under § 5001, prejudgment interest on damages in a case for breach of contract is mandatory, and interest is to be computed from "the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages

were incurred at various times, interest shall be computed upon each item from the date it was incurred . . . ."  N.Y. C.P.L.R. § 5001(a), (b).  Only simple interest is allowed.  See, e.g., Spodek v. Park Prop. Dev. Associates, 96 N.Y.2d 577, 581 (2001).  The prejudgment rate of interest is 9% per annum under N.Y. C.P.L.R. § 5004.

192.   Pursuant to Spodek and the SPA § 5.14(c), OM is entitled to prejudgment interest on its CARVM claim damages, with interest separately accruing from the date of each individual breach when payment was due, which was "quarterly in arrears on the last Business Day of each calendar quarter," as the term Business Day is defined by the SPA in § 1.1.  See ¶¶ 117–123.

193.   Harbinger is also entitled to prejudgment interest on the damages incurred from OM's breach of contract and failure to pay the PP Reduction.  Harbinger's cause of action accrued as early as July 6, 2012, when it sent OM the final written demand for payment of the $50 million PP Reduction.  PTX 312.  Therefore, Harbinger's prejudgment interest shall accrue from July 6, 2012.

194.   The amount of prejudgment interest shall be calculated by the Clerk of the Court in accordance with N.Y. C.P.L.R. §§ 5001 and 5004.

195.   The parties are entitled to post-judgment interest as provided for by law in 28 U.S.C. § 1961 (2012).  See, e.g., Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 101 (2d Cir. 2004) (citations omitted); Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008) (citations omitted) (quoting 28 U.S.C. § 1961); United States v. Michael Schiavone & Sons, Inc., 450 F.2d 875, 876–77 (1st Cir. 1971) (citations omitted).  Post-judgment interest in an action brought in federal court under diversity jurisdiction is awarded pursuant to 28 U.S.C. § 1961.  FCS Advisors, Inc. v. Fair Fin. Co., 605 F.3d 144, 147 (2d Cir. 2010) (citations omitted); Cappiello v. ICD Publications, Inc., 720 F.3d 109, 112 (2d Cir. 2013) (holding that "under § 1961, federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions"), cert. denied, 134 S. Ct. 683, 187 L. Ed. 2d 550 (2013).

196.   The amount of post-judgment interest shall be calculated by the Clerk of the Court in accordance with 28 U.S.C. § 1961.

**Attorney's Fees**

197.   Both Harbinger and OM seek attorneys' fees pursuant to the SPA §§ 9.1(a)(ii), and 9.1(b) respectively.  In a federal diversity action, the right to attorneys' fees arises out of the governing state law.  Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 873 (2d Cir. 1994) (quoting Riordan v. Nationwide Mutual Fire Ins. Co., 977 F.2d 47, 53 (2d Cir.1992)).

198.   New York law generally provides that "attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule."  Oscar Gruss & Son, Inc. v.

Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (citing Bourne Co. v. MPL Commc'ns, Inc., 751 F. Supp. 55, 57 (S.D.N.Y. 1990); Matter of A.G. Ship Maintenance Corp. v. Lezak, 69 N.Y.2d 1, 5 (1986); Mighty Midgets v. Centennial Ins. Co., 47 N.Y.2d 12, 21–22 (1979)).  New York courts will enforce a contractual provision for attorneys' fees when "the intention to do so is unmistakably clear from the language of the contract."  Oscar Gruss & Son, Inc., 337 F.3d at 199 (internal quotations omitted) (quoting Hooper Assoc. v. AGS Computers, 74 N.Y.2d 487, 492 (1989)).  The SPA § 9.1(a)(ii) provides that

> [s]ubject to the expiration of the representations and warranties of Seller as provided in Article VIII and the limitations set forth in this Article IX, Seller agrees to indemnify and hold harmless each of Buyer, its Affiliates (including, after the Closing, the Transferred Companies), and their respective officers, directors, employees, partners, managers, agents, advisers and representatives (collectively, the "Buyer Indemnitees") from and against all Losses to the extent arising from or related to: . . . (ii) any breach of any of the covenants and agreements of Seller contained in this Agreement . . . .

PTX 1.074–075.

199.  Section 9.1(b), substantially similar, provides that

> [s]ubject to the expiration of the representations and warranties of Buyer as provided in Article VIII and the limitations set forth in this Article IX, Buyer agrees to indemnify and hold harmless each of Seller, its Affiliates, and their respective officers, directors, employees, agents, advisers and representatives (collectively, the "Seller Indemnitees") from and against all Losses to the extent arising from or related to (ii) any breach of any of the covenants and agreements of Buyer contained in this Agreement that survive the Closing . . . .

PTX 1.0076.

200.  The SPA § 1.1 defines Losses to include "any and all liabilities, claims, expenses (including reasonable attorneys' fees and expenses) and damages . . . ."  PTX 1.014–015.

201.  The court has found that OM breached the terms of the agreement as stated in the SPA § 5.21(f), and on summary judgment that Harbinger breached the SPA § 5.14(c).  Therefore both parties have valid claims for attorneys' fees under the SPA § 9.1.  The parties are ordered to confer and attempt to come to an agreement on the reasonable amount of attorneys' fees owed.  If the parties cannot come to an agreement within 21 days of judgment being entered, the parties may make a motion for further adversarial submissions pursuant to FRCP 54(d)(2).

## **<u>CONCLUSION</u>**

The court finds that Harbinger has met its burden to prove OM breached the terms of the SPA § 5.21(f).  OM has not proved its counterclaim for breach of contract.  The court finds that OM has proven its damages under the SPA § 5.14(c).  The parties are ordered to confer and agree to a proposed judgment consistent with this opinion and to submit the agreed upon proposed judgment to the Clerk of the Court.


SO ORDERED.




    /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: March 18, 2015
         New York, New York